1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL STANNARD, et al., | Case No. 1:22-cv-01250-JLT-EPG |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND |
| v. | |
| STATE CENTER COMMUNITY COLLEGE DISTRICT, et al., | (Docs. 4, 11) |
| Defendants. | |

Michael Stannard, Ph.D. and David Richardson are two professors who are employed at the State Center Community College District.  They bring this free speech discrimination action against SCCCD, SCCCD's Chancellor, Carole Goldsmith, Ed.D, and SCCCD Vice Chancellor Juliana D. Mosier, challenging the constitutionality of the college's anti-discrimination and harassment policies.  Pending is Defendants' Motion to Dismiss.  (Docs. 4, 11.)  For the reasons set forth below, the Court **GRANTS** the motion with leave to amend.

## I.    BACKGROUND

### A.  Dr. Michael Stannard

The present dispute arises out of two comments Stannard made while working at Clovis Community College.  The first statement occurred during a race-sensitivity training session that took place the day following the January 6, 2021, riots at the United States Capitol Building.  (Doc. 1 at ¶ 6.)  In that meeting, Stannard commented "that the riot at the Capitol was 'bad' and

1

that the burning of minority-owned businesses during last summer's riots was [also] 'bad.'"  (*Id.*)

Then, in a "Justice and Healing Circle," Stannard reportedly commented that "children do better

if they are raised with both biological parents," as opposed to single-parent households.  (*Id.*)[1]

After making this comment, the organizer of the meeting informed him that his remarks were

"offensive" and "[a]nother participant threatened to leave the group if the group did not move on

from the topic."  (*Id.* at ¶ 9.)

On March 9, 2021, SCCCD Human Resources Department Investigator, Erica Reyes, met

with Stannard as part of an investigation into these two comments.  (*Id.* at ¶¶ 5–6.)  This

investigation included an hour-long interview, during which Reyes questioned Stannard about his

comments.  (*Id.* at ¶ 6.)  Reyes asked Stannard if "he would have made these comments if there

had been no African Americans present," "whether he intended to hurt the feelings of other

attendees," and "if he was aware that he was invalidating the opinions of others and . . . that his

comments had caused someone to" cry.  (*Id.* at ¶ 7.)  "Stannard affirmed that his intent was to

speak the truth in a public environment where these issues were raised," and that the feelings of

others "did not justify his censoring himself."  (*Id.* at ¶ 8.)  After conclusion of the interview,

Stannard "was kept in suspense, [and] did not know whether he would keep his job," whether

"further action would be taken," whether "there [would] be any further specious claims against

him," and alleges that he was "force[d] to censor and suppress his speech in order to avoid a

further re-occurrence [sic] of another 'investigation.'"  (*Id.* at ¶ 15.)

On May 10, 2021, President of Clovis Community College, Lori Bennett, Ed.D,

concluded that his comments "did not rise to the level of discrimination in violation of District

policy," yet his comments offended some employees.[2]  (*Id.* at ¶ 16.)  Bennett therefore

---

[1] Stannard denies making this comment and represents that he stated that "children have a right to be raised by their
biological parents, and that there was a philosophical argument for the biological two-parent family based on the
'problem of origins,' i.e., children who do not know their parents question their own origins." (Doc. 1 at ¶ 6.)

[2] Th policies of SCCCD at issue are Administrative Regulations 3430 and 3435.  Plaintiffs have not provided the text
of AR 3430 in their Complaint. AR 3435 defines "discrimination" as:

> [T]he unfair or unjust treatment of an individual based on certain protected characteristics that
> adversely affects their employment or academic experience.  An adverse action for discrimination
> purposes is any action taken or pattern of conduct that, taken as a whole, materially and adversely
> affected the terms, conditions, privileges, benefits of or the ability to fully participate in activities
> or events associated with an individual's employment or academic environment.  An adverse

"encourage[d]" Stannard "'and all employees[] to demonstrate empathy toward others and to reflect on how statements we make may impact others to ensure that we are creating an inclusive working and learning environment for all employees and students.'" (*Id.*)

Bennett then informed Stannard of SCCCD's anti-harassment and anti-discrimination policies, stating, in full: "State Center Community College District does not condone harassment, discrimination, unprofessional conduct, or other misconduct in the workplace or educational environment and takes such complaints seriously.  The District has a strong policy prohibiting discrimination, harassment, and retaliation and a thorough investigation has been conducted of this complaint." (*Id.*)

Stannard now claims that "[t]his matter should never have gotten this far," that the "warnings, admonitions and instructions were nebulous and threatening to [him] in that they implied that he had not demonstrated empathy," did not explain what "demonstrated empathy" meant, and "further implied that he should reflect on how his statements in the context of the investigation hurt others and undermined an 'inclusive working and learning environment,'" concluding with a "nebulous threat about 'unprofessional conduct.'" (*Id.* at ¶ 17.)

B.  David Richardson

Richardson is a self-identified "gay and conservative" history instructor at Madera Community College.  (Doc. 1 at ¶ 20.)  The present dispute stems from an autumn 2021 "College Hour" online meeting at Madera, which is a faculty-wide, one-hour long forum for SCCCD to

---

action includes conduct that is reasonably likely to impair a reasonable individual's work or academic performance or prospects for advancement or promotion.  However, minor or trivial actions or conduct that are not reasonably likely to do more than anger or upset an individual cannot constitute an adverse action.

(Doc. 1 at ¶ 64.) AR 3435 also defines "harassment" as:

[C]onduct based on certain protected characteristics that creates a hostile, offensive, oppressive, or intimidating work or educational environment and deprives a person of their statutory right to work or learn in an environment free from harassment.  In the workplace, harassment also includes conduct based on certain protected classes that sufficiently offends, humiliates, distresses, or intrudes upon a person, so as to disrupt the person's emotional tranquility in the workplace, affect their ability to perform the job as usual, or otherwise interfere with and undermine their personal sense of well-being. (Refer to AR 3430 – Prohibition of Harassment for specific examples of harassment).

(*Id.* at ¶ 66.)

instruct faculty on policies and other subjects.  (*Id.* at ¶ 21.)

*i.*     *College Hour Incident*

On October 15, 2021, SCCCD required its instructors to attend a College Hour meeting on the subject of personal gender pronoun etiquette.  (Doc. 1 at ¶ 22.)  Jamie MacArthur, Ph.D., conducted the presentation, and announced that they preferred "they/them" gender nonbinary pronouns.  (*Id.*)[3]  During this online videoconference meeting, the speaker "could be seen in a large window on the computer screen while the other attendees were in small thumbnails with either the live feed of them watching," or some other image, if preferred.  (*Id.* at ¶ 23.)  Each thumbnail presented the attendee's name and a line for the attendee to insert the preferred gender pronouns.  (*Id.*)

Richardson represents that he "philosophically and intellectually disputes that any person can change empirical, ontological, or objective reality by a process of" identifying by a different gender pronoun or identity than one that corresponds with their biological sex.  (Doc. 1 at ¶ 25.)  For example, Richardson believes that "since females and women are not born with male chromosomes, genitalia, and male secondary sex characteristics, as a matter of philosophical and intellectual commitment to truth, he disputes that a male can change sex by a matter of self-identification."  (*Id.*)  During the meeting, Richardson "reasoned that it was not intellectually equitable to allow only certain people to pick certain 'Preferred Gender Pronouns,'" and therefore "filled out his 'Preferred Gender Pronouns' as 'Do, Re, Mi.'"  (*Id.* at ¶ 27.)  Richardson attests that "[i]n doing this, Richardson was not joking, and he was not mocking anyone"—he states he "was making the serious point that" gender pronouns are "based on an irrational perception of reality and that if they were to be mandated, displayed, or required, then they would frustrate communication for ideological reasons."  (*Id.*)

*ii.*     *Email Exchanges*

No one commented on Richardson's pronouns during the meeting, and in his opinion, "no one noticed[.]" (*Id.* at ¶ 29.)  However, on October 18, 2021, MacArthur sent an email to

---

[3] Plaintiff states that MacArthur is a biological-born "male identifying as a female, i.e., a transexual or 'trans-female' and that MacArthur prefers gender nonbinary pronouns.

4

Richardson, stating, in relevant part:

> The reason that I am contacting you is because I noticed in the College Hour on Friday that you had what appeared to be a joke shared where someone might normally share their pronouns on zoom (do-re-mi).  I wanted to let you know that doing this is considered to be extremely offensive by people in the trans community.  It's possible that you didn't know this, so I wanted to take a moment to share some resources related to this with you so that you have a better understanding of how people in the trans community would like to be treated[.]  Here is an article: . . .
>
> . . .
>
> I didn't mention anything about this at the time of the meeting, as I wanted to stay focused on the dialogue at hand.  Although it was painful for me to not say anything in that moment, I chose to put the good of the community ahead of my own well being.  I am choosing to share this information with you directly now instead of with someone else out of respect for the ideals embodied by our union of solidarity within our community of scholars.  I hope this message is received with the spirit of good will that I intend and that you would choose not to use the zoom platform as a way of making a joke that is harmful to trans people.

(*Id.* at ¶ 30.)

Richardson felt this "communication was threatening to [him]" and expresses that he feared he would be "cancelled" as a dissenting voice.  (*Id.* at ¶ 32.)  "Such 'cancellation' could involve termination, discipline, mobbing, or the loss of privileges and professional standing." (*Id.*)  Richardson believes that MacArthur used their position "as a transexual victim in order to coerce Richardson and others to acede to [their] ideological positions and that [MacArthur] intended to force Richardson to cease to exercise his right of free expression and be forced to espouse [MacArthur's] speech."  (*Id.*).  Richardson responded to MacArthur's email, referring to himself as "Do" in place of "I," "mi" in place of "my," and "they" in place of "you" and "your":

> To be blunt, what makes they think it was a joke? Am Do not allowed to identify mi own pronouns as an LGBTQIA2+ individual? Have Do done or said anything to anyone to make they think it was a 'joke'?  Do think they are making assumptions about mi own thought processes and rationale that is offensive in and of itself.  Do don't find anything about the entire debate 'funny'.  If they are uncomfortable with mi choice of pronouns, Do might suggest that the issues is [sic] not re although Do would never presume to know what is going on in their mind.  Do also find [sic] it interesting that they would presume Do is any less educated on the subject of the transgender community than they is [sic].  Do don't question their choice of personal pronouns.  Personal pronouns are personal.

(*Id.* at ¶ 33.)

On November 1, 2021, SCCCD's Employee Relations Coordinator, James Young, contacted Richardson regarding "concerns" over his use of pronouns during the College Hour meeting.  (*Id.* at ¶ 34.)  Young requested a time to speak with Richardson regarding this matter, to which Richardson replied:

> If Dr. MacArthur and yourself would like to make an issue of my personal pronouns which as I have told Dr. MacArthur are personal, then we are going to be opening a can of worms that I don't believe the District would want to get involved in.  Picking and choosing which personal pronouns people can and cannot use would amount to harassment in the workplace and the creation of a toxic work environment.  This week is not possible as I have three faculty evaluations that need to be completed.  That being said, I would be happy to meet with you in the future as long as any meeting includes a union representative and everyone understands that any attempt to coerce or in any other way change my personal pronouns will be seen on my part as hostility towards an open and proud LGBTQIA2S+ individual.  Thank you.

(*Id.* at ¶ 35.)

Richardson "copied his supervisors and some faculty members" to this email response "because he understood [MacArthur] was moving in the direction of 'canceling' him."  (*Id.* at ¶ 36.)  On November 1, 2021, MacArthur responded to this email, admitting that he had involved Human Resources and their union, and expressed that he wanted "to discuss the harm that has been caused and how to mediate a solution to that harm" through a "facilitated discussion" to create a safe workplace setting for everyone.  (*Id.* at ¶ 37.)  Richardson alleges this meant that MacArthur "wanted Human Resources to compel Richardson to adhere to [MacArthur's] speech standards," and therefore, Richardson requested Human Resources ("HR") to investigate MacArthur's harassment of him, however, HR failed to do so.  (*Id.* at ¶¶ 38–39.)

### iii.    Investigation and Reprimand

SCCCD initiated an investigation into Richardson, which "lasted for approximately six months."  (*Id.* at ¶ 39.)  The investigation's "Allegations and Findings" concluded that Richardson (1) "intentionally misused pronouns in a mocking manner for Jamie MacArthur 8 times in an email exchange on October 18, 2021"; (2) intentionally used second- and third-person pronouns "in a mocking manner" in that email; (3) retaliated against MacArthur for raising concerns related to his use of pronouns in a Zoom meeting, and for seeking an informal resolution through HR; and (4) sent emails to Madera Community College staff and faculty "as retaliation

for Dr. MacArthur attempting to seek an informal resolution through [HR], as a way to intimidate Dr. MacArthur into dropping their complaint." (*Id.*)  Richardson contests these findings.  (*Id.* at ¶¶ 40–41.)

On May 17, 2022, Vice President of Learning and Student Services, Dr. Marie Harris, called Richardson to a meeting and presented him a "Letter of Reprimand." (*Id.* at ¶ 42.)  The Letter instructed Richardson "to immediately stop using pronouns in a mocking manner in the workplace," to "exhibit basic standards of conduct and act professionally when [he] interact[s] with employees and students of this District, including in written exchanges via email," and warned that further "failure of this type or similar unprofessional behavior may result in disciplinary action, and . . . may lead to termination." (*Id.* at ¶ 45.)  The Letter admonished Richardson to adhere to all provisions of the Board Policies and Administrative Procedures of this District and the professors' collective bargaining agreement.  (*Id.* at ¶ 46.)  Finally, SCCCD required Richardson to complete six hours of Diversity, Equity, and Inclusion training by September 9, 2022, submit "proof of completion" to Harris via email, and then "provide a written response to [Harris] via email" responding to several reflection questions.  (*Id.*)  Richardson believes that this "discipline constituted punishment" and that "he was assigned to receive indoctrination on racism and making his environment . . . one that 'that does not center on homophobia.'" (*Id.* at ¶ 47.)

C.   Procedural History

Plaintiffs filed this instant action in Fresno Superior Court, which Defendants removed to federal court thereafter.  (Doc. 1.)  Defendants filed their pending Motion to Dismiss (Doc. 4) for failure to state a claim and for failing to establish standing.[4]  Defendants partially amended their motion, abandoning their argument that Plaintiffs failed to exhaust their administrative remedies.  (Doc. 11.)  The matter is fully briefed and ripe for review.  (Pls.' Opp'n, Doc. 14; Defs.' Reply, Doc. 19.)  The Court now turns to the merits of the motion.

---

[4] Defendants do not explicitly invoke Federal Rule of Civil Procedure 12(b)(1) in moving to dismiss the Complaint for lack of Article III standing. This argument attacks the Court's subject-matter jurisdiction, which implicates Rule 12(b)(1). *See infra*.

1    ## II.    LEGAL STANDARDS

2    A.  Rule 12(b)(1)

3    "Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized

4    by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v.*

5    *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *Exxon Mobil Corp. v. Allapattah*

6    *Servs., Inc.*, 545 U.S. 546, 552 (2005).  As such, "[i]t is to be presumed that a cause lies outside

7    this limited jurisdiction. . . and the burden of establishing the contrary rests upon the party

8    asserting jurisdiction."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *Advanced*

9    *Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1256 (9th Cir. 2022) (same).

10    Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may challenge a

11    claim for relief for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  It is

12    well-established that Article III "[s]tanding is a constitutional requirement for the exercise of

13    subject matter jurisdiction over disputes in federal court."  *Tailford v. Experian Info. Sols., Inc.*,

14    26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)).  Thus,

15    even where the defendants fail to raise or challenge a claim or Complaint for lack of standing,

16    "federal courts have a duty to raise, sua sponte, questions of standing before addressing the

17    merits" of any claim.  *Iten v. Los Angeles*, 81 F.4th 979, 984 (9th Cir. 2023) (citing *Steel Co. v.*

18    *Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th

19    1053, 1058 (9th Cir. 2023) ("[A] jurisdictional issue such as Article III standing may be raised

20    *sua sponte* by the court at any time.") (citation omitted); *see also* Fed. R. Civ. P. 12(h)(3)

21    (requiring that "the court must dismiss the action" if it "determines at any time that it lacks

22    subject-matter jurisdiction.").

23    Article III of the Constitution limits the Court's authority to resolving "Cases" or

24    "Controversies."  U.S. CONST., art. III, § 2.  "The doctrine of standing, among others, implements

25    this limit on [the Court's] authority."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023)

26    (internal quotation marks and citation omitted).  The Supreme Court "has established that the

27    irreducible constitutional minimum of standing contains three elements that a plaintiff must plead

28    and—ultimately—prove."  *Id.* (internal quotation marks and citation omitted).  "First, the plaintiff

must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted). "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

"'The party invoking federal jurisdiction bears the burden of establishing' the [three] elements of standing, and 'each element must be supported in the same way as any other manner on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (parenthetical in original) (citations omitted).

B.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and

9

common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the nonmoving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Boquist*, 32 F.4th at 773–74 (internal citation and quotation marks omitted) (cleaned up).  However, "[c]onclusory allegations and unreasonable inferences do not provide [] a basis" for determining a plaintiff has plausibly stated a claim for relief.  *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).

## III.   DISCUSSION

Plaintiffs' first and second causes of action allege that Mosier and Goldsmith, acting in their official capacities, violated Plaintiffs' First Amendment right to free speech by enforcing SCCCD's anti-harassment and anti-discrimination policies, AR 3430, prohibiting harassment, and AR 3435, prohibiting discrimination, harassment, retaliation, and sexual misconduct.  (Doc. 1 at 33–40; *id.* at ¶ 63.)  Plaintiffs allege that both policies are unconstitutionally vague and overbroad, amount to impermissible content-based and viewpoint discrimination, and have the effect of chilling both Plaintiffs' speech through self-censorship.  (*Id.*; *see also id.* at ¶¶ 58, 63–78.)[5]  Plaintiffs bring these first two causes of action "pursuant to 42 [U.S.C.] § 1983 for prospective relief, injunctive relief and declaratory relief."  (*Id.* at ¶ 94.)  Richardson alone brings the third through eighth causes of action against SCCCD alone, alleging various claims of retaliation, discrimination, and harassment pursuant to California state law.  (*Id.* at 40–49.)

Defendants move to dismiss Plaintiffs' Complaint, arguing, in part, that Defendants are immune from § 1983 claims under the Eleventh Amendment, and second, that Plaintiffs have failed to establish Article III standing to request declaratory and injunctive relief on their constitutional claims.  (*See* Doc. 4-1 at 23–25, 26–27.)  The Court first resolves Defendants' threshold arguments pertaining to Eleventh Amendment immunity and Article III standing, as

---

[5] The Court refers to the pagination of all documents by their CM/ECF page numbers, rather than the page number at the bottom of each document.

1   both implicate the Court's jurisdiction to entertain this case.  *Sinochem Int'l Co. v. Malay. Int'l*

2   *Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the

3   merits of a case without first determining that it has jurisdiction over the category of claim in suit

4   (subject-matter jurisdiction) and the parties (personal jurisdiction).") (citation omitted); *In re*

5   *Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999) ("Eleventh Amendment sovereign immunity limits

6   the jurisdiction of the federal courts and can be raised by a party at any time during judicial

7   proceedings or by the court sua sponte.") (citations omitted).

8         A.    <u>Redundant Defendants</u>

9         Toward the end of their Eleventh Amendment discussion, Defendants move to dismiss

10  Mosier and Goldsmith as redundant defendants, to the extent they are sued "in their official

11  capacities for compensatory [ ] damages[.]"  (Doc. 4-1 at 25.)

12        When a plaintiff sues a state official for monetary damages in her official capacity, it "is

13  not a suit against the official but rather is a suit against the official's office," and "[a]s such, it is

14  no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 591 U.S. 58,

15  71 (1989) (collecting cases); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("[A] plaintiff

16  seeking to recover on a damages judgment in an official-capacity suit must look to the

17  government entity itself.") (footnote omitted).  In these situations, the Court has discretion to

18  dismiss the state officer as "a redundant defendant."  *Ctr. for Bio-Ethical Reform, Inc. v. L.A.*

19  *Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).  Alternatively, a state official sued in their

20  official capacity for injunctive relief is considered a "person" under § 1983 and "official-capacity

21  actions for prospective relief are not treated as actions against the State."  *Will*, 591 U.S. at 71

22  n.10 (internal quotation marks and citations omitted); *see also Cornel v. Hawaii*, 37 F.4th 527,

23  531 (9th Cir. 2022) ("[S]tate officials are 'persons' under §1983 when sued for prospective

24  injunctive relief.") (citation omitted).

25        As Plaintiffs bring their first two causes of action against Mosier and Goldsmith in their

26  official capacities, requesting only "prospective relief, injunctive relief and declaratory relief,"

27  (Doc. 1 at ¶¶ 94, 101), and not monetary damages, Mosier and Goldsmith are not redundant

28  defendants.  *Will*, 591 U.S. at 71 n.10.  Plaintiffs' third through eighth causes of action are against

1  SCCCD alone.  (Doc. 1 at 40–49.)  The Court denies Defendants' motion on this ground.

2       B.    <u>Eleventh Amendment Immunity</u>

3       In their motion, Defendants invoke the Eleventh Amendment to argue that Defendants are

4  entitled to immunity for § 1983 claims.  (Doc. 4-1 at 23–25.)  Plaintiffs respond that Defendants

5  waived this Eleventh Amendment immunity defense by removing the case to federal court.  (Doc.

6  14 at 25.)  In Reply, Defendants "agree that the Eleventh Amendment argument is inapplicable."

7  (Doc. 17 at 11.)  As Defendants have expressly withdrawn their immunity defense in Reply, the

8  Court denies Defendants' motion on this ground as well.

9                  *i.  Ex parte Young*

10       Notwithstanding Defendants' withdrawn arguments pertaining to SCCCD, Plaintiffs agree

11  that the *Ex parte Young* doctrine controls the scope of their constitutional claims against Mosier

12  and Goldsmith.  (Opp'n, Doc. 14 at 25 (citing *Ex parte Young* 209 U.S. 123 (1908)); *Cerrato v.*

13  *S.F. Cmty. Coll. Dist.*, 26 F.3d 968 (9th Cir. 1994) (in suit against community college district, its

14  chancellor, and six board members: "a California community college school district [is] a state

15  entity that possesse[s] Eleventh Amendment immunity from section 1983 claims . . . We have

16  jurisdiction, however, to hear Cerrato's section 1983 claims against the other defendants—in their

17  official capacities—for prospective injunctive relief.") (citations omitted); *see also R.W. v.*

18  *Columbia Basin Coll.*, 77 F.4th 1214, 1217 (9th Cir. 2023) ("[T]he district court correctly applied

19  the *Ex parte Young* doctrine allowing R.W.'s suit to proceed against the [Columbia Basin

20  College] officials . . .").[6]

21       "It is well established that the Eleventh Amendment does not bar a federal court from

22  granting prospective injunctive relief against an officer of the state who acts outside the bounds of

23  [their] authority."  *Cerrato*, 26 F.3d at 973.  Accordingly, the Court may entertain a "section 1983

24  claim to the extent that [the plaintiff] asks for prospective injunctive relief from the other

25   

26  [6] Indeed, the *Ex parte Young* doctrine, which permits prospective lawsuits against state officials, is a separate inquiry altogether from regular Eleventh Amendment immunity protecting the State.  *See Idaho v. Coeur d'Alene Tribe of*

27  *Idaho*, 521 U.S. 261, 276–77 (1997) ("Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most

28  cases, is not a bar.") (citation omitted).  The Court may analyze whether the *Ex parte Young* exception applies, therefore, notwithstanding SCCCD's explicit waiver of immunity.  *Id.*

defendants in their official capacities[.]" *Id.*; *see also Va. Off. for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (internal quotation marks and citation omitted); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 955 (9th Cir. 2023) ("*Ex Parte Young* allows suits seeking prospective relief against a state official who has a fairly direct connection to an ongoing violation of federal law.") (internal quotation marks and citations omitted).  The Court may consider "defendants' past conduct as it relates to ongoing or future violations" in making this determination. *Comm. to Save Moklumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 310 (9th Cir. 1993); *see also Lund v. Cowan*, 5 F.4th 964, 970 (9th Cir. 2021).

Both Plaintiffs seek prospective, injunctive relief.  (Doc. 1 at ¶¶ 94, 101.)  However, Plaintiffs' requests for prospective relief are largely based on past conduct that is no longer "ongoing" nor adequately alleged will recur.  Take, for example, the following excerpted allegations directly from Plaintiffs' first cause of action:

> SCCCD's **policies also violated the rights of Plaintiffs** and other instructors under the First and Fourteenth Amendments by burdening their speech on the basis of the viewpoints expressed with lengthy investigations during which Plaintiffs' ability to freely express themselves **was chilled by the prospect** that if they said anything inconsistent with the viewpoints allowed by SCCCD or leftwing instructors[,] such statements would be used against them.  Both of plaintiffs' academic freedom and right of free speech **was also burdened on the basis of viewpoint discrimination in that in both cases, in that they received either a warning or a discipline based on speech** that fell within Plaintiffs' First Amendment/Academic Freedom rights, while those who made equivalent statements with viewpoints that were supported by SCCCD were not warned or disciplined.  Hence, Richardson **was subjected to discipline** . . .
>
> . . .
>
> Stannard **was also warned that if he 'retaliated' against the unknown complaints, he would be subject to discipline** . . .
>
> . . .
>
> A reasonable person would believe – and Stannard did believe – that he was being singled out **because of the contents of his statements** for disparate treatment designed to warn, threaten and chill his speech with threats that some future statement made in an academic discussion to some other person making a statement might 'rise to the level of a discrimination in violation of District

1    policy' and result in the threatened sanctions being imposed on him.

2    . . .

3    In addition, **the discipline imposed on Richardson violated the First and Fourteenth Amendments to the United States Constitution** in that they bore no

4    reasonable relationship to any constitutionally permitted objective or condition of the employment relationship . . .

5

6    (Doc. 1 at ¶¶ 89–93 (boldening and underlining added).)

7    Plaintiffs' second cause of action similarly only implicates past harm.  (*See id.* at ¶ 100

8    ("[T]he application of SCCCD's policies, including AR 3435, *has been applied in the case of*

9    *Plaintiffs* to speech that is constitutionally protected.") (emphasis added).)  In other words,

10   Plaintiffs' first two causes of action—against only Mosier and Goldsmith in their official

11   capacities—complain of past injuries: Stannard's investigation and Richardson's discipline.

12   "Admittedly, the line between retrospective relief and prospective relief can blur." *Lund*, 5 F.4th

13   at 970 (citation omitted). "But in general, relief that in essence serves to compensate a party

14   injured in the past by an action of a state official in his official capacity that was illegal under

15   federal law is barred even when the state official is the named defendant, while relief that serves

16   directly to *bring an end to a present violation* of federal law is not barred by the Eleventh

17   Amendment even though unaccompanied by a substantial ancillary effect on the state treasury."

18   *Id.* (emphasis added) (internal quotation marks and citation omitted).

19   Plaintiffs' first two causes of action do not sound in *present* or ongoing violations of

20   federal law, such that the *Ex parte Young* exception can apply.  Instead, both Plaintiffs complain

21   only about their past injuries.  To the extent that Plaintiffs allege that their injuries may chill

22   "some future statement," this allegation is vague and does not provide enough information—for

23   the purposes of *both Ex parte Young* and Article III standing purposes—to complain about

24   potential future conduct.  *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd.*

25   *of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) ("To bring a claim for prospective injunctive

26   relief, the plaintiff must demonstrate that he has suffered or is threatened with a concrete and

27   particularized legal harm, coupled with *a sufficient likelihood* that he will again be wronged in a

28   similar way.") (emphasis added) (internal quotation marks and citation omitted).

14

1        Accordingly, Plaintiffs' allegations do not allow them to bring First and Fourteenth

2    Amendment claims challenging SCCCD's anti-discrimination and anti-harassment policies for

3    viewpoint discrimination, content-based discrimination, vagueness, and overbreadth.  The

4    allegations raise only past harm and present no current or ongoing harm, let alone a sufficient

5    pleading of future harm, to satisfy *Ex parte Young* and Article III's commands.  For this reason,

6    the Court **GRANTS** Defendants' motion regarding these free speech theories and **DISMISSES**

7    Plaintiffs' First Amendment claims premised on vagueness, overbreadth, viewpoint

8    discrimination, and content-based discrimination.  *Garrett v. Governing Bd. of Oakland Unified*

9    *Sch. Dist.*, 583 F. Supp. 3d 1267, 1274–75 (N.D. Cal. 2022) (dismissing claims with prejudice

10    when *Ex parte Young* doctrine did not apply to "remedy retrospective harms"); *Semerjyan v. Serv.*

11    *Emps. Int'l Union Local 2015*, 489 F. Supp. 3d 1048, 1056 (C.D. Cal. 2020) (dismissing First

12    Amendment claims with prejudice when *Ex parte Young* exception did not apply because "the

13    Complaint's factual allegations establish that there is *no* ongoing violation.") (emphasis in

14    original).

15        Plaintiffs allege also ongoing harm regarding self-censorship and chilled speech.  (*See*

16    Doc. 1 at ¶¶ 51 ("Richardson and others are chilled in their speech because of the arbitrary and

17    vague nature and application of the pronoun policy."), 58 ("Dr. Stannard has withdrawn from

18    social justice circles . . ."), 59 ("Richardson likewise has engaged in self-censorship."), 63

19    ("SCCCD's Policies Chill the Exercise of Free Speech") (boldening and capitalizations omitted);

20    *but see id.* at ¶¶ 58 ("Plaintiffs' exercise of their free speech rights *has been chilled* by SCCCD's

21    actions.") (emphasis added), 89 ("Plaintiffs' ability to freely express themselves *was chilled by*

22    the prospect that . . .") (emphasis added), 105 ("SCCCD attempted to chill or deter Richardson's

23    constitutionally protected speech . . .").) To the extent such allegations suggest present or ongoing

24    harm, resulting in currently chilled speech, *Ex parte Young* applies.  The Court addresses both

25    Plaintiffs' allegations pertaining to chilled speech—and their standing to bring such claims—

26    further below.

27        C.     Article III Standing

28        Plaintiffs have the burden to show that they have Article III standing for each claim

1  pressed and for each of form of requested relief sought.  *TransUnion LLC v. Ramirez*, 594 U.S.

2  413, 430–31 (2021); *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021). This requirement does

3  not change in either the declaratory judgment or injunctive relief context.  *See Haaland v.*

4  *Brackeen*, 599 U.S. 255, 292–93 (2023) (analyzing standing for plaintiffs' requests for

5  declaratory and injunctive relief).  For the final element, redressability, "a court will consider the

6  relationship between the judicial relief requested and the injury suffered."  *California v. Texas*,

7  593 U.S. 659, 671 (2021) (internal quotation marks and citation omitted).  "If at least one plaintiff

8  has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing

9  *Rumsfeld v. F. for Acad. and Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

10        i.        Self-Censorship: Dr. Stannard[7]

11        The Court must review the actual chilling effect on Dr. Stannard's speech caused by the

12  investigation.  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175–78 (9th Cir. 2022).  It is well-

13

---

14  [7] In his Opposition, Stannard also suggests, in cursory fashion, that Defendants "compelled [his] speech." (Doc. 14
at 16 ("The threats, *compelled speech*, chilling of speech, and viewpoint discrimination all constitute constitutional
15  injuries . . .") (emphasis added).  Further below in their Opposition, Richardson suggests the same.  (*Id.* at 18 ("[I]n
addition to the compelled speech . . .").  A facial challenge to standing attacks a plaintiff's allegations in their
16  Complaint alone.  *Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022).  Therefore, the Court cannot consider new
allegations outside the Complaint; the same is true regarding a Rule 12(b)(6) challenge.  *Nazemi v. Specialized Loan*
17  *Servicing, LLC*, 637 F. Supp. 3d 856, 864 (C.D. Cal. 2022) ("[T]he Court will not reach into and beyond the
opposition brief to sustain an unpleaded or underpleaded claim.") (citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d
18  1194, 1997 n.1 (9th Cir. 1998)); *RJ v. Cigna Health and Life Ins. Co.*, 625 F. Supp. 3d 951, 965 (N.D. Cal. 2022)
("Plaintiffs' Opposition brief lists several statutory violations . . . but these do not appear anywhere in the FAC, and
19  therefore will not be considered.") (citations omitted).

20  In the Complaint, there is only one mention of "compelled speech": that MacArthur "wanted Human Resources to
compel Richardson to adhere to [MacArthur's] speech standards." (Doc. 1 at ¶ 37.)  This allegation does not pertain
21  to Stannard and has no relevance in the Court's following standing analysis of his claims.

22  As a matter of standing principles, "the plaintiff's injury must be fairly traceable to the challenged action *of the
defendant*." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (emphasis added).  The alleged "compelled speech"
23  is only fairly traceable to *MacArthur*—a non-party to this case. Also, this allegation is vague and conclusory, and
cannot withstand *Twombly* and *Iqbal*'s pleading commands.  *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954
24  (9th Cir. 2023). In addition, Richardson cannot bring a claim against either state official under *Ex parte Young*
because this is a claim arising from past harm, with no ongoing, present effects.  *See supra.*  Finally, as with all First
25  Amendment claims, only the "government may not compel a person to speak its own preferred messages." *303
Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (collecting cases).  There is no indication that MacArthur is a
26  government actor, or in any way affiliated with SCCCD as more than a visiting speaker.  (*See* Doc. 1 at ¶ 22.)
Plaintiffs have not alleged any relevant information regarding MacArthur, other than that MacArthur holds a Ph.D., is
27  gender non-conforming, and was "in charge of training on [Preferred Gender Pronoun] etiquette."  (*Id.* at ¶¶ 22, 32.)
Plaintiffs' allegation that MacArthur "was exercising authority given to [them] by the State of California through
28  SCCCD" is a bare conclusion.  (*Id.* at ¶ 32.)  Even if MacArthur *was* acting on behalf of SCCCD, a mere desire to
compel speech does not amount to actual compelled speech. *303 Creative*, 600 U.S. at 586.  Plaintiffs' allegation
that MacArthur "wanted [HR] to compel Richardson" does not give rise to liability.  (Doc. 1 at ¶ 37.)

1  established that "[t]he self-censorship door to standing does not open for every plaintiff," *Cal.*

2  *Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003), and "self-censorship

3  alone is insufficient to show injury." *Lopez*, 630 F.3d at 792 (citations omitted).  "Mere

4  allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present

5  objective harm or a threat of specific future harm." *Id.* (cleaned up) (internal quotation marks and

6  citation omitted).  Instead, the Court's inquiry focuses on "the credibility of the threat that the

7  challenged law will be enforced against" the plaintiff. *Id.* (citation omitted).

8         "Where a plaintiff has refrained from engaging in expressive activity for fear of

9  prosecution under the challenged [regulation], such self-censorship is a constitutionally sufficient

10  injury as long as it is based on an actual and well-founded fear that the challenged statute will be

11  enforced." *Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir. 2023).  In assessing a claimed threat of

12  enforcement, the Court looks to three factors: "(1) whether the plaintiffs have articulated a

13  'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have

14  communicated a specific warning or threat to initiate enforcement proceedings, and (3) the

15  history of past prosecution or enforcement under the challenged [regulation]." *Id.* (cleaned up)

16  (footnote and citation omitted).[8]

17         Similarly, when requesting injunctive relief for past injuries, a plaintiff must show not

18  only a "concrete and particularized legal harm," but also "a sufficient likelihood that he will again

19  be wronged in a similar way." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd.*

20  *of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (internal quotation marks and citation omitted).

21  "Plaintiffs may demonstrate that an injury is likely to recur by showing that the defendant had a

22  written policy, and that the injury stems from that policy.  Where the harm alleged is directly

23  traceable to a written policy, there is an implicit likelihood of its repetition in the immediate

24  future." *Id.* at 681 (cleaned up) (internal quotation marks and citation omitted).  Alternatively,

25  "[a] past harm may confer standing to seek injunctive relief if the plaintiff continues to suffer

26  adverse effects." *Phillips v. U.S. Customs and Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023)

27  (cleaned up) (internal quotation marks and citation omitted).

28
_____

[8] "The threatened state action need not necessarily be a prosecution."  *Lopez*, 630 F.3d at 786 (citations omitted).

As an initial matter, Stannard alleges that SCCCD's anti-discrimination and harassment policies continue to chill his speech. *Id.*; (Doc. 1 at ¶¶ 58, 63 ("SCCCD's Policies Chill the Exercise of Free Speech.") (boldening and capitalizations omitted).)  The Court therefore must assess whether these continued adverse impacts are tethered to a threatened enforcement of the regulations.

Absent in the Complaint is any allegation of Stannard's "concrete" plan to speak in a way that violates SCCCD's policies. Stannard has represented only that he has withdrawn from social circles and self-censored himself during trainings.  (Doc. 1 at ¶ 58.)  This is insufficient to warrant a fear of future enforcement.  *Lopez*, 630 F.3d at 787 ("Because the Constitution requires something more than a hypothetical intent to violate the law, plaintiffs must articulate a concrete plan to violate the law in question by giving details about their future speech such as when, to whom, where, or under what circumstances.") (cleaned up) (internal quotation marks and citation omitted).

Also, SCCCD has not given any "specific warning or threat" to initiate proceedings and has only recited its own policies to Plaintiff.  *Compare Lopez*, 630 F.3d at 787 ("But general threats by officials to enforce those laws which they are charged to administer do not create the necessary injury in fact.") (cleaned up) (internal quotation marks and citations omitted) *with Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) ("Washington's general warning of enforcement coupled with Tingley's self-censorship in the face of the law satisfy the second prong . . . for standing.").  A thorough review of the Complaint demonstrates that SCCCD never made a "general threat" to Stannard, let alone a threat of enforcement.  (Doc. 1 at ¶ 16.)  Instead, Lori Bennett merely recited that SCCCD "does not condone harassment, discrimination, unprofessional conduct, or other misconduct in the workplace," "takes such complaints seriously," and "has a strong policy prohibiting" discrimination, harassment and retaliation.  (*Id.*) She commented only that an investigation had occurred, (*id.* ("[A] thorough investigation has been conducted")), and then encouraged Stannard to "demonstrate empathy."  (*Id.*)  The Court cannot conclude that this reference to SCCCD policies, review of what took place, and

1  encouragement to be empathetic constitutes a threat.[9]

2  In addition, a plaintiff's claim of future harm "lack[s] credibility when the challenged

3  speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority has

4  disavowed the applicability of the challenged law to the plaintiffs." *Lopez*, 630 F.3d at 788.  "In

5  the First Amendment context, a fear of prosecution will only inure if the plaintiff's intended

6  speech arguably falls within the [regulation's] reach" and does not exist "where the enforcing

7  authority expressly interpret[s] the challenged law as not applying to the plaintiffs' activities."  *Id.*

8  This is similar to the "written policy" requirement for requesting prospective relief based on past

9  injuries.  *Fellowship of Christian Athletes*, 82 F.4th at 681.

10  Notably, Stannard has not provided the actual text of the regulations that he challenges.

11  Instead, Plaintiffs have provided only the "definitions" section of the challenged regulations,

12  located in AR 3435.  (Doc. 1 at ¶ 64.)  Furthermore, the Court cannot determine whether Stannard

13  has a credible fear of prosecution because he has failed to provide any "intended speech" that

14  might fall within the purview of each regulation.  *Lopez*, 630 F.3d at 788.  Instead, SCCCD has

15  already concluded that Stannard's previous remarks did *not* violate the SCCCD's anti-

16  discrimination policy.  (Doc. 1 at ¶ 16.)  In other words, SCCCD "expressly interpreted the

17  challenged [regulation] as not applying to [Stannard's] activities."  *Lopez*, 630 F.3d at 788.

18  Even if Stannard made future remarks regarding the January 6, 2021, riots, the Black

19  Lives Matter Protests, opined on the propriety of single-parent households, or made future

20  remarks of a similar nature, AR 3435's "definitions" sections squarely exclude such remarks from

21  its purview.  (Doc. 1 at ¶¶ 64, 66.)  For example, such remarks cannot fall under the definition of

22  "discrimination" because they do not result in the "unfair or unjust treatment of an individual

23  based on *certain protected characteristics*," even if the remarks had the effect of creating an

24  adverse "academic experience."  (*Id.* at ¶ 64 (emphasis added).)  There is no mention or reference

25  to discussion of riots, protests, or the nature of households within the regulation's definition of

26  "protected characteristics."  (*Id.* at ¶ 65.)  For the same reason, such potential, future remarks

27

28

---

[9] "It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation."  *Nunez v. City of L.A.*, 147 F.3d 867, 875 (9th Cir. 1998).

1   could not plausibly fall within the purview of "harassment" because they also would not

2   constitute "conduct based on certain protected characteristics."  (*Id.* at ¶¶ 65, 66.)  In other words,

3   not only would future remarks of the same kind not fall within AR 3435's purview, but Plaintiff

4   cannot rely on past harm for prospective relief because his alleged "harm" did not result from

5   these written policies.

6          The Court has no alternative but to determine, based on the face of the pleadings, that

7   Stannard's "withdrawal" and self-censorship are self-inflicted injuries.  This is an insufficient

8   basis to confer Article III standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)

9   (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their

10   fears of hypothetical future harm that is not certainly impending.") (citations omitted); *Twitter*, 56

11   F.4th at 1176 ("And to the extent Twitter argues that any actions it has taken in response to the

12   [Texas Office of the Attorney General's Civil Investigative Demand] create an Article III injury,

13   those injuries are self-inflicted because the actions were voluntary.") (citation omitted).

14   Accordingly, Stannard lacks Article III standing to bring a self-censorship claim against Mosier

15   and Goldsmith.  The Court **GRANTS** Defendants' motion to dismiss (Doc. 4) on this ground.

16          *ii.      Self-Censorship: Dr. Richardson*

17          Richardson alleges that SCCCD has "an unwritten [Preferred Gender Pronoun (PGP)]

18   policy" and that he "and others are chilled in their speech because of the arbitrary and vague

19   nature and application of the pronoun policy."  (*Id.* at ¶¶ 48, 51; *see also id.* at ¶ 105 ("SCCCD

20   attempted to chill or deter Richardson's constitutionally protected speech as set forth in this

21   complaint.").)  As such, Richardson contends that he "has engaged in self-censorship."  (*Id.* at

22   ¶ 59.)

23          Richardson has not alleged a "concrete plan" to make similar, future remarks of the same

24   kind.  *Porter*, 68 F.4th at 437.  However, Richardson has alleged a possible threat of future

25   enforcement.  Specifically, Richardson's Letter of Reprimand ordered Richardson "to

26   immediately stop using pronouns in a mocking manner in the workplace," "to exhibit basic

27   standards of conduct and act professionally . . . including in written exchanges via email," and

28   admonished that "[f]urther failure of this type or similar unprofessional behavior may result in

1   disciplinary action, and as stated in BP 3430, may lead to termination." (Doc. 1 at ¶ 45.) This

2   would be sufficient to confer standing for a compelled speech claim. *Isaacson v. Mayes*, 84 F.4th

3   1089, 1100 (9th Cir. 2023) ("Although a specific threat or warning of prosecution is relevant, we

4   have never held that a specific threat is necessary to demonstrate standing.") (internal quotation

5   marks and citation omitted); *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) ("We have,

6   however, interpreted the government's failure to *disavow* enforcement of the law as weighing in

7   favor of standing . . . Washington has not disavowed enforcement and instead has confirmed that

8   it will enforce the ban on conversion therapy . . .") (emphasis in original). "[I]n the context of

9   pre-enforcement challenges to laws on First Amendment grounds, a plaintiff need only

10   demonstrate that a threat of potential enforcement will cause him to self-censor." *Tingley*, 47

11   F.4th at 1068 (internal quotation marks and citation omitted).

12          Though Richardson has facially satisfied Article III standing requirements by showing

13   that SCCCD may enforce its policies against him in the future, Richardson has failed to show

14   exactly *how* he has self-censored. Richardson's allegations are conclusory, as he has failed to

15   demonstrate how the SCCCD's regulations, or his past disciplinary action has chilled his speech.

16   *Lopez*, 630 F.3d at 792 ("Mere allegations of a subjective 'chill' are not an adequate substitute for

17   a claim of specific present objective harm or a threat of specific future harm.") (cleaned up)

18   (internal quotation marks and citation omitted); *Compare Twitter*, 56 F.4th at 1175 ("Twitter's

19   complaint, taken as true, does not show any chilling effect on its speech . . . Twitter's naked

20   assertion that its speech has been chilled is a 'bare legal conclusion' upon which it cannot rely to

21   assert injury-in-fact.") (citation omitted) *with Tingley*, 47 F.4th at 1068 ("He claims to be unable

22   'to freely and without fear speak what he believes to be true' and contends that his conversations

23   with new clients are 'more guarded and cautious' and that he is afraid to 'publicize that he offers

24   to counsel minors on these issues.'") (cleaned up) *and Cal. Pro-Life Council, Inc. v. Getman*, 328

25   F.3d 1088, 1093 (9th Cir. 2003) (holding that California Pro-Life Council self-censored because

26   it "planned to spend more than $1000 on a communication in the November 2000 general election

27   in order to defeat California Proposition 34" but "decided against the planned expenditure

28   because it feared that such a communication might fall within the regulatory ambit of the

1   [Political Reform Act].").

2       A thorough review of the Complaint does not demonstrate any facts demonstrating *how*

3   Richardson has engaged in self-censorship.  (*See generally* Doc. 1 at ¶¶ 51 ("Richardson and

4   others are chilled in their speech"), 59 ("Richarson likewise has engaged in self-censorship."),

5   105 ("SCCCD attempted to chill or deter Richardson's constitutionally protected speech as set

6   forth in this complaint.").)  Richardson was obligated to "clearly allege facts demonstrating each

7   element of standing," including self-censorship and chilled speech.  *Twitter*, 56 F.4th at 1175

8   (cleaned up) (internal quotation marks and citation omitted).  Richardson has failed to do so.

9       Furthermore, Richardson has not tied his previous discipline to the challenged, written

10  policies in this case.  Instead, Richardson pleads that "SCCCD had an unwritten PGP policy and

11  that [Richardson] could use his own PGP so long as they were not deemed 'mocking.'"  (Doc. 1

12  at ¶ 48.)  Richardson alleges that prior to his discipline, "SCCCD had not published a policy on

13  pronouns," however, he fails to allege that since his discipline, SCCCD has published such

14  regulations.  (*Id.* at ¶ 49.) Indeed, Richardson asserts that SCCCD had an "unwritten" preferred

15  gender pronoun policy.  (*Id.* at ¶ 48 (emphasis added).)  In other words, not only does Richardson

16  tie his harms (investigation, disciplinary action) to an unwritten policy, but Richardson has failed

17  to demonstrate that this unwritten policy remains in effect, making future harm improbable.

18  *Fellowship of Christian Athletes*, 82 F.4th at 680–81.

19      Even if the Court looked to the instant challenged policy, AR 3435, "Protected

20  Characteristics" includes "gender identity" as a "protected characteristic." But to constitute

21  "discrimination" and "harassment," there must be ongoing, repeated, and seriously harmful

22  conduct.  (Doc. 1 at ¶¶ 64 ("An adverse action for discrimination purposes is any action taken or

23  pattern of conduct that, taken as a whole, materially and adversely affected the terms, conditions,

24  privileges, benefits of or the ability to fully participate in activities or events associated with an

25  individual's employment or academic environment."), ¶ 66 (harassment is "conduct based on

26  certain protected characteristics that creates a hostile, offensive, oppressive, or intimidating work

27  or educational environment and deprives a person of their statutory right to work or learn in an

28  environment free from harassment"—it must "disrupt the person's emotional tranquility in the

1   workplace, affect their ability to perform the job as usual, or otherwise interfere with and

2   undermine their personal sense of well-being.").)  Richardson has not alleged that he intends to

3   make future remarks that would be prohibited by either regulation.  Nor does he tie his alleged

4   ongoing chilled speech to these regulations to constitute present harm.  Richardson therefore

5   lacks Article III standing to bring such free speech claims based on his hypothetical and

6   conclusory future and ongoing injuries.  For these reasons, the Court **GRANTS** Defendants'

7   motion to dismiss (Doc. 4).

8           E.      Supplemental Jurisdiction Over State Claims

9           Title 28 U.S.C. § 1367(c) provides that "district courts may decline to exercise

10  supplemental jurisdiction over a claim under subsection (a) if -- . . . (3) the district court has

11  dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3); *Johnson v.*

12  *Barr*, 79 F.4th 996 (9th Cir. 2023) ("[T]he district court may determine, using its sound

13  discretion, whether to retain supplemental jurisdiction over the remaining state law claims or to

14  remand this case to state court.") (citations omitted).

15          Plaintiffs' third through eighth claims all sound in state law, under the California Labor

16  Code, Civil Code, and Government Code.  (Doc. 1 at 40–49.) Until the plaintiffs state a federal

17  claim, the Court declines to consider whether it will exercise supplemental jurisdiction over

18  Plaintiffs' third through eighth causes of action.

19          **CONCLUSION**

20  Based upon the foregoing, the Court **ORDERS**:

21          (1) Defendants' Motion to Dismiss (Docs. 4, 11) is **GRANTED IN PART**.

22          (2) Plaintiffs' first and second causes of action are **DISMISSED with 21 days leave to**

23              **amend**.

24  ///

25  ///

26  ///

27  ///

28  ///

23

1         Failure to file a second amended complaint will result in the Court declining to exercise

2  supplement jurisdiction and remanding the matter to the state court.

3

4  IT IS SO ORDERED.

5      Dated:  __**May 10, 2024**__

                                         UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28