1
2
3
4
5
6               **UNITED STATES DISTRICT COURT**
7               **EASTERN DISTRICT OF CALIFORNIA**
8

9  MICHAEL STANNARD, et al.,              Case No. 1:22-cv-01250 JLT EPG

10              Plaintiffs,               ORDER GRANTING DEFENDANTS'
        v.                                MOTION TO DISMISS WITH LEAVE TO
11                                        AMEND
   STATE CENTER COMMUNITY
12 COLLEGE DISTRICT, et al.,              (Doc. 32)

13              Defendants.

14

15         Michael Stannard and David Richardson are two professors associated with the State

16  Center Community College District ("SCCCD"). They bring this free speech action against

17  SCCCD, SCCCD's Chancellor, Carole Goldsmith, SCCCD' Vice Chancellor Juliana D. Mosier,

18  and Angel Reyna, the President of Madera Community College ("MCC"), challenging the

19  constitutionality of SCCCD's anti-discrimination and anti-harassment policies and advancing

20  related claims. Pending is Defendants' Motion to Dismiss. (Doc. 25.) For the reasons set forth

21  below, the Court **GRANTS IN PART** Defendant's motion to dismiss.

22                            **I.    BACKGROUND**

23  **A. Dr. Michael Stannard**

24         Dr. Michael Stannard holds a doctorate in philosophy, and he has been an instructor at the

25  SCCCD for approximately thirty years. (Doc. 21 at ¶ 10.) This litigation arises, in part, from two

26  incidents involving him and some of his colleagues.

27         1.  First Incident

28         The first investigation arose out of two comments Stannard made while working at Clovis

1  Community College. The first statement occurred during a race-sensitivity training session that

2  took place the day following the January 6, 2021 riots at the United States Capitol Building. (Doc.

3  21 at ¶ 13.) In that meeting, Stannard commented "that the riot at the Capitol was 'bad' and that

4  the burning of minority-owned businesses during last summer's riots was [also] 'bad.'" (*Id.*)

5  Then, in a "Justice and Healing Circle," Stannard reportedly commented that "children do better

6  if they are raised with both biological parents," as opposed to single-parent households. (*Id.*)

7  Stannard denies making this comment and states that "what he [actually] said was that children

8  have a right to be raised by their biological parents, and that there was a philosophical argument

9  for the biological two-parent family based on the 'problem of origins,' i.e., children who do not

10  know their parents question their own origins." (*Id.*). Stannard states that, after making his "brief

11  comment about the 'problem of origins,' he was told by the organizer that his remarks were

12  'offensive.' Another participant threatened to leave the group if the group did not move on from

13  the topic." (*Id.* at ¶ 16.)

14        On March 9, 2021, SCCCD Human Resources Department Investigator, Erica Reyes, met

15  with Stannard as part of an investigation into those two comments. (Doc. 21 at ¶¶ 11–12.)

16  "Stannard affirmed that his intent was to speak the truth in a public environment where these

17  issues were raised," and that the feelings of others "did not justify his censoring himself." (*Id.* at

18  ¶ 15.) Stannard states that he "was kept in suspense, [and] did not know whether he would keep

19  his job." (*Id.* at ¶ 22.) He further alleges that he was "force[d] to censor and suppress his speech

20  in order to avoid . . . another 'investigation.'" (*Id.*)

21        On May 10, 2021, President of Clovis Community College, Lori Bennett, concluded that

22  his comments "did not rise to the level of discrimination in violation of District policy," yet his

23  comments offended some employees. (Doc. 21 at ¶ 23.) Bennett "'encourage[d] Stannard, and all

24  employees, to demonstrate empathy toward others and to reflect on how statements we make may

25  impact others to ensure that we are creating an inclusive working and learning environment for all

26  employees and students.'" (*Id.*)

27        Stannard believes that the "warnings, admonitions and instructions were nebulous and

28  threatening" to him, and that the "matter should never have gotten this far. The complaints

1  should have been told about the Constitutional right of free speech and how they cannot subvert

2  the investigative procedures to harass and intimidate those who they perceived as their

3  ideological/career/political adversaries." (Doc. 21 at ¶¶ 24–25.)

4       2.  Second Investigation

5       The second incident arose out of a faculty union meeting in December of 2023. During

6  that meeting, "the issue of a male SCCCD instructor who had gone through a Title IX

7  investigation came up before the general membership. This person was described as a 'rapist' by

8  several female instructors and his presence on campus was referred to as a threat to other

9  instructors by members of the union attending the meeting." (Doc. 21 at ¶ 27.) Stannard

10  "suggested that there be a show of restraint in that not all facts about the prior incident were

11  known." (*Id.*) This "became the basis of a second charge" that Stannard "had engaged in

12  'harassment[.]'" (*Id.* at ¶ 28.)

13       On January 23, 2024, Stannard received a letter from Christine Phillips, Director of

14  EEO/Diversity & Professional Development for SCCCD, informing him that someone had made

15  certain Title IX allegations at him, which, if true, also "violated Board Policies 3430 and 3433,

16  and Administrative Regulation 3434." (Doc. 21 at ¶ 30.)  The next day, Stannard received a

17  "REVISED Notice of Allegations. Allegations subject to Title IX," which stated:

18
19         The Complainant alleges that Respondent engaged in the following conduct:

20         Michael STANNARD made unwelcome and offensive statements about victims of sexual assault and women in general which were

21         misogynistic, abusive, intimidating, and denigrating, and created a hostile work environment, and he threatened to sue any employee

22         who filed a complaint or grievance against him.

23  (*Id.* at ¶ 31.)

24       On February 5, 2024, Stannard received a third Letter from Christine Phillips informing

25  him that she has "dismissed a formal Title IX complaint of sexual harassment," but nonetheless

26  informed him "that the dismissal of a formal complaint under Title IX does not preclude the

27  District from continuing an investigation or taking action under other District policies, code of

28  conduct or administrative rules/regulations." (Doc. 21 at ¶¶ 33–34.)  In particular, the letter stated

that Stannard remains subject to an investigation "under Administrative Regulation 3435 – Responding to Discrimination, Harassment, and Retaliation Complaints and Investigation." (*Id.* at ¶ 34.) This second investigation is still ongoing. (*Id.* at ¶ 35.)

Finally, the Second Amended Complaint (SAC) states that Stannard "will be retiring in 2024[]" and that "because his past experience with SCCCD, consisting of several investigations for implausible violations of 'harassment' and 'discrimination' policies, . . . he has decided not to seek such part-time teaching work with SCCCD in the future." (Doc. 21 at ¶ 153.) As such, the Court presumes that Stannard retired on December 31, 2024, and that he is presently not teaching part-time at the SCCCD.

## B. David Richardson

Richardson is a self-identified "gay and conservative" history instructor at Madera Community College. (Doc. 21 at ¶ 36.) The present dispute stems from an autumn 2021 "College Hour" online meeting at Madera, which is a faculty-wide, "hour-long forum for SCCCD to instruct faculty on policies or other subjects determined by SCCCD." (*Id.* at ¶ 37.)

### 1. First Investigation

#### i. College Hour Incident

On October 15, 2021, SCCCD required its instructors to attend a "College Hour" meeting about personal gender pronoun etiquette. (Doc. 21 at ¶ 38.) Jamie MacArthur, Ph.D., conducted the presentation and announced a preference for the "they/them" gender nonbinary pronoun. (*Id.*)[1] During this online videoconference meeting, the speaker "could be seen in a large window on the computer screen while the other attendees were in small thumbnails with either the live feed of them watching," or some other image, if preferred. (*Id.* at ¶ 40.) Each thumbnail presented the attendee's name and a line for the attendee to insert their preferred gender pronoun. (*Id.*)

During the meeting, Richardson "reasoned that it was not intellectually equitable to allow only certain people to pick certain 'Preferred Gender Pronouns,'" and, therefore, "filled out his 'Preferred Gender Pronouns' as 'Do, Re, Mi.'" (Doc. 21 at ¶ 44.) Richardson states that he "was

---

[1] Richardson states that MacArthur is a biological "male identifying as a female, i.e., a transexual or 'trans-female.'" (Doc. 20 at ¶ 38.)

not joking, and he was not mocking anyone." (*Id.*) He states he "was making the serious point that . . . 'Preferred Gender Pronouns' . . . should not be mandatory because they were based on an irrational perception of reality and that if they were to be mandated, displayed, or required, then they would frustrate communication for ideological reasons." (*Id.*)

> ### ii.  *Email Exchanges*

No one commented on Richardson's pronouns during the meeting, and in his opinion, "no one noticed." (Doc. 21 at ¶ 46.)  A few days after the meeting, on October 18, 2021, MacArthur sent an email to Richardson, stating, in relevant part:

> The reason that I am contacting you is because I noticed in the College Hour on Friday that you had what appeared to be a joke shared where someone might normally share their pronouns on zoom (do-re-mi).  I wanted to let you know that doing this is considered to be extremely offensive by people in the trans community.   It's possible that you didn't know this, so I wanted to take a moment to share some resources related to this with you so that you have a better understanding of how people in the trans community would like to be treated[.]
>
> . . .
>
> I didn't mention anything about this at the time of the meeting, as I wanted to stay focused on the dialogue at hand.  Although it was painful for me to not say anything in that moment, I chose to put the good of the community ahead of my own well being.  I am choosing to share this information with you directly now instead of with someone else out of respect for the ideals embodied by our union of solidarity within our community of scholars.  I hope this message is received with the spirit of good will that I intend and that you would choose not to use the zoom platform as a way of making a joke that is harmful to trans people.

(*Id.* at ¶ 47.)

Richardson felt this "communication was threatening to [him]," and he feared he would be "cancelled" as a dissenting voice. (Doc. 21 at ¶ 49.) Richardson responded to MacArthur's email:

> To be blunt, what makes they think it was a joke? Am Do not allowed to identify mi own pronouns as an LGBTQIA2+ individual? Have Do done or said anything to anyone to make they think it was a 'joke'? Do think they are making assumptions about mi own thought processes and rationale that is offensive in and of itself. Do don't find anything about the entire debate 'funny'. If they are uncomfortable with mi choice of pronouns, Do might suggest that the issues is not re although Do would never presume to know what is going on in their mind. Do also find it interesting that they would presume Do is any less educated on the subject of the transgender community than they is. Do don't question their choice of personal pronouns.

1           Personal pronouns are personal.

2    (*Id.* at ¶ 50.)

3           On November 1, 2021, SCCCD's Employee Relations Coordinator, James Young,

4    contacted Richardson regarding "concerns" over his use of pronouns during the College Hour

5    meeting. (Doc. 21 at ¶ 51.) Young requested a time to speak with Richardson regarding this

6    matter, to which Richardson replied:

7             If Dr. MacArthur and yourself would like to make an issue of my
         personal pronouns which as I have told Dr. MacArthur are personal,

8             then we are going to be opening a can of worms that I don't believe
         the District would want to get involved in. Picking and choosing

9             which personal pronouns people can and cannot use would amount
         to harassment in the workplace and the creation of a toxic work

10             environment. This week is not possible as I have three faculty
         evaluations that need to be completed. That being said, I would be

11             happy to meet with you in the future as long as any meeting includes
         a union representative and everyone understands that any attempt to

12             coerce or in any other way change my personal pronouns will be seen
         on my part as hostility towards an open and proud LGBTQIA2S+

13             individual. Thank you.

14    (*Id.* at ¶ 52.)

15           Richardson "copied his supervisors and some faculty members" to this email response

16    "because he understood [MacArthur] was moving in the direction of 'canceling' him." (Doc. 21

17    at ¶ 53.) On November 1, 2021, MacArthur responded to this email, admitting that he had

18    involved Human Resources and their union, and expressed that he wanted "to discuss the harm

19    that has been caused and how to mediate a solution to that harm" through a "facilitated

20    discussion," to create a safe workplace setting for everyone. (*Id.* at ¶ 54.) Richardson alleges this

21    meant that MacArthur "invoked the power of SCCCD to compel Richardson to [MacArthur's]

22    speech standards." (*Id.*) Richardson states that he had requested Human Resources ("HR") to

23    investigate MacArthur's harassment of him, which did not take place. (*Id.* at ¶¶ 55–56.)

24           *iii.  Investigation and Reprimand*

25           SCCCD initiated an investigation into Richardson, which "lasted for approximately six

26    months." (Doc. 21 at ¶ 56.) It concluded that Richardson (1) "intentionally misused pronouns in a

27    mocking manner for Jamie MacArthur 8 times in an email exchange on October 18, 2021"; (2)

28    intentionally used second- and third-person pronouns "in a mocking manner" in that email; (3)

retaliated against MacArthur "for bringing up concerns related to [his] use of pronouns in a Zoom meeting, and for attempting to seek an informal resolution through [HR]"; and (4) sent emails to Madera Community College staff and faculty "as retaliation for Dr. MacArthur attempting to seek an informal resolution through [HR], as a way to intimidate Dr. MacArthur into dropping their complaint." (*Id.*) Richardson contests these findings for many reasons. (*See generally id.* at ¶¶ 57–58.)

On May 17, 2022, Vice President of Learning and Student Services, Dr. Marie Harris, called Richardson to a meeting and presented him a "Letter of Reprimand." (Doc. 21 at ¶ 60.) The Letter instructed Richardson "to immediately stop using pronouns in a mocking manner in the workplace," to "exhibit basic standards of conduct and act professionally when [he] interact[s] with employees and students of this District, including in written exchanges via email," and warned that further "failure of this type or similar unprofessional behavior may result in disciplinary action, and . . . may lead to termination." (*Id.* at ¶ 63.) Richardson "was also informed at the meeting with Harris that SCCCD had an unwritten [preferred gender pronoun ("PGP")] policy and that he could use his own PGP so long as they were not deemed 'mocking.'" (*Id.* at ¶ 66.)

2.  <u>Second Investigation</u>

On April 29, 2023, the Madera Community College campus ("MCC") of SCCCD organized and held an on-campus "open house," where "potential students, their parents, and community members could walk among the tables, look at the exhibits, and speak to the instructors." (Doc. 21 at ¶ 72.) Instructors were expected to put on the table "things associated with the discipline they taught" and discussions prospective students and community members "would presumably be on the subject that the instructor taught and involve a discussion of the substance of the course or various issues about the course." (*Id.*) For example, Richardson "would place items pertaining to the Civil War on the history department table. His discussions with interested people would largely involve the Civil War." (*Id.*) Richardson "also made it his practice to bring candies, chips, cookies, and other snack items for visitors to take." (*Id.* at ¶ 73.) The snacks were supplied and paid for by Richardson; SCCCD was "aware of his practice and

never issued any restrictions or guidelines concerning his participation at open houses." (*Id.*)

Among the things that Richardson brought were two kinds of chocolate bars from Jeremy's Chocolates: the ones "without nuts were labeled 'She/her' and the ones with nuts were labeled 'He/him.'" (Doc. 21 at ¶ 74.) Richardson claims to have brought those bars to the open house "because he had a remaining box and wanted to get rid of this candy before it spoiled." (*Id.*) Richardson further states that they were "a small portion of the total snacks he brought" and that "[h]e did not 'display' the[m] . . . so that they would get attention. Rather, the Jeremy's Chocolates were mixed in with, and often obscured by, other candies." (*Id.*) According to Richardson, no one objected or "expressed any misgivings or concerns" except another employee, Denna Calvin, who confronted Richardson about the messages on the bar. (*Id.* at ¶¶ 76–77.)

There were varying accounts of what happened during this confrontation. According to Richardson, Calvin was "interrogating him about his agenda[;] Calvin was loud and aggressive and attracted the attention of instructors and administrators who were standing near the history table." (Doc. 21 at ¶ 77.) When Calvin pressed him about the meaning of the messages on the bar, Richardson told "Calvin [to] contact the company with her inquiries." (*Id.*)

Calvin subsequently filed a Title IX complaint against Richardson for, among other things, the allegedly "mocking" pronouns and the reference to "building a woke-free economy." Richardson was placed on administrative leave pending the outcome of the complaint; this decision was communicated to him through a letter signed by Julianna Mosier (Vice Chancellor – Human Resources) and approved by Carole Goldsmith (Chancellor). (Doc. 21 at ¶ 82.) Richardson insisted that "[t]here was no reasonable basis for a competent college administrator" to believe that there was a colorable Title IX violation. (*Id.* at ¶¶ 87–88.)

On May 10, 2023, SCCCD retained an outside investigator to investigate the incident, with a final report issued on July 3, 2023. (Doc. 21 at 98.) The report found, among other things, that Richardson did not "bring the chocolate bars . . . to intentionally offend the trans and non-binary community[.]" (*Id.* at ¶ 89 (quoting *id.* at 154).) SCCCD "continued to pursue the Title IX process[]" notwithstanding Richardson's request to have it dismissed. (*Id.* at ¶¶ 90–91.)

After Calvin and Richardson submitted written responses, (Doc. 21 at 98), SCCCD

1    conducted a recorded hearing over Zoom on December 1, 2023,[2] with a final determination issued

2    on January 3, 2025, which explained that even though Richardson was investigated for possible

3    violations of Administrative Regulations ("AR") 3430, 3433, and 3435,[3] "[t]he preponderance of

4    the evidence does not support a finding" that Richardson had, in fact, violated those provisions,

5    (*id*. at 97).[4]

6         Richardson claims that, because he was "suspended for nine months" pending the

7    outcome of the investigation, he "lost out on professional opportunities" and "suffered shame,

8    mortification, embarrassment, and anxiety." (Doc. 21 at ¶ 97.) He further alleges that, because he

9    lost access to his email, he "was prevented or substantially hindered from engaging in

10   professional development and obtaining information about SCCCD." (*Id*.)

11        Approximately two months after the Title IX determination, Richardson was served a

12   "Ninety Day Notice to Correct Deficiencies (Education Code sections 87732 and 87734.)" (Doc.

13   21 at ¶ 98.) The Notice expressly referenced the Title IX's finding that while Richardson's

14   conduct did not arise to the level of harassment (under any of the challenged regulations), it was

15   nonetheless "unprofessional" under Education Code § 87734.[5] (*Id*. at 105, 114.) The Notice

16   _____

17   [2] At first glance, this hearing appeared to be a quasi-judicial proceeding—for example, the Complainant (Calvin) and Respondent (Richardson) had "Advisors" who were permitted to cross-examine witnesses. (*See* Doc. 21 at 100–01.)

18   [3] Notwithstanding typographical errors scattered throughout the record, the challenged SCCCD policies appear to be AR 3430, 3433, 3434, and 3435. (Doc. 21 at ¶ 169.)

19        First, AR 3433 supplies the definition of sexual harassment under Title IX, which covers actions "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the District's education program or activity[.]" (Doc. 21 at 117.) AR 3434 is a purely

20   procedural provision that "only applies to conduct defined as sexual harassment under Title IX and federal regulations and [] meet Title IX jurisdictional requirements." (*Id*. at 120.) AR 3434 outlines the procedural aspects of a Title IX investigation, addressing topics such as the hearing format, cross examination, and what must be included

21   in the final written determination. (*Id*. at 128–32.)

22        Second, even if an action does not rise to the level of sexual harassment under Title IX, it may be prohibited under AR 3430, which defines "General Harassment" as incidents that "are sufficiently pervasive, persistent, or severe that a reasonable person" belonging to one of the enumerated protected classes "would be adversely affected

23   to a degree that interfere with their ability to participate in or to realize the intended benefits or an institutional activity, employment or resource." (*Id*. at 84.) AR 3435 expressly states that "[f]or sexual harassment, sexual

24   misconduct, or sexual assault under Title IX, Complainants must proceed under" AR 3433; and "[f]or other forms of . . . harassment and discrimination," that is, those that may violate AR 3430, "Complaints should use [AR 3435's]

25   procedure." (*Id*. at 88.)

26   [4] The Court assumes that "343333" and "34335" on page 97 of Doc. 21 were clerical errors. Notwithstanding

27   typographical errors scattered throughout the record, the challenged SCCCD policies appear to be AR 3430, 3433, 3434, and 3435. (Doc. 21 at ¶ 169.)

28   [5] California Education Code § 87734 states that a community college "shall not act upon any charges of

1  directed Richardson to, among other things: "provide every student and District staff member

2  with respect[;]" "not denigrate or belittle students or employees or make inappropriate comments

3  regarding his, her, or their gender, gender identity, gender expression, pronouns, or any other

4  protected characteristic[;]" "adhere to all provisions of the collective bargaining agreement, . . .

5  which incorporates the ethical standards of the American Association of University Professors[;]"

6  "comply with . . .  the District's Board Policies and Administrative Regulations[]" and

7  Procedures; "communicate with all individuals respectfully and professionally[;]" and complete

8  "ten hours of additional professional development in the areas of diversity, equity, inclusion,

9  access, and effective communication." (*Id.* at 114.)

10  **C. Procedural History**

11      Plaintiffs filed this instant action in Fresno Superior Court, which Defendants removed to

12  federal court on September 28, 2022. (Doc. 1.) On May 13, 2024, the Court granted Defendants'

13  initial motion to dismiss with leave to amend. (Doc. 20.) Plaintiffs filed the SAC on June 3, 2024.

14  (Doc. 21.) Defendants moved to dismiss the SAC for failure to state a claim and for failure to

15  establish standing. (Doc. 25). The matter is fully briefed and ripe for review. (Pls.' Opp'n, Doc.

16  29; Defs.' Reply, Doc. 31.)[6] As indicated, (Doc. 27), the Court took the matter under submission

17  without oral argument.

---

18  unprofessional conduct or unsatisfactory performance" pursuant to § 87732 "unless during the preceding term or half

19  college year prior to the date of the filing of the charge, and at least 90 days prior to the date of the filing," it "has given the employee . . . written notice of the unprofessional conduct or unsatisfactory performance, specifying the

20  nature thereof with specific instances of behavior and with particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge." Cal. Educ. Code §§ 87732, 87734.

21  [6] Under Fed. R. Civ. P. 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two

22  ways. First, a "factual" attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings. When the defendant raises a factual attack, the plaintiff must support the jurisdictional

23  allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context. The plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements

24  for subject-matter jurisdiction has been met." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citations omitted). This Court may also "resolve those *factual disputes* itself." *Id.* at 1121–22 (citations omitted) (emphasis

25  added). Second, a defendant's "facial" attack "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Id.* at 1121 (quoting *Safe Air for Everyone v. Meyer*, 373

26  F.3d 1035, 1039 (9th Cir.2004)). That is the case here, for Defendants are not arguing that the factual allegations in the SAC are false, inaccurate, or otherwise disputable. (Doc. 31-1 at 2 ("[T]he Declaration does not state any new

27  facts in dispute . . .").) As such, this Court resolves Defendants' facial attack in a manner akin to "a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the

28  plaintiff's favor," without considering any party submissions outside of the SAC. *Leite*, 749 F.3d at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir.2013)). The parties' dispute over the propriety of the other's declarations, (*see, e.g.*, Doc. 29 at 9–10; Doc. 30 at 5), is therefore moot.

1       **D. The Claims**

2           From what the Court can discern from Plaintiffs' pleading[7], the SAC advances the

3   following causes of action.

4           Richardson and Stannard jointly bring the first and second causes of action against

5   Defendants in their official capacities, seeking prospective injunctive relief. The first cause of

6   action alleges (a) that SCCCD's anti-discrimination and anti-harassment policies—AR 3430, AR

7   3433, AR 3434, and AR 3435—are overbroad, facially and as-applied, (Doc. 21 at ¶¶ 161–62);

8   (b) that those policies are facially invalid because they amount to content- and viewpoint-based

9   restrictions on speech, (*id.* at ¶¶ 163–65); (c) that those policies were unconstitutionally applied to

10  Plaintiffs, (*id.* at ¶ 169); and (d) that Defendants have engaged in selective, viewpoint-

11  discriminatory enforcement of those policies, (*id.* at ¶¶ 166–68).[8] The second cause of action

12  alleges that AR 3430, AR 3433, AR 3434, and AR 3435 are void for vagueness, facially and as-

13  applied. (*Id.* at ¶¶ 173–77.)

14          Richardson, alone, brings the third and fourth causes of action, seeking retrospective

15  damages against Defendants in their individual capacities. The third cause of action alleges that

16  Defendants retaliated Richardson for bringing the "He/Him Nuts" and "She/Her Nutless"

17  chocolate bars to the open house event, in violation of his First Amendment rights. (Doc. 21 at

18  ¶¶ 180–86.) The fourth of causes of action alleges that Defendants retaliated against Richardson

19  for filing a lawsuit against SCCCD. (*Id.* at ¶¶ 189–93.) Richardson further brought various state

20  law claims under the fifth through twelfth causes of action. (*Id.* at ¶¶ 194–254.)

21

22  [7] The Eleventh Circuit has identified four common categories of inappropriate pleading. As relevant here, the SAC "contain[s] multiple counts where each count adopts the allegations of all preceding counts, causing each successive

23  count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). Even though this is not per se problematic, but

24  because the SAC "replete with conclusory, vague, and immaterial facts," *see id.* at 1322, and because the SAC has factual elements and legal elements "scattered throughout the complaint," the SAC does not satisfy the "short and

25  plain statement" standard under Rule 8, *see Chagolla v. Vullo*, No. CV-17-01811-PHX-SPL, 2018 WL 10602297, at *2 (D. Ariz. Mar. 30, 2018) (citing *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988)). Moreover, Plaintiffs failed to "separat[e] into a different count each cause of action or claim for relief." *Weiland*, 792 F.3d at

26  1323. In particular, the first cause of action contains multiple claims and theories, all jumbled up together.

27  [8] Richardson further claims that the discipline imposed on him "b[ears] no reasonable relationship to any constitutionally permitted objective or condition of [] employment," "but instead unconstitutionally burden[s his]

28  academic freedom and right to free speech by, inter alia, imposing viewpoint discrimination on [him]. . . ." (Doc. 21 at ¶ 170.)

## II.    CONSTITUTIONAL STANDING[9]

It is well-established that Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)). This requirement is further comprised of "three elements that a plaintiff must plead and—ultimately—prove." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (internal quotation

---

[9] Because the SAC is very disorganized and difficult to follow, the Court notes that the following issues are not under consideration.

First, as this Court explained in its prior order, "Richardson has not tied his [first] discipline to the challenged, written policies in this case." (Doc. 20 at 22 (emphasis added).) Yet, the SAC is still devoid of any indication that he was disciplined under AR 3430, AR 3433, or AR 3435; as such, the Court cannot assess whether those regulations were applied to Richardson with respect to his first discipline.

Second, and relatedly, though the SAC discusses the personal gender pronouns policy ("PGP Policy") in the factual preamble to the causes of action, (*see, e.g.*, Doc. 21 at ¶ 66), the PGP policy is not mentioned in the first through fourth causes of action, (*see id.* at ¶¶ 156–193). Thus, this Court will not consider whether the PGP policy is constitutional, facially or as applied to Richarson. *See* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to provide a "short and plain statement" for each claim).

Third, Richardson did not raise a generalized First Amendment retaliation claim with respect to his first discipline. Because of that, and the two reasons articulated above, this Court cannot assess the constitutionality of Richardson's first discipline—it was never properly raised. Moreover, because Education Code §§ 87732 and 87734 are not mentioned anywhere under the first to fourth causes of action, (Doc. 21 at ¶¶ 156–93), this Court will not consider whether those two regulations were constitutionally applied to Richardson.

Finally, AR 3434 is a purely procedural provision that outlines the process of a Title IX investigation, addressing issues including but limited to conflict of interest, (*id.* at 124); presumption of non-responsibility, (*id.* at 127); gathering of evidence (*id.* at 128–29); hearing format (*id.* at 130–31); cross examination (*id.* at 131); content of the written determination, (*id.* at 132); and procedure for appeal, (*id.* at 133). The procedure outlined in AR 3434 is substantially based on the requirements articulated in 34 C.F.R. § 106.45. *See* Grievance Process for Formal Complaints of Sexual Harassment, 34 C.F.R. § 106.45 (Aug. 14, 2020). In fact, AR 3434 expressly cites to, among other things, 34 C.F.R. § 101 et seq. as its legal justifications. (Doc. 21 at 120; *see also* Doc. 21 at ¶¶ 90–91 (stating that the second investigation against Richardson, which was initiated under AR 3435, should have been dismissed pursuant to 34 C.F.R. § 106.45).)

Plaintiffs, however, failed to properly raise a facial or as-applied challenge to AR 3434, as "procedural due process"—i.e., the government's obligation to use fair procedures before or after taking certain actions—is simply not one of the enumerated claims. Though Plaintiffs expressly mention AR 3434 under the first cause of action, which is grounded in violations of the First Amendment, they failed to connect AR 3434 to any Fourteenth Amendment procedural due process violation. To the extent that Plaintiffs allege that they were selectively targeted for investigations on the basis on their speech, it is considered in Part III.C, *infra*, as part of the selective enforcement issue; as such, the Court will not expressly consider AR 3434 throughout the remainder of this opinion.

As an aside, Plaintiffs did not explain in the SAC (Doc. 21) or their brief in opposition (Doc. 29) how the plain text of AR 3434, on its face, falls outside the bounds of reasonable investigatory discretion that is given to public employers. *See Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality) ("Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or *how much investigation needs to be done*, or how much evidence is needed to come to a particular conclusion. In those situations, *many different courses of action will necessarily be reasonable.* Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." (emphases added)). Thus, even if this Court to consider Plaintiff's facial challenge to AR 3434, this Court fails to see a colorable argument that it may be facially unconstitutional under the Due Process Clause of the Fourteenth Amendment.

The only allegation in the SAC that comes close to an as-applied procedural due process claim is Richardson's statement about how he was subjected to "lengthy investigations" based on his viewpoints. (Doc. 21 at ¶ 166.) But an investigation and subsequent hearing that, together, lasted less than one year does not offend due process.

1    marks and citation omitted). "First, the plaintiff must have suffered an injury in fact that is both

2    concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal

3    quotation marks and citation omitted). "Second, the plaintiff's injury must be fairly traceable to

4    the challenged action of the defendant, meaning that there must be a causal connection between

5    the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted).

6    "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a

7    favorable decision." *Id.* (internal quotation marks and citation omitted).

8        "'The part[ies] invoking federal jurisdiction bears the burden of establishing' the [three]

9    elements of standing," *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (quoting *Lujan v.*

10   *Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), "for *each claim* that they press and for *each form of*

11   *relief* that they seek (for example, injunctive relief and damages)[,]" *TransUnion LLC v. Ramirez*,

12   594 U.S. 413, 430–31 (2021) (citations omitted) (emphases added). Here, the parties' dispute

13   over whether Richardson and Stannard have satisfied the injury-in-fact requirement.

14       **A. Plaintiff Stannard**

15       Stannard argues that he was "injured" by SCCCD in three distinct ways: first, the

16   challenged SCCCD policies, as written, chilled his speech; second, SCCCD's investigations into

17   his past activities chilled his speech; and third, the suffered economic harms because he had to

18   hire a lawyer to defend himself from SCCCD's investigations. The Court examines each one in

19   turn.

20       1. "Chilling" Effect of SCCCD's policies

21       In the first and second causes of action, Stannard alleges that SCCCD's anti-

22   discrimination and harassment policies have chilled—and continues to chill—his speech, (Doc.

23   21 at ¶¶ 21, 119), even though there is no evidence or allegation that they were applied to him,

24   (*see id*. at ¶¶ 23 (stating that Stannard "was advised that '. . . [his] comments did not rise to the

25   level of discrimination in violation of District policy[] . . .''), 35 (stating that "there has been no

26   determination o[n] the merits" of the second incident involving Stannard).)

27       Moreover, what is notably missing from the SAC is "any description of *concrete plans*"

28   by Stannard to speak in a way that will violate SCCCD's policies in the future—he has not

13

1    provided any indication as to what kind of speech that he intends to engage in the future, or when

2    they might occur. *See Lujan*, 504 U.S. at 564 (emphasis added). Stannard merely states, for

3    instance, that he "has decided to withdraw from circumstances where he might have to speak on

4    issues that might get him accused of 'harassment[,]'" (Doc. 21 at ¶ 151), and that absent the

5    challenged policies, he "would otherwise engage in such speech as circumstances allowed." (*Id.*

6    at ¶ 152.). But what is "such speech"? And under what "circumstances"? The allegations in the

7    SAC on this point are nonspecific and entirely conclusory. His failure to articulate a "concrete

8    plan" to violate the challenged regulations is one of the fatal deficiencies that prevent him from

9    establishing Article III standing. *See Brown*, 600 U.S. at 561 ("First, the plaintiff must have

10   suffered an injury in fact that is both *concrete* and particularized and actual or imminent, *not*

11   *conjectural or hypothetical*." (internal quotation marks and citation omitted) (emphases added)).

12         Stannard also alleges that he fears that SCCCD intends to "chill his speech with threats

13   that *some* future statement made in an academic discussion to *some* other person making a

14   statement *might* 'rise to the level of a discrimination in violation of District policy,'" which might

15   result in the threatened sanctions being imposed on him. (Doc. 21 at ¶ 168 (emphases added)).

16   Again, Dr. Stannard's claim of self-censorship is based on a highly "speculative chain of

17   possibilities . . . based on potential future [discipline]" that is not "certainly impending or is fairly

18   traceable to [the challenged regulations]." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, 417–

19   418 (2013). This chain of possibilities is made worse by the fact that Stannard has, apparently,

20   retired—while Stannard states that he wishes to "seek [] part-time teaching [positions] with

21   SCCCD in the future[,]" "he has decided not to" "because of his experience with SCCCD[.]"

22   (Doc. 21 at ¶ 153; *see also* Doc. 29 at 21–22). It is also unclear whether and when SCCCD might

23   seek to hire a retired instructor with Stannard's qualifications to teach a philosophy course.

24         In sum, rather than pleading sufficient facts showing that he has "suffered an injury in fact

25   that is both concrete and particularized and actual or imminent, not conjectural or hypothetical,"

26   *Brown*, 600 U.S. at 561, Stannard alleges that he is presently injured by a chain of possibilities

27   that looks something like this: Stannard enters retirement → he wants to return to the school and

28   teach on a part-time basis → SCCCD wants a part-time instructor to teach an unspecified course

1  rather than a full-time faculty member → Stannard is a suitable candidate and is selected to teach

2  that course → in that context, Stannard makes "*some* [unspecified] future statement . . . to *some*

3  [unspecified] person . . . [that] *might* 'rise to the level of a discrimination in violation of District

4  policy" → this *might* result some of the "threatened sanctions" being imposed on him →

5  therefore, he "has decided to withdraw from [those unspecified] circumstances where he *might*

6  have to speak on [some unspecified] issues that *might* get him accused of 'harassment.'" (*See*

7  Doc. 21 at ¶¶ 151–53, 168) (emphases added). Stannard is alleging that the last step in the chain

8  is deterring him from taking the second step in the chain. The standing jurisprudence does not

9  permit the Court to make so many assumptions and logical leaps.

10  Put another way, the key problems here are: (1) because Stannard is now in retirement, he

11  needs to allege sufficient facts to suggest that he is entitled to, or has substantial likelihood of

12  receiving, part-time teaching assignments in the future; (2) Stannard proffered no planned speech;

13  and (3) his claim of self-censorship is based on a highly "speculative chain of possibilities," one

14  that is filled with references to unspecified events or circumstances and filled with qualifiers like

15  "some" and "might."

16  ## 2.  The "Chilling Effect" of SCCCD's Investigations

17  Stannard points to the burdens of administrative investigations and their impact on him

18  and his speech. Stannard alleges that the "investigations have been lengthy, have resulted in

19  inquiries into [his] private beliefs, have disrupted [his] personal and professional life, and have

20  caused him to suffer anxiety as a result of the threat to his employment." (Doc. 21 at ¶ 151.)

21  Stannard further alleges that, "[b]ecause [] these . . . proceedings aris[e] from his exercise of his

22  First Amendment rights, [he] has decided to withdraw from circumstances where he might have

23  to speak on issues that might get him accused of 'harassment.'" (*Id*.) Stated differently, Stannard

24  alleges that he has engaged—and will continue to engage—in self-censorship because of

25  SCCCD's "extraordinarily intrusive and chilling" investigations against him. *See White v. Lee*,

26  227 F.3d 1214, 1238 (9th Cir. 2000).

27  Though not a common way to establish "injury in fact," it is not entirely without

28  precedent. On the one hand, "a 'significantly intrusive' FBI field investigation into a plaintiff's

15

1    political beliefs and personal life, for instance, has been deemed sufficiently onerous that it

2    reasonably could generate a 'chilling effect' for standing purposes, as has an 'extraordinarily

3    intrusive and chilling' investigation by a federal agency, lasting for eight months, into certain

4    plaintiffs' protected speech and beliefs[.]" *Abbott v. Pastides*, 900 F.3d 160, 179 (4th Cir. 2018)

5    (first discussing *Clark v. Library of Congress*, 750 F.2d 89, 92–95 (D.C. Cir. 1984); and then

6    discussing *White*, 227 F.3d at 1228, 1237–38, 1242). On the other hand, "a threatened

7    administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to

8    confer standing unless the administrative process itself imposes some *significant* burden,

9    *independent of any ultimate sanction*." *Id*. (citations omitted) (emphases added).

10        Here, the first investigation was brief. On March 4, 2021, Stannard was asked to meet

11    with Erica Reyes "about some unspecified claims that had been made against him." (Doc. 21 at

12    ¶ 11.) On March 9, they sat down for an "hour-long interview," during which "Stannard was

13    interrogated about two statements he allegedly made." (*Id*. at ¶ 13.) On May 10, the President of

14    Clovis Community College determined that the allegations against Stannard "was 'not

15    sustained.'" (*Id*. at ¶ 23.) The entire investigation lasted two months, with an hour-long interview

16    at the outset. Thus, even assuming, *arguendo*, that there is "an objectively reasonable 'threat' that

17    [Stannard] might someday have to meet briefly with a [College] official in a non-adversarial

18    format, to provide [his] own version of events in response to [someone's] complaints, [it] cannot

19    be characterized as the equivalent of a credible threat of 'enforcement' or as the kind of

20    'extraordinarily intrusive' process that might make self-censorship an objectively reasonable

21    response." *Abbott*, 900 F.3d at 179. Stannard's "claim to injury by way of threatened 'process' is

22    purely speculative and thus insufficient to establish standing." *Id*. (citation and footnote omitted).

23        With respect to the second investigation, the SAC does not specify what happened during

24    the second investigation and what Stannard had to do, except the fact that Stannard had met for

25    one and half hours with Alison Winter at SCCCD headquarters on February 26, 2024. (Doc. 21 at

26    ¶ 35.) And, unlike Richardson, (*see id*. at ¶ 97), Stannard has not alleged that he was placed on

27    leave, or that he has lost access to his computer, his email, or on-campus opportunities.

28        As such, Stannard has not plausibly alleged that the second investigation is the kind of

16

1    "extraordinarily intrusive and chilling" process—like an investigation by the FBI or another

2    federal agency, *see White*, 227 F.3d at 1228, 1237–38, 1242; *Clark*, 750 F.2d at 92–95—"that

3    might make self-censorship an objectively reasonable response," *see Abbott*, 900 F.3d at 179; *see*

4    *also Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011) ("Any 'chilling effect

5    . . . must be objectively reasonable.'" (quoting *Zanders v. Swanson*, 573 F.3d 591, 593–94 (8th

6    Cir. 2009) (some quotation marks omitted))).[10]

7        3.   Economic Costs

8        Finally, Stannard argues that he has incurred economic costs (*e.g.*, the cost of retaining a

9    lawyer) in connection with the school's investigations, which he argues is a form of cognizable

10   injury. (Doc. 29 at 18.) In support of this proposition, he cites an order from a magistrate judge,

11   which supposedly held that "[p]ayment of attorney fees to defend [a] conflict of interest charge

12   constituted an injury in fact." (*Id.*) In truth, that opinion reads: "While *the costs of litigation alone*

13   *are insufficient to establish standing*, the diversion of Local 261's resources to address other

14   problems (investigating alleged corruption and restroom access) and away from its mission are

15   sufficient to establish direct standing." *Laborers Int'l Union Local 261 v. City & Cnty. of San*

16   *Francisco*, 2022 U.S. Dist. LEXIS 119250, *13 (citations omitted) (emphasis added). To be clear,

17   litigation cost alone is *not* an injury in fact.

18       Instead, the cited opinion merely applies a known doctrine pertaining to organizational

19   standing. That is, spending money to sue another person or entity, which diverts resources away

20   from an organization's other activities, may be "sufficient to establish organizational standing,"

21   "if the organization shows that, *independent of the litigation*, the challenged policy frustrates the

22   organization's goals." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018)

23

---

24   [10] Stannard also alleges that he has suffered "stigmatic injury" due to SCCCD's investigations. (*See* Doc. 29 at 17,
25   25.). The Court struggles to understand the legal significance of Stannard's alleged "stigmatic injury." First, is the
     "stigmatic injury" substantially different from the "chilling effect" theory discussed above? If so, how? To the extent
     that the "stigma" alleged here is analogous to defamation, it may not be an actionable First Amendment injury, *cf.*
26   *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States,
     but not a constitutional deprivation."); consequently, if Stannard seeks an opportunity to "clear his name," his may
27   wish to file and plead a "stigma-plus" procedural due process claim instead, *see, e.g., Bollow v. Federal Reserve*
     *Bank of San Francisco*, 650 F.2d 1093, 1100 (9th Cir.1981) (citing *Board of Regents v. Roth*, 408 U.S. 564, 573
28   (1972)). Second, as discussed above, the Court is not aware of any authority holding that an *ordinary* government
     investigation, without more, gives rise to an injury-in-fact.

17

1    (citations and internal quotation marks omitted) (emphasis added). Here, Stannard is not an

2    organizational plaintiff. Nor has he pled a "diversion-of-resource" theory.

3        In any event, the existence of past economic damages is not particularly important with

4    respect to Stannard, as he is only seeking prospective injunctive relief under the first and second

5    causes of action. (Doc. 21 at ¶¶ 171, 178.) That is because "any *past financial harm* is not

6    redressable by the *injunctive relief* [he] seeks and therefore provides no independent basis for

7    jurisdiction." *Twitter*, 56 F.4th at 1176 (footnote omitted) (emphases added). Moreover, unlike

8    the plaintiff in *Twitter*, Stannard did not even provide any "conclusor[y] and vague[] assert[ion]

9    that [he] will continue to incur financial costs." *Id*. at n.1. Therefore, his "future costs are too

10   speculative to establish injury-in-fact redressable by the requested injunctive relief." *Id*.

11   Accordingly, the Court **DISMISSES** all claims brought by Stannard **with leave to amend.**

12       **B.  Plaintiff Richardson: First and Second Causes of Action**

13       Richardson cites to several cases for the proposition that a warning letter placed in an

14   employee's personnel file is a cognizable form of injury. (Doc. 29 at 26–27.) At a high level of

15   generality, this Court agrees. *See Boswell v. Potter*, 51 F. App'x 661, 663 (9th Cir. 2002)

16   ("Letters of warning placed in the employee's personnel file are likely to deter employees from

17   engaging in protected activity."); *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840,

18   847 (9th Cir. 2004) ("A warning letter or negative review also can be considered an adverse

19   employment action."). But the mere existence of a warning letter does "not automatically

20   'provide [Richardson with] a passport to explore the constitutionality' of [all of the challenged]

21   provisions." *See Abbott*, 900 F.3d at 179 n.10 (quoting *Covenant Media of S.C., LLC v. City of N.

22   Charleston*, 493 F.3d 421, 429 (4th Cir. 2007)). Rather, it is well-established that a "plaintiff . . .

23   'must establish that he has standing to challenge *each provision* of [each policy] by showing that

24   he was injured by application of those provisions.'" *Id*. (quoting *Covenant Media of S.C.*, 493

25   F.3d at 429–30) (emphasis added); *see also TransUnion*, 594 U.S. at 430–31 (explaining that a

26   plaintiff "must demonstrate standing for *each claim* that they press and for *each form of relief*"

27   (emphases added). That, and the fact that the SAC is very disorganized, compel the Court to take

28   a regulation-by-regulation approach when considering whether Richardson has established Article

1    III standing with respect to the first and second causes of action.

2         1.   As-Applied Challenges to AR 3430, AR 3433, and AR 3435

3         To begin, Richardson alleges that "SCCCD's harassment-discrimination policies,"

4    including AR 3430, AR 3433, and AR 3435, "are unconstitutional as applied[]" to him. (Doc. 21

5    at ¶ 169.)[11] Nothing in the SAC, however, shows that AR 3430, AR 3433, and AR 3435 were

6    applied to Richardson. As this Court explained in its prior order, "Richardson has not tied his

7    [first] discipline to the challenged, *written policies in this case*." (Doc. 20 at 22 (emphasis

8    added).) Even though he was expressly warned about this deficiency, he took no corrective

9    action—the SAC is devoid of any indication as to what policy or regulation Richardson was

10   disciplined under.

11        With respect to his second discipline, the Court notes that the SCCCD expressly stated in

12   its written "Determination Letter" that "[t]he preponderance of the evidence does not support a

13   finding that [Richardson had] violated" AR 3430, AR 3433, or AR 3435. (Doc. 21 at 97). Instead,

14   as Richardson states, the SCCCD "gave [him] a 'Ninety Day Notice' pursuant to Education Code

15   § 87732 (Grounds for Dismissal) and *§ 87734 (Unprofessional Conduct)* for 'unprofessional

16   conduct relative to his bringing the chocolate bars to the open house.'" (Doc. 21 at ¶ 142

17   (emphasis added).) The plain language of the Ninety Day Notice[12] also makes it clear that the

18   College justified the second discipline based on Education Code §§ 87732 and 87734, (Doc. 21 at

19   111–12), *not* SCCCD policies such as AR 3430.

20        Though Richardson was reprimanded under Education Code §§ 87732 and 87734, he has

21   not shown how AR 3430, AR 3433, and AR 3435 were applied to him. Richardson has failed to

22   allege any facts suggesting the contrary; accordingly, he simply cannot bring an *as-applied*

23   challenge against AR 3430, AR 3433, and AR 3435, when they were *never applied to him.*

24   _____

     [11] As discussed above in Part I.E., *supra*, this Court is not considering Richardson's facial or as-applied challenges to
25   AR 3434, except to the extent that he raises a selective enforcement claim.

26   [12] The Court incorporates by reference several exhibits appended to the Second Amended Complaint that are central
     to Plaintiffs' causes of action, including but limited to the "Notice to Correct Deficiencies (Education Code sections
27   87732 and 87734)." *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a
     part of the pleading for all purposes."). Under *Khoja v. Orexigen Therapeutics, Inc.*, this Court "may assume [an
28   incorporated document's] contents are true." 899 F.3d 988, 1003 (9th Cir. 2018) (quoting *Marder v. Lopez*, 450 F.3d
     445, 448 (9th Cir. 2006)) (alteration in original).

In sum, considering Richardson's continued failure to connect his first discipline to the SCCCD policies that he is challenging, even though this Court had expressly warned him of this deficiency, (Doc. 20 at 22), as well as the undisputable fact that SCCCD had expressly stated after its second investigation that Richardson was *not* found to have violated AR 3430, AR 3433, and AR 3435, (Doc. 21 at 97), this Court **DISMISSES** his as-applied First Amendment challenges to AR 3430, AR 3433, and AR 3435 **WITHOUT LEAVE TO AMEND**.

    2.   <u>Facial Challenges to AR 3430, AR 3433, and AR 3435</u>

Having said that, even though nothing in the SAC shows that the two warning letters were issued pursuant to AR 3430, AR 3433, or AR 3435, (*see id*. at ¶¶ 60–64; *id*. at 111–15), this Court nonetheless finds that Richardson has an "objectively reasonable" fear that he will be investigated a third time, at which time he might be found to have violated one of the challenged regulations, *see Benham*, 635 F.3d at 135. After all, Richardson was investigated twice—both lasted for more than half a year, which suggest that SCCCD did not view the two complaints against Richardson as wholly meritless, (Doc. 21 ¶¶ 56, 64), both were related to gender identity, (*id*. at ¶¶ 56, 94), and both resulted in a letter that included the word "unprofessional" in it, (*id*. at ¶¶ 61 ("This letter is to address concerns regarding your recent unprofessional conduct."), 100 ("The Title IX Hearing Officer concluded that your conduct was 'mocking, obnoxious, in poor taste, and unprofessional.'" (citation to the record omitted)). After two instances of "unprofessional" conduct, there is at least a colorable possibility that a third incident could arise to SCCCD's definition of "harassment" or "discrimination" under AR 3430, AR 3433, or AR 3435. *See Porter v. Martinez*, 68 F.4th 429, 437 (9th Cir. 2023) (noting that a history of past prosecution or enforcement may be one important factor to be considered in the standing analysis)

Moreover, even though Richardson was not found to have violated AR 3430, AR 3433, or AR 3435, he was specifically investigated for possible violations those provisions with respect to his actions during the open house event. (*See* Doc. 21 at 97.) The Court therefore finds that Richardson has an objectively reasonable fear that he may be disciplined in the future under one of the challenged written policies. Accordingly, Richardson has established Article III standing to

1  pursue facial challenges to AR 3430, AR 3433, and AR 3435.

2      3.  Selective Investigation

3      Finally, the Court turns to Richardson's claim that he was selectively investigated due to

4  the content and viewpoint expressed in his speech. (Doc. 21 ¶ 168.) For substantially the same

5  reasons articulated above, the Court finds that Richardson has established a reasonable fear that

6  he will be selected for investigation again in the future, at which time he might be warned or

7  disciplined for "unprofessional" conduct.

8    **C.  Plaintiff Richardson: Third and Fourth Causes of Action**

9      1.  The Third Cause of Action

10     The standing analysis with regarding the third cause of action is more straightforward.

11 Richardson alleges that, with respect to SCCCD's second investigation into his behavior,

12 Defendants "directed SCCCD to penalize [his] speech" by placing him on administrative leave

13 pending the outcome of the second investigation against him, banning him "from non-public

14 spaces at SCCCD," and terminated his access to his work computer and work email. (Doc. 21 at

15 ¶¶ 82, 183.) As a result, he could not communicate with colleagues and missed out on many

16 professional activities. (*Id*. at ¶ 97.) More specifically, Richardson alleges in paragraph 97 of the

17 SAC:

18         [He] was suspended for nine months and kept from teaching for
           approximately 11 months. The suspension interfered with his ability
19         to teach over the course of three semesters . . . [He] lost out on
           professional opportunities including the selection of new instructors,
20         which he would have been involved in as the senior member of the
           history department . . . During the time that [he] was suspended he
21         was banned from coming to "non-public areas" on campus and
           attending meetings with colleagues and engaging in professional
22         development. Because his email was cut-off, [he] was prevented or
           substantially hindered from engaging in professional development
23         and obtaining information about SCCCD.

24 (*Id*.) Therefore, when compared to Stannard, Richardson's experience is more akin to cases where

25 courts have held that "extraordinarily intrusive and chilling" investigations may satisfy Article III

26 standing. *See White*, 227 F.3d at 1238.

27     Moreover, Richardson cites to many cases where federal courts have addressed, on the

28 merits, situations where an employee was suspended with pay, which necessarily means that

1  those courts found there was Article III standing. (*See* Doc. 29 at 26–27.) Similarly, Richardson

2  was also suspended with pay; as such, the Court believes there is at least a colorable argument

3  that SCCCD's heavy-handed approach to the second investigation may have "chilled"

4  Richardson's speech. *See, e.g.*, *Wasson v. Sonoma Cnty. Junior Coll. Dist.*, 4 F. Supp. 2d 893,

5  905 (N.D. Cal. 1997) (rejecting an argument that a plaintiff has not suffered any injury in fact

6  when she "was placed on administrative leave with pay[]" and "was prevented from teaching for

7  months"), *aff'd on other grounds sub nom. Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659

8  (9th Cir. 2000). Accordingly, the Court finds that Richardson has established Article III standing

9  with respect to the third cause of action.

10          2.  The Fourth Cause of Action

11          As mentioned, a plaintiff "must demonstrate standing for *each claim* that they press and

12  for *each form of relief* that they seek." *TransUnion*, 594 U.S. at 430–31 (emphases added). After

13  combing through the SAC, the Court could identify very few allegations that even hint at the

14  existence of "injury-in-fact" and "causation" with respect to the fourth cause of action, in which

15  Richardson alleges that Defendants retaliated against him for filing a lawsuit against the SCCCD.

16          The fourth cause of action, at paragraphs 187 to 193 of the SAC, offers nothing but a legal

17  conclusion, stating that Defendants "personally participated in and directed SCCCD to penalize

18  Richardson's First Amendment protected activity." (Doc. 21 at ¶ 190.) This conclusion does not

19  establish "injury-in-fact," and it does not plausibly suggest the existence of a *causal* relationship

20  between the second discipline and his lawsuit against the SCCCD. *See Daniel v. Nat'l Park Serv.*,

21  891 F.3d 762, 767 (9th Cir. 2018) ("These naked assertions fail our edict that a plaintiff may not

22  'rely on a bare legal conclusion to assert injury-in-fact, or engage in an ingenious academic

23  exercise in the conceivable to explain how defendants' actions caused his injury.'" (citations

24  omitted)); *see also Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016)

25  ("At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the

26  complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the

27  suppressive conduct."). Combing through the remainder of the SAC, the Court could not find any

28  allegations suggesting that SCCCD retaliated against Richardson *in response to* the lawsuit. In

1   other words, Richardson failed to plausibly allege that filing a lawsuit against the SCCCD *caused*

2   Defendants to issue a warning letter to him (the "Notice to Cure Deficiencies") 18 months later.

3   The Court therefore **DISMISSES** the fourth cause of action **with leave to amend**.

4          To summarize, the Court finds that Richardson has sufficiently demonstrated that he has

5   Article III standing to pursue his facial—but not as-applied—challenges to AR 3430, AR 3433,

6   and AR 3435 under the first (raising various First Amendment-related claims) and second

7   (arguing that aforementioned policies are void for vagueness) causes of action. Richardson has

8   also established Article III standing with respect to his First Amendment retaliation claim under

9   the third cause of action (alleging that SCCCD "retaliated" against him for bringing the "He/Him

10  Nuts" and "She/Her Nutless" chocolate bars to the open campus event), but he has not established

11  Article III standing with respect to the fourth cause of action (alleging that he was disciplined

12  because he filed a lawsuit against SCCCD).

13         **III.    MOTION TO DISMISS: FIRST AND SECOND CAUSES OF ACTION**

14         Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move

15  to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

16  12(b)(6). To survive a motion to dismiss, the complaint "must contain sufficient factual matter,

17  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

18  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

19         This plausibility inquiry is a "context-specific task that requires [this Court] to draw on its

20  judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and "'draw all reasonable

21  inferences in favor of the nonmoving party,'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir.

22  2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945

23  (9th Cir. 2014)). However, "[c]onclusory allegations and unreasonable inferences do not provide

24  [] a basis" for determining a plaintiff has plausibly stated a claim for relief. *Coronavirus Reporter

25  v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted).

26         **A.   Content- and Viewpoint-Based Restrictions on Protected Speech**

27         Richardson argues that policies are facially invalid because they amount to content- and

28  viewpoint-based restrictions on *protected* speech. (Doc. 21 at ¶¶ 163–65.) In response,

1    Defendants seem to argue that speech or conduct that rises to the level of harassment under Title

2    VII is not protected under the First Amendment.[13] (*See* Doc. 25-1 at 25 ("[N]ot a single of

3    Plaintiff Richardson's constitutional rights included the right to commit misconduct *in the*

4    *workplace* by harassing and retaliating against his fellow co-workers." (emphasis added)); Doc.

5    31 at 2 ("Plaintiff Richardson does not have the constitutional right to harass or discriminate

6    based on Federal law under the Civil Rights Act of 1964 . . ."); *Id*. at 8 ("Speech that is harassing

7    or discriminatory is not protected under the Constitution . . . As discussed above, Plaintiff

8    Richardson's actions, including the deliberate mockery of a colleague, the disclosure of

9    confidential emails, and the distribution of candy bars with offensive labels, do not constitute

10   protected constitutional rights . . .").)

11        While Richardson correctly points out that there is no per se harassment exception to the

12   First Amendment, (Doc. 21 at ¶ 159), Defendants do not take such an extreme position; rather,

13   Defendants seem to argue that because Richardson's speech fell within the definition of

14   harassment under Title VII, it was not protected speech. The Court now turns to the challenged

15   policies.

16        1.   Facial Challenge to AR 3430

17        The Court begins by noting that there are many similarities between AR 3430's and Title

18   VII's definitions of harassment, the latter of which has not been found to offend the First

19   Amendment. "[F]or conduct to constitute harassment under [Title VII's] 'hostile environment'

20   theory, it must both: (1) be viewed subjectively as harassment by the victim and (2) be objectively

21   *severe or pervasive* enough that a *reasonable person* would agree that it is harassment." *Saxe v.*

22   *State Coll. Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001) (citing *Harris v. Forklift Systems,*

23   *Inc.*, 510 U.S. 17, 21–22 (1993)). Thus, "Title VII is not violated . . . unless [an action is] so

24   severe or pervasive as to constitute an *objective change* in the conditions of employment.'" *Id*.

25   (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)) (emphasis added). Here, AR

26   3430 similarly states that "[h]arassment shall be found where, in aggregate, the incidents are

27

28   ───────────────
     [13] Indeed, AR 3430, for instance, expressly invokes, among other things, Title VII of the Civil Rights Act of 1964
     and Title IX of the Education Amendments of 1972 as its legal justifications. (Doc. 21 at 84.)

1 sufficiently *pervasive, persistent, or severe* that a *reasonable person* with the same characteristics

2 *would be adversely affected to a degree that interfere with their ability to participate* in or to

3 realize the intended benefits or an institutional activity, employment or resource."[14] (Doc. 21 at

4 84 (emphases added).) The Court therefore finds the definition of harassment under Title VII and

5 AR 3430 to be substantially similar—they both articulate some sort of "severe or pervasive," as

6 well as some sort of "objective" or "reasonable person," standard.[15]

7       Several circuit courts have also applied Title VII's "severe or pervasive" standard to Title

8 IX, at least with respect to colleges and universities, without any obvious First Amendment

9 problem.[16] That, combined with the fact that AR 3430 is substantially identical to Title VII's

10 "severe or pervasive standard," convinces this Court that AR 3430 is also facially constitutional

11 as a matter of law. In sum, this Court determines that AR 3430 passes constitutional muster

12 because it sufficiently incorporates Title VII's "severe or pervasive" and "objective change"

13

---

14 [14] The "Hearing Determination Letter" states that "[p]ervasiveness is a measure of widespread nature of the conduct
or its impact[,]" that "[p]ersistent is a measure of how frequently the conduct occurs[,]" that "[s]everity is a measure

15 of the egregiousness of an incident, either in isolation or in aggregate[,]" and that "the alleged conduct" must affect a
reasonable "person's ability to participate in or benefit from the College's activity[.]" (Doc. 21 at 107.)

16
[15] The similarities are hardly surprising considering that AR 3430 expressly invokes, among other things, Title VII of

17 the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 as its legal justifications. (Doc. 21 at
84.)

18
[16] *See, e.g., Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) ("Similarly, a Title

19 IX hostile education environment claim is 'governed by traditional Title VII 'hostile environment' jurisprudence.' A
Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the

20 environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation,
ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment." (citations

21 omitted)); *DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) ("[U]nless harassment is qualified with a
standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech."

22 (citation and footnote omitted)); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) ("Consistent
with the Supreme Court's *Davis* decision, we have recognized that, to succeed on a Title IX claim premised on

23 sexual harassment, a plaintiff must show," among other things, "that the harassment was sufficiently severe or
pervasive to create a hostile (or abusive) environment in an educational program or activity[.]" (citation and

24 quotation marks omitted)); *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004) ("This court has
endorsed looking to Title VII law to determine whether the alleged sexual harassment is sufficiently severe or

25 pervasive to constitute illegal discrimination on the basis of sex under Title IX." (citations omitted)). In *Rowles v.
Curators of Univ. of Missouri*, for instance, the Eighth Circuit rejected a First Amendment challenge against a public

26 university's sexual harassment policy, which prohibits any conduct that "creates a hostile environment by being
sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies the ability of an

27 individual to participate in or benefit from educational programs or activities or employment access, benefits or
opportunities." 983 F.3d 345, 352 (8th Cir. 2020). The *Rowles* case is one of the clearest examples where a court of

28 appeals affirmed, on First Amendment grounds, a public university's decision to impose Title VII's "hostile
environment" jurisprudence—and, by extension, the "severe or pervasive" standard—onto its students, staff, and
faculty members alike.

1    standards. *See DeJohn*, 537 F.3d at 320 ("[U]nless harassment is qualified with a standard akin to

2    a severe or pervasive requirement, a harassment policy may suppress core protected speech."

3    (citation and footnote omitted)); *Rowles*, 983 F.3d at 352 (rejecting a First Amendment challenge

4    against a public university's sexual harassment policy, which prohibits any conduct that is

5    "sufficiently severe or pervasive and objectively offensive that it interferes with, limits or denies

6    the ability of an individual to participate in or benefit from educational programs or activities

7    . . ."). Accordingly, the Court **DISMISSES** Richardson's facial challenge to AR 3433 with

8    **PREJUDICE**, for amending the SAC with more factual allegations would not cure any legal

9    deficiencies in his arguments.

10        2.   Facial Challenge to AR 3433

11       AR 3433 defines sexual harassment as actions "determined by a reasonable person to be

12   so severe, pervasive, ***and*** objectively offensive that it effectively denies a person equal access to

13   the District's education program or activity," (Doc. 21 at 117 (emphasis added)), which is a more

14   stringent standard than Title VII's "severe ***or*** pervasive" standard that federal courts have

15   routinely applied without serious First Amendment-related problems. And if the latter is

16   constitutional, so is the former. *See Rowles*, 983 F.3d at 352, 358–59 (rejecting a First

17   Amendment challenge against a public university's sexual harassment policy that defines

18   harassment as any conduct that is "sufficiently severe ***or*** pervasive and objectively offensive that

19   it interferes with [] . . . the ability of an individual to participate in or benefit from educational

20   programs or activities or employment access" (emphasis added)).

21       In addition, Richardson expressly concedes in the SAC that "a university might be able to

22   prohibit harassment that amounts to 'discrimination' against a protected class that is 'so severe,

23   pervasive, and objectively offensive that it can be said to deprive the victims of access to the

24   educational opportunities or benefits provided by the school,'" (Doc. 21 at ¶ 162 (quoting *Davis*

25   *ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999))), so it makes little

26   sense, then, to allow him to simultaneously pursue a facial challenge to AR 3433, which uses

27   substantially same wording.

28       In case there is any doubt, the Court further notes that in *Davis*, a majority of Supreme

Court Justices considered and rejected the dissenting Justices' First Amendment concerns, noting

that there are "very real limitations" to Title IX's "so severe, pervasive and objectively offensive"

standard that it just articulated, which does not create liability for "teas[ing]," "name-calling,"

isolated incidents, or "a mere 'decline in grades.'" *Davis*, 526 U.S. at 652. And this Court

declines to abrogate the sexual harassment definition articulated by the Supreme Court in *Davis*,

unless there is some truly exceptional and extraordinary justification. The present case doesn't

come anywhere close to offering one. Accordingly, the Court **DISMISSES** Richardson's facial

challenge to AR 3433 with **PREJUDICE**, for further amending the SAC with more factual

allegations would not cure a meritless and futile legal claim.

    3.   Facial Challenge to AR 3435

    Richardson alleges that AR 3435 "includes the following definition of 'discrimination':

> 'Discrimination' includes the unfair or unjust treatment of an individual based on certain protected characteristics that adversely affects their employment or academic experience. An adverse action for discrimination purposes is any action taken or pattern of conduct that, taken as a whole, *materially and adversely affected* the terms, conditions, privileges, benefits of or the ability to fully participate in activities or events associated with an individual's employment or academic environment. An adverse action includes conduct that is *reasonably likely to impair a reasonable individual's* work or academic performance or prospects for advancement or promotion. However, minor or trivial actions or conduct that are *not reasonably likely to do more than anger or upset an individual cannot constitute an adverse action*."

(Doc. 21 at ¶ 129 (emphases added).) Richardson further alleges that "AR 3435 includes the

following definition of 'harassment':

> 'Harassment' includes conduct based on certain protected characteristics that creates a hostile, offensive, oppressive, or intimidating work or educational environment and deprives a person of their statutory right to work or learn in an environment free from harassment. In the workplace, harassment also includes conduct based on certain protected classes that sufficiently offends, humiliates, distresses, or intrudes upon a person, so as to disrupt the person's emotional tranquility in the workplace, affect their ability to perform the job as usual, or otherwise interfere with and undermine their personal sense of well-being. (Refer to AR 3430 - Prohibition of Harassment for specific examples of harassment)."

(Doc. 21 at ¶ 131.)

    Unlike AR 3430 and AR 3433, however, Defendants cannot simply invoke Title VII or

Title IX as a defense, at least not without further briefing, because AR 3435's definition of "harassment" and "discrimination" do not clearly track either Title VII's "severe or pervasive" standard or Title IX's "so severe, pervasive, and objectively offensive" standard. Accordingly, the Court **DENIES** Defendants' motion to dismiss with respect to Richardson's facial challenges to the two provisions of AR 3435.

### B. Vagueness and Overbreadth

The Court now turns to Richardson's overbreadth and vagueness claims, under the first and second causes of action, respectively. (Doc. 21 at ¶¶ 161, 176.) A statute or regulation may be facially invalid under the substantial overbreadth doctrine "if there is a realistic danger that it will significantly compromise recognized First Amendment protections of parties not before the Court. In other words, a regulation imposing lawful limits on some expressive activities may nevertheless be invalid if at the same time it reaches too much expression that is protected by the Constitution." *O'Brien v. Welty*, 818 F.3d 920, 929–30 (9th Cir. 2016) (citation and quotation marks omitted). "A regulation may also violate the First Amendment if it is unconstitutionally vague. To pass muster, a regulation must allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id*. at 930 (citation and quotation marks omitted). "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). For instance, even if a challenged regulation is too vague or overbroad when imposed upon the public, it might be perfectly constitutional when applied to government employees. *See Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality) ("Yet surely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large.").

#### 1. Vagueness

As a preliminary matter, the Court notes that, even though Defendants have raised and discussed the vagueness claim in their motion to dismiss, (Doc. 25-1 at 26–27), Richardson failed to address it in his brief, (Doc. 29). And a plaintiff who "makes a claim" in a complaint "but fails to raise the issue in response to a defendant's motion to dismiss" "effectively abandoned [that]

28

1   claim." *Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *see also*

2   *Maldonado v. City of Ripon*, 2021 WL 2682163, at *8 (E.D. Cal. June 30, 2021) ("Plaintiff does

3   not address Defendants' arguments regarding punitive damages in his opposition to the motion to

4   dismiss and therefore concedes the arguments. Accordingly, Plaintiff's claim for punitive

5   damages is [dismissed] without leave to amend." (internal citation omitted)). Even if this Court

6   were to consider the vagueness claim, this Court is nonetheless persuaded by Defendants'

7   position.

8          Richardson alleges that the SCCCD's policies are unconstitutionally vague because they

9   lack "any definitions, detail, context, or notice to faculty about what sorts of language the

10  [College] views as 'harassing,' 'invasive,' or 'unwanted.'" (Doc. 21 at ¶ 176.) He further points

11  to, for example, AR 3435, which states:

12              "Harassment" includes conduct based on certain protected
               characteristics that creates a hostile, offensive, oppressive, or
13             intimidating work or educational environment and deprives a person
               of their statutory right to work or learn in an environment free from
14             harassment. In the workplace, harassment also includes conduct
               based on certain protected classes that sufficiently offends,
15             humiliates, distresses, or intrudes upon a person, so as to disrupt the
               person's emotional tranquility in the workplace, affect their ability to
16             perform the job as usual, or otherwise interfere with and undermine
               their personal sense of well-being. (Refer to AR 3430 - Prohibition
17             of Harassment for specific examples of harassment).

18  (*Id.* at ¶ 131.)

19         The Court agrees with Defendants' argument that words like "harassment" are "a regular

20  part of common discourse," such that they are not inherently void for vagueness. (Doc. 25-1 at

21  26.) Indeed, several circuit courts also seem to agree. In *United States v. Osinger*, for instance, the

22  Ninth Circuit expressly rejected a vagueness challenge to an anti-stalking statute, 18 U.S.C.

23  § 2261A(2)(A), explaining that words like "'harass' and 'substantial emotional distress' are not

24  esoteric or complicated terms devoid of *common understanding*." 753 F.3d 939, 945 (9th Cir.

25  2014) (emphasis added); *see also United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)

26  ("Here, we think that a common sense reading of the statute adequately defines the prohibited

27  conduct. 'Harass' and 'intimidate' are not obscure words. *Most people would readily understand*"

28  their meanings. (emphasis added)).

Richardson also ignores the fact that courts have upheld statutes and regulations that are comparably vague in the context of public employment or public education. *See, e.g.*, *Tindle v. Caudell*, 56 F.3d 966, 973 (8th Cir. 1995) (holding that police department rules prohibiting officers from engaging in "any personal act or conduct which[] . . . could result in justified criticism of the officer or the department" and prohibiting officers from "ridicul[ing], mock[ing], derid[ing], taunt[ing], or belittle[ing] any person" are not unconstitutionally overbroad and vague); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) (upholding a regulation authorizing dismissal of university professors for "failure to maintain standards of sound scholarship and competent teaching"). In *Keating v. Univ. of S. Dakota*, for instance, the Eighth Circuit held that a public university's abstractly worded "civility clause is not facially void for vagueness." 569 F. App'x 469, 471 (8th Cir. 2014) (per curiam). There, the full text of the civility clause reads:

> Faculty members are responsible for discharging their instructional, scholarly and service duties civilly, constructively and in an informed manner. They must treat their colleagues, staff, students and visitors with respect, and they must comport themselves at all times, even when expressing disagreement or when engaging in pedagogical exercises, in ways that will preserve and strengthen the willingness to cooperate and to give or to accept instruction, guidance or assistance.

*Id.* at 470. The court explained that "[a]lthough the policy employs broad language, that alone does not necessarily prevent an ordinary person from recognizing that certain conduct will result in discharge or discipline." *Id.* The Court suggested that people should not view the word "civility" in isolation, for "the civility clause articulates a more comprehensive set of expectations that, *taken together*, provides employees meaningful notice of the conduct required by the policy." *Id.* (emphasis added). True, "[t]he outer contours of the civility clause perhaps are imprecise, but many instances of faculty misconduct would fall clearly within the clause's proscriptions, thus precluding the conclusion that the policy is facially unconstitutional." *Id.*

Here, too, AR 3435 and AR 3430—the latter of which is incorporated by reference into AR 3435—*taken together* provide many detailed definitions and examples to those who must follow them. *See id*. Given the absence of specific and concrete explanations from Richardson as

1  to why AR 3430, AR 3433, and AR 3435 are distinguishable from the precedents cited, this Court

2  concludes that Richardson has failed to state a void for vagueness claim, on either a facial or as-

3  applied theory.

4       For all these reasons, the Court **DISMISSES** Richardson's vagueness claim under the

5  second cause of action **WITHOUT LEAVE TO AMEND**, for Richardson has failed to defend

6  his vagueness claim in his brief in opposition, (Doc. 29), to Defendants' motion to dismiss the

7  second cause of action, (Doc. 25-1 at 26–27). Moreover, adding more factual allegations would

8  not meaningfully affect this Court's legal conclusion that the challenged regulations are not

9  facially void for vagueness.

10       2.  Overbreadth

11       The Court now turns to Richardson's overbreadth claim under the first cause of action,

12  which rests on a First Amendment doctrine designed "to prevent the chilling of protected

13  expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). The Supreme Court, however,

14  has cautioned that the overbreadth doctrine is "strong medicine" that should be "employed . . .

15  sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). As such,

16  the Supreme Court has repeatedly emphasized that, to succeed on a claim of substantial

17  overbreadth, a challenged regulation's overly broad, "unconstitutional applications must be

18  realistic, not fanciful, and their number must be *substantially disproportionate* to the

19  [regulation's] lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (emphasis

20  added). And Richardson "bears the burden of demonstrating, 'from the text of [the law] and from

21  actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)

22  (quoting *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988)).

23       Even though Defendants argue that Richardson has failed to state a claim under every

24  cause of action, (*see* Doc. 25-1 at 20), this Court could not locate any substantive discussion by

25  Defendants as to the overbreadth issue. The Court therefore finds that Defendants have neither

26  properly raised nor adequately contested the overbreadth issue.

27       Having said that, the Court has already determined above, *supra*, that AR 3430 and AR

28  3433 satisfy the constitutional stricture, for they have been repeatedly applied by federal courts

1  across the country with no obvious First Amendment problems; as such, there is no need to revisit

2  the constitutionality of those two regulations under the overbreadth theory. Accordingly, the

3  Court **DENIES** Defendants' motion to dismiss only with respect to Richardson's claim that AR

4  3435 is facially overbroad.

5  **C. Selective Enforcement**

6  Finally, the Court turns to Richardson's allegation, under the first cause of action, that

7  Defendants "have engaged in . . . [an] unconstitutional *pattern* of conduct[]" by, *inter alia*,

8  selectively investigating and disciplining him "while those who made equivalent statements with

9  viewpoints that were supported by SCCCD were not warned or disciplined." (Doc. 21 at ¶¶ 166–

10  71 (emphasis added); *see also id*. at ¶¶ 118–19) Stated differently, Richardson alleges that

11  Defendants' purported selective enforcement of SCCCD policy amounted to an unwritten

12  "pattern" of viewpoint discrimination of speech in violation of the First Amendment. Defendants,

13  however, contend that Richardson did not sufficiently plead its viewpoint discrimination claim.

14  (Doc. 25-1 at 24.) This Court agrees with Defendants that Richardson failed to plead sufficient

15  facts as to make out a prima facie case of "selective enforcement."

16  Within the Ninth Circuit, selective enforcement of a law or regulation based on a

17  speaker's viewpoint is evaluated through the lens of the Equal Protection Clause of the

18  Fourteenth Amendment. *See Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152–

19  57 (9th Cir. 2007). Specifically, to prevail on a claim alleging that the government's "selective

20  enforcement of an otherwise valid law neutral as to speech violates the equal protection clause,"

21  *Hightower v. City & Cnty. of San Francisco*, 77 F. Supp. 3d 867, 885 (N.D. Cal. 2014), *aff'd sub*

22  *nom. Taub v. City & Cnty. of San Francisco*, 696 F. App'x 181 (9th Cir. 2017), "the party

23  alleging discrimination must first show that the enforcement had a discriminatory effect, and the

24  government was motivated by a discriminatory purpose," *Nat'l Inst. of Fam. & Life Advocs. v.*

25  *Bonta*, 769 F. Supp. 3d 1109, 1130–31 (C.D. Cal. 2025) (first citing *Rosenbaum*, 484 F.3d at

26  1152–53; and then citing *United States v. Armstrong*, 517 U.S. 456, 465–66 (1996)).[17]

27

28  [17] If a plaintiff "seek[s] to enjoin alleged selective enforcement," he "must demonstrate the [alleged] misconduct is part of a policy, plan, or a pervasive pattern." *Id*. 1131 (quoting *Rosenbaum*, 484 F.3d at 1153).

32

1    The Court now turns to the "discriminatory effect" prong and considers the two incidents

2    involving Richardson.

3        1.   Calvin and the Second Discipline

4     "To establish a discriminatory effect . . , the claimant must show that similarly situated

5    individuals . . . were not prosecuted." *Armstrong*, 517 U.S. at 465; *Freeman v. City of Santa Ana*,

6    68 F.3d 1180, 1187 (9th Cir.1995) ("[I]t is necessary to identify a 'similarly situated' class

7    against which the plaintiff's class can be compared. (citation omitted)). In *Rowles v. Curators of*

8    *Univ. of Missouri*, for example, a male Ph.D. candidate was accused of stalking and harassing a

9    female student. F.3d 345, 351–52 (8th Cir. 2020). Among his various purported grievances, the

10   plaintiff argued that the university treated his female accuser more favorably based on her sex. *Id.*

11   at 360. In rejecting the plaintiff's "'selective enforcement' theory[,]" the Eighth Circuit explained

12   that his "allegations regarding the University's treatment of [his] accuser d[id] not support his

13   claim that a female in *similar circumstances*—i.e., a female accused of sexual harassment or

14   stalking—was treated more favorably." *Id.* (emphasis added). Stated differently, a male student

15   accused of harassment must show that a female student accused of harassment would have been

16   treated differently; it's not enough to allege that a female accuser was treated differently.

17       Here, Richardson complains that Calvin, his accuser, was not investigated for allegedly

18   making false statements to the Title IX coordinator. (Doc. 21 at ¶ 116.)[18] Accepting that

19   allegation as true, as the Court must on a motion to dismiss, Calvin was not a "similarly situated

20   comparator." For one, Richardson contends that Calvin lied to the Title IX coordinator, a different

21   kind of accusation than the sexual harassment allegation against Richardson. For another, she was

22   an accuser, not a person accused of sexual harassment. *See Rowles*, F.3d at 361.

23       Instead, Richardson must plausibly allege that a "similarly situated" person, but with a

24   different viewpoint, would not have been investigated and disciplined like he was. For instance,

25   Richardson has not alleged—much less plausibly alleged—that a person displaying "He/Him Can

26

27   _____

     [18] The Court further notes that Richardson has not provided the Court with a copy of his request to investigate
     Deanna Calvin, or SCCCD's response to his request (if any) or included any related allegations in the SAC. (*See*
28   Doc. 21 at ¶ 116.). This makes it difficult for the Court to evaluate Richardson's claim that SCCCD has, in fact,
     enforced its regulations in a viewpoint-discriminatory manner.

1    Be Nutless" and "She/Her Can Have Nuts Too" chocolate bars at the history department's table

2    would not have been investigated/disciplined, even though he was investigated and subsequently

3    disciplined for displaying "He/Him Nuts" and "She/Her Nutless" chocolate bars.

4        2.    MacArthur and the First Investigation

5        With respect to the first investigation, Richardson alleges—and expressly points to the

6    quoted passage in paragraph 55 of the SAC as evidence—that he had requested HR to

7    "investigate [MacArthur]'s harassment" of him, but to no avail. (Doc. 21 at ¶ 55.) He believes

8    that this disparity in treatment—that he was investigated but MacArthur was not—was due to the

9    difference in the viewpoint expressed in their emails. But the quoted passage in paragraph 55 of

10    the SAC shows no evidence of a request to investigate MacArthur, (*see id*.), so the Court has no

11    way to assess the similarity between the situations.

12        Richardson also states that he believes the "SCCCD would utilize [MacArthur]'s

13    complaints as a putative victim in order to coerce [him] to accede to the ideological position that

14    SCCCD had advocated through [MacArthur]." (Doc. 21 at ¶ 49.) Stated differently, Richardson

15    appears to be arguing that the SCCCD used MacArthur's complaint as a pretext to "coerce [him]

16    to accede to" SCCCD's ideological position. But to succeed on an argument based on "pretext" in

17    a selective enforcement case, Richardson still needs to show that a "similarly situated" person

18    would not have been punished, even though he was punished. The SAC, however, fails to make

19    any such allegations. For example, Richardson complains that "SCCCD ignored [MacArthur]'s

20    speech actions but chose to punish the mirroring speech of Richardson." (*Id*.) But MacArthur's

21    email to Richardson does not even arguably contain mockery or harassment. It was written in a

22    serious tone.

23        In sum, because Richardson has not alleged the existence of a "similarly situated"

24    comparator, he fails to plausibly allege the existence of any "discriminatory effect." *Rosenbaum*,

25    484 F.3d at 1154 ("Because appellants did not identify a bona fide control group, they cannot

26    demonstrate a discriminatory effect in the City's issuance of permits for amplified sound."). As

27    such, this Court need not proceed to the "discriminatory purpose" prong.[19] The Court

28    _____

[19] To be sure, it is possible that *Reed*'s statement that "an innocuous justification cannot transform a *facially* content-

1    **DISMISSES** Richardson's selective enforcement claim, but **with leave to amend**, for, if given a

2    chance to amend the SAC, Richardson may be able to plead enough facts to make out a prima

3    facie case of selective enforcement.

### IV.    MOTION TO DISMISS: THIRD CAUSE OF ACTION

5         Richardson alleges in the third cause of action that he was engaged in protected speech as

6    a private citizen at the open house when he handed out the chocolate bars, and that Defendants

7    "directed SCCCD to penalize" him for his speech by placing him on administrative leave with

8    pay. Though not clearly labeled as such, this is a first amendment retaliation claim. (*See* Doc. 21

9    at ¶ 186 ("As a proximate result of Defendants' retaliation, [Richardson] has been caused to

10   suffer . . ."); Doc. 29 at 26 ("Richardson alleges that he was retaliated against because of his

11   speech and because he filed a legal action against SCCCD.").)

12        Before turning to Richardson's generalized First Amendment retaliation claim under the

13   third cause of action, it is important to re-emphasize what issues are not being considered by this

14   Court. First, since the Court has already found that Richardson lacks Article III standing to make

15   his as-applied challenges to AR 3430, AR 3433, and AR 3435 in Part II.B, *supra*, they will not be

16   reconsidered here. Second, because Education Code §§ 87732 and 87734 are not mentioned

17   anywhere under the first to fourth causes of action, (*id*. at ¶¶ 156–93), this Court does not

18   consider whether those two provisions were constitutionally applied to Richardson. Third, the

19   Court has already considered and rejected Richardson's selective enforcement claim with leave to

20   amend above, *supra*; and, for the same reasons, the Court rejects Richardson's selective

21   enforcement theory under the third cause of action as well.[20]

22   _____

23   based law into one that is content neutral[]"may have abrogated the discriminatory purpose prong of *Rosenbaum sub
     silentio* with respect to free speech cases. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165–66 (2015) (emphasis
     added). But this Court need not decide that today, for Richardson has failed to establish discriminatory effect.

24

25   [20] Richardson points to the Supreme Court's recent decision in *Gonzalez v. Trevino*, 602 U.S. 653 (2024), for the
     proposition "that retaliatory enforcement could be based on disparate enforcement." (Doc. 29 at 27.) While that
     statement is certainly correct, the Supreme Court's opinion in *Gonzalez* does not help his case for a multitude of
26   reasons.

27        For one, the *Gonzalez* case did not actually address "retaliatory" or "disparate" enforcement in the usual civil
     context. There, the Supreme Court admonished the Fifth Circuit for taking "an overly cramped view of" the "*Nieves*
     exception," which is a "slim" exception to the general requirement that a plaintiff seeking to establish a prima facie
28   case of retaliatory *arrest* must prove the absence of probable cause. *Gonzalez*, 602 U.S. at 658; *see also id*. at 665
     (Alito, J., concurring) ("And to illustrate the thinness of this exception, *Nieves* offered the example of a vocal critic of

**A.  Legal Frameworks**

  1.  The *Eng/Pickering* Inquiry

The Court begins by noting that many of the cases cited by Richardson regarding content- and viewpoint-based discrimination of speech are related to situations where the government is regulating or otherwise burdening the speech of the public. (*See, e.g.*, Doc. 21 at ¶¶ 163–64 (citing cases like *R.A.V. v. City of St. Paul*).) Those cases, however, have limited applicability in situations where the government is regulating the speech of its employees. *See Waters*, 511 U.S. at 678 (1994) ("To begin with, even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees."); *City of San Diego, Cal. v. Roe,* 543 U.S. 77, 80 (2004) (per curiam) (summary reversal) ("[A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public.").

"Instead, the Court applies a distinct *Pickering*-based analysis that 'reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (quoting *Roe,* 543 U.S. at 82). The relevant standard is set forth in *Garcetti v. Ceballos*:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to

---

the police who is arrested for jaywalking." (citing *Nieves*, 587 U.S. at 407)). The purpose of the *Nieves* exception is "to account for 'circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Id.* (quoting *Nieves*, 587 U.S. at 406). For example, "jaywalking is endemic but rarely results in arrest." *Nieves*, 587 U.S. at 407. Hence, if a police officer singles out and arrests a vocal critic of the police for jaywalking, it may give rise to an inference that the officer acted in retaliation of the arrestee's speech. *Id.* In such situation, the Supreme Court held that a plaintiff may "present[] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*

Thus, neither *Nieves* nor *Gonzalez* abrogated the general principle that, to establish a prima facie case of selective enforcement, a plaintiff needs to provide "*objective* evidence" showing that, even though he was penalized, "*similarly situated individuals* not engaged in the *same sort of protected speech*" were not penalized. *Id.* (emphases added) Richardson, however, failed to present even a single "similarly situated" individual—that is the principal deficiency with Richardson's selective enforcement theory, as discussed in Part IV.C, *supra*.

Even if Richardson's case somehow fits within the *Nieves* exception, he still needs to satisfy steps 1 through 3 of the *Eng/Pickering* analysis. *See Gonzalez*, 602 U.S. at 664 (Alito, J., concurring) (explaining that the plaintiff must either satisfy the *Nieves* exception or "prove the absence of probable cause as a threshold requirement before they can advance their claims under the *Mt. Healthy* framework[]").

In sum, even though Richardson is correct that selective enforcement may form the basis of a First Amendment retaliation claim, but for the reasons stated in Part III.C, *supra*, his reference to the Supreme Court's opinion in *Gonzalez* does not help his case.

public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

547 U.S. 410, 418–19 (2006) (citations omitted).

"In analyzing First Amendment retaliation claims brought by government employees, [the Ninth Circuit] employ[s] the familiar test established in *Pickering*." *Adams v. Cnty. of Sacramento*, 143 F.4th 1027, 1033 (9th Cir. 2025). Specifically:

Under the *Pickering* framework, it is the plaintiff's burden to establish that "(1) she spoke on a matter of public concern; (2) she spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." "If [a plaintiff] establishes such a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating [the employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech."

*Id*. at 1033–34 (quoting *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018)) (alterations in original). This is also known as the *Eng v. Cooley* analysis within the Ninth Circuit.

2.  Qualified Immunity

As Defendants point out, (Doc. 25-1 at 28), even if Richardson makes out a plausible claim for relief, they are "entitled to qualified immunity, even if they violated [Plaintiff]'s First Amendment rights, [so long as] they reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information [that they] possessed.'" *See Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (third alteration in original) (quoting *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 973 (9th Cir. 1996)). Stated differently, if the caselaw is sufficiently ambiguous as to whether Richardson's speech was protected, or whether Defendants' actions are lawful, Defendants are entitled to qualified immunity, and the third cause of action must be dismissed.

37

Since qualified immunity is a defense, the burden of pleading it rests with the defendant, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980), which is met here, (Doc. 25-1 at 28). The burden is now on the plaintiff to show that he suffered an underlying constitutional violation and the official's conduct violated clearly established law. *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) ("The plaintiff in a § 1983 action bears the burden of proving that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct."). As the Supreme Court explained in detail in *D.C. v. Wesby*:

> [O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that the rule was firmly established." . . .

583 U.S. 48, 62–64 (2018) (citations omitted) (cleaned up).

The Court evaluates each step of the *Eng/Pickering* analysis with these principles in mind.

**B.  Step 1: Matter of Public Concern**

"Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng v. Cooley*, 552 F.3d 1062,

1070 (9th Cir. 2009) (citation and internal quotation marks omitted). But "speech concerning only personal interest, such as speech addressing a personal employment dispute or complaints over internal office affairs," *Adams*, 143 F.4th at 1035 (citation and quotation marks omitted), or private communications concerning a workplace misconduct investigation, *Roberts v. Springfield Util. Bd.*, 68 F.4th 470, 475 (9th Cir. 2023), may not be a matter of public concern. That is because "[s]peech that deals with 'individual personnel disputes and grievances' . . . [are generally] of 'no relevance to the public's evaluation of the performance of governmental agencies.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

"Whether an employee's speech addresses a matter of public concern" must be determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "Although the speech's form is not always 'dispositive,' a speaker's "narrow . . . focus and limited audience weigh against [a] claim of protected speech." *Adams*, 143 F.4th 1037 (quoting *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)). For instance, "private communications are directed to co-workers—rather than the public or press—may cut against a conclusion that the matter is of public concern." *Id*. at 1037–38 (citations omitted).

Here, because Defendants did not raise or otherwise contest the question of whether Richardson's speech involved a matter of public concern, this Court assumes—but without deciding—that step 1 of the *Eng* analysis resolves in favor of Richardson.

## C. Step 2: Private or Public Speech

Next, the Court turns to the question of whether Richardson spoke as a private citizen or as a public employee. "Two inquiries are necessary to resolve this mixed question of law and fact. First, a factual determination must be made as to the 'scope and content of a plaintiff's job responsibilities.'" *Johnson*, 658 F.3d at 966 (quoting *Eng*, 552 F.3d at 1071). "Second, the 'ultimate constitutional significance' of those facts must be determined as a matter of law." *Id*. "If [the plaintiff] spoke as any ordinary citizen might, then [the] inquiry continues. But if [the plaintiff]'s speech 'owes its existence' to his position as a teacher, then [he] spoke as a public

1    employee, not as a citizen, and [the] inquiry is at an end." *Id.* (citations omitted); *see also Eng*,

2    552 F.3d at 1071 ("In evaluating whether a plaintiff spoke as a private citizen, we must therefore

3    assume the truth of the facts as alleged by the plaintiff with respect to employment

4    responsibilities. If the allegations demonstrate an official duty to utter the speech at issue, then the

5    speech is unprotected, and qualified immunity should be granted.").

6         While "no single formulation of factors can encompass the full set of inquiries relevant to

7    determining the scope of a plaintiff's job duties," *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th

8    Cir. 2013) (en banc), several factors may be considered. The Ninth Circuit, for instance, instructs

9    courts to consider a few "guiding principles," namely, "whether or not the employee confined his

10   communications to his chain of command," "the subject matter of the communication," and

11   whether "a public employee speaks in direct contravention to his supervisor's orders." *Id.* at

12   1074–75 (citation omitted)). Other considerations may include "the impetus for [the] speech, the

13   setting of [the] speech, the speech's audience," *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d

14   531, 540–41 (6th Cir. 2012) (internal citation and quotation marks omitted)), as well as "whether

15   the employee was commissioned or paid to make the speech in question[,] . . . whether the

16   employee spoke at her place of employment[,] whether the speech gave objective observers the

17   impression that the employee represented the employer when she spoke (lending it 'official

18   significance')[,] whether the employee's speech derived from special knowledge obtained during

19   the course of her employment[,] and whether there is a so-called citizen analogue to the

20   speech[,]" *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011) (internal citations omitted).

21        Turning to the details of the second incident, Richardson acknowledges in the SAC that

22   the MCC organized the open-campus event "for the various departments to have instructors put

23   out things associated with the discipline they taught," so that "potential students, their parents,

24   and community members" could speak to instructors about "the substance of the course or

25   various issues about the course" that they teach. (Doc. 21 at ¶ 72; Doc. 31 at 7.) Defendants

26   therefore argue that Richardson showed up "acting in a representative capacity on behalf of the

27   [MCC], and . . . that he was perceived as such by event attendees." (Doc. 31 at 7; *see also* Doc.

28   25-1 at 10 (similar).)

1          1.  Setting and Perception

2          To begin with, Richardson argues that "Defendants misconceive the issue when they

3   assert that Richardson could have been perceived to have been a representative of SCCCD at the

4   Open Campus event." (Doc. 29 at 24.) Stated differently, Richardson argues that the correct

5   question is not about whether Richardson was perceived to be a representative of SCCCD, but

6   rather whether he was, in fact, a representative of SCCCD. The Court agrees with Defendants to

7   the extent (a) that Richardson was reasonably perceived by members of the public as a

8   representative of the MCC, which Richardson does not expressly dispute, and (b) that perception

9   may be one important factor to consider, even though it may not be dispositive. Indeed, several

10  precedents seem to have placed a great deal of emphasis on the setting of the speech.

11         *Foley v. Town of Randolph*, for instance, involved a situation where, even though the

12  Chief of the local Fire Department "was not required to speak to the press as part of his job," he

13  nonetheless "d[id] so at a press conference convened by the State Fire Marshal." 598 F.3d 1, 6–7

14  (1st Cir. 2010). The First Circuit explained that because he "spoke from the scene of the fire

15  where he was on duty, in uniform, and sp[oke] alongside the State Fire Marshal," it was quite

16  likely "that anyone who observed [his] speech took it to bear the *imprimatur* of the Fire

17  Department." *Id*. at 7–8 (emphasis added). Accordingly, the First Circuit held that the plaintiff in

18  that case "addressed the media in his official capacity, as Chief of the Fire Department, at a forum

19  to which he had access because of his position." *Id*. at 7 (citations and quotation marks omitted).

20         Here, too, by voluntarily standing behind the official table designated for the College's

21  history department and introducing himself as a history professor, Richardson obtained a

22  "position of authority and trust," as a tenured faculty member, and used that "to lend [his speech]

23  greater credence or persuasiveness." *See Decotiis*, 635 F.3d at 34. The setting and context of the

24  speech invariably created an official-like appearance, a fact that tends to favor a finding of

25  official speech rather private speech. *See id*. at 32 (explaining that "whether the employee spoke

26  at her place of employment" and "whether the speech *gave objective observers the impression*

27  that the employee represented the employer when she spoke (lending it 'official significance')"

28  may be relevant considerations (citations omitted) (emphasis added)). To be sure, a college

41

1    professor standing behind the history department's table is not perfectly analogous to a uniformed

2    government officer speaking to journalists at the scene of an accident, but the similarities between

3    *Foley* and the present case create a serious doubt as to whether Richardson spoke as a private

4    citizen rather than a college professor at the open house.

5         Another relevant case is *Barone v. City of Springfield, Oregon*, 902 F.3d 1091 (9th Cir.

6    2018). There, the Ninth Circuit addressed a situation where a municipal police department held an

7    "event headlined 'Come Meet [this employee] from the Springfield Police Department.' The

8    Department paid her to attend the event; she wore her uniform; and her supervisor attended." *Id.*

9    at 1097. The Ninth Circuit held that the plaintiff spoke in her official capacity in part because she

10   "did not 'speak[ ] in direct contravention to [her] supervisor's orders,'" she "was the listed

11   speaker . . . , her supervisors were aware of the event, and one of her supervisors attended the

12   event." *Id.* at 1101 (quoting *Dahlia*, 735 F.3d at 1075) (first and second alterations in original).

13   The Court further noted that "she spoke while clothed in official attire, while on the clock, and in

14   a location she had access to by virtue of her position." *Id.* at 1100–01.

15        The facts alleged in the SAC are analogous to the *Barone* case. Here, Richardson's "direct

16   supervisor," Dr. Marie Harris, was present at the open house. (Doc. 21 at ¶ 71.) While the SAC

17   does not indicate that Richardson was wearing any uniform, he stood behind the official table

18   designated for MCC's history department—it gave his participation and his speech a degree of

19   formality and official-like appearance that may be comparable to wearing a uniform.[21] *See*

20   *Decotiis*, 635 F.3d at 32 (noting that "whether the employee spoke at her place of employment"

21   and "whether the speech gave objective observers the impression that the employee represented

22   the employer when she spoke (lending it 'official significance')" are relevant considerations

23   (citations omitted)). It was, after all, "a location [he] had access to by virtue of [his] position." *See*

24   *Barone*, 902 F.3d at 1101 (citation omitted).

25

---

26   [21] This Court is required to consider all facts from the perspective of the government employer when evaluating First
     Amendment retaliation claims, *see* *Waters*, 511 U.S. at 677, and when determining whether government officials are

27   entitled to qualified immunity, *see* *Demers*, 746 F.3d at 417. Absent facts and arguments to the contrary, Defendants
     presumably had reasonable basis to believe that Richardson had the appearance of being a representative of MCC at

28   the open house. (*See* Doc. 21 at 156–66 ("Additionally, the witnesses provided consistent statements that any faculty
     member that voluntarily attended the open house event was a representative of Madera Community College.").

Moreover, the event was organized by the government and took place on government property. *See Handy-Clay*, 695 F.3d at 540–41 (noting that the "setting of [the] speech" is a relevant factor); *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1161 (11th Cir. 2015) ("Practical factors that may be relevant to, but are not dispositive of, the inquiry include . . . whether the speech occurred at the workplace[.] . . ."). Much like *Barone*, the event was organized with the express purpose of introducing prospective students, their parents, as well as members of the local community, to some of MCC's employees (including Richardson) and the work that they do (i.e., the courses that they teach). (Doc. 21 at ¶ 71.) Even though Richardson was not separately paid to attend the open house, (*Id.*), whereas the plaintiff in the *Barone* case was, this Court does not find that difference to be dispositive.

### 2. Employment Contract

Next, Richardson argues that his spoke at the open house as a private citizen rather than official employee because his employment contract with the school does not specify that he needs to attend the open house and that he was not getting paid extra to do it.[22] (Doc. 29 at 25.)

An employment contract, however, does not need to spell out every minor task that an employee shall undertake—the Ninth Circuit has expressly cautioned against "rely[ing] mechanically on formal or written job descriptions." *Johnson*, 658 F.3d at 966; *see also Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 172–73 (4th Cir. 2013) (per curiam) ("Speech that is not explicitly required as part of [an employee]'s day-to-day job may nevertheless fall within the scope of that employee's official duties." (citation and quotation marks omitted) (alteration in original)); *Garcetti*, 547 U.S. at 424–25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform[.]"). Rather, one would assume that participating in an on-campus open house is a reasonable, natural part of a professor's job duties, even if attendance is, strictly speaking, voluntary. *Cf.* Restatement (Second) of Agency § 229 (1958) ("To be within the scope of the employment, conduct must be of *the same general nature* as that authorized, or incidental to the conduct authorized." (emphasis

---

[22] A salaried employee is "paid" to perform all tasks within the scope of his employment; therefore, the answer to the question of whether a particular task was within the scope of employment will also determine whether an employee was "paid" to perform said task.

1    added)).

2        Moreover, Richardson spoke in his official capacity even assuming, *arguendo*, that

3    Richardson was merely "volunteering." (*See* Doc. 21 at ¶ 72.) In *Shenoy*, the Fourth Circuit

4    addressed a situation where the plaintiff, a doctor, "took a leading role on the hospital's peer

5    review committees. Committee membership was voluntary; committee members received no

6    compensation and were permitted to resign at any time[;]" and the plaintiff's employer never

7    "supervised the committee." 521 F. App'x at 170. The plaintiff "argue[d] that because his

8    committee work was voluntary and unpaid, it could not be part of his professional duties." *Id*. at

9    172. The Fourth Circuit, however, disagreed, explaining that, "[w]hile [the plaintiff]'s roles on

10   the committees were voluntary, once he accepted those roles, his service became part of his duties

11   and his speech became covered by *Garcetti*." *Id*. at 173.

12       Likewise, Richardson alleges that "it was not part of [his employment] contract to attend"

13   the open house and that "he was not being compensated for volunteering." (Doc. 21 at ¶ 72.) But

14   the absence of pay is not outcome determinative—even an unpaid volunteer's speech may be

15   subject to the *Eng/Pickering* analysis. *See Shenoy*, 521 F. App'x at 172–73; *Kuenzi v. Reese*, No.

16   3:23-CV-00882-IM, 2024 WL 4592424, at *3 (D. Or. Oct. 28, 2024) ("conclud[ing] that [a

17   volunteer]'s speech was pursuant to her official duties" under the *Eng/Pickering* framework). It

18   does not change the fact that the open house event was "organized and sponsored by [SCCCD]

19   with the objective of promoting the College and its academic programs[,]" as Defendants

20   correctly point out, (Doc. 31 at 7; *see also* Doc. 21 at 158–59, 166), and that academic

21   departments and faculty members, including Richardson, were "invited" to attend, (Doc. 21 at

22   158–59, 166).[23] Consequently, Richardson showed up at the open house not as a private citizen

23   handing out "He/Him Nuts" and "She/Her Nutless" chocolate bars, but as a professor at the MCC

24   standing behind the history department table "testifying" to prospective students and their parents

25

---

26   [23] This Court's duty to view facts in light most favorable to Plaintiff Richardson does not preclude it from accepting
     this fact as true. For one, *Waters* directs federal courts to "look to the facts as the employer reasonably found them to

27   be[,]" even if it turns out to be "substantively incorrect." 511 U.S. at 677–79. Here, Richardson did not argue that SCCCD
     unreasonably relied on this fact, nor does he dispute its veracity. For another, because the investigation report is

28   appended and incorporated by reference into the SAC, this Court "may assume [the incorporated document's]
     contents are true." *Khoja*, 899 F.3d at 1003 (quoting *Marder*, 450 F.3d at 1003) (alteration modified).

1   about his regular job duties—that is, the classes that he teaches about the Civil War. *See Tamayo*

2   *v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) (explaining that a government employee was

3   testifying before a legislative committee "because of the position she held within the agency" and

4   that she was "not appearing as 'Jane Q. Public'"). And his participation at the open house was

5   "actuated, at least in part, by a purpose to serve [his employer,]" *cf*. Restatement (Second) of

6   Agency § 228(a) (1958), by helping it to raise community awareness and attract prospective

7   students, (*see* Doc. 31 at 7; Doc. 21 at ¶ 72; *see also id*. at 166).

8        3.   The *Dahlia* Factors

9        Richardson also argues that he spoke at the open house as a private citizen rather than

10  official employee under the *Dahlia* Factors. (Doc. 29 at 24–25.) *Dahlia* explained, among other

11  things, that, especially in a "highly hierarchical employment setting such as law enforcement,"

12  the question of whether an employee spoke to someone outside of the chain of command—or

13  spoke in defiance of a superior—is highly relevant, "if not necessarily dispositive," in

14  determining in determining whether said employee spoke pursuant to his or her official duties.

15  *Dahlia*, 735 F.3d at 1074–75. *Dahlia* also teaches that "the subject matter of the communication"

16  is an important factor to consider. *Id*.

17       In the present case, Richardson expressly states that "he was not speaking in contravention

18  of supervisor's direct orders[,]" (Doc. 29 at 25), a factor that tilts in favor of a finding that he

19  spoke in his official capacity. True, a professor's speech to students and their parents might be,

20  strictly speaking, outside said professor's upward "chain of command." But that may be a

21  reasonable and natural part of a teacher's or professor's job. *See Coomes v. Edmonds Sch. Dist.*

22  *No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016) ("Coomes also spoke to parents—clearly outside of

23  her chain of command. However, communicating with parents about students' IEPs and their

24  progress in the EBD program was part and parcel of Coomes's job."). If anything, two of the

25  three *Dahlia* Factors—speaking outside the chain of command and in defiance of a direct order—

26  are less important in the academic sphere, where college professors tend to enjoy a great deal of

27  autonomy and flexibility over their work. *See Dahlia*, 735 F.3d at 1074 (noting that whether the

28  employee worked at a "highly hierarchical" environment may affect the *Dahlia* analysis)

1    The only *Dahlia* factor that arguably tilts in favor of Richardson is the subject matter of

2    the speech, for the message printed on the chocolate bar was not related to the class that he

3    teaches on the Civil War. *See id*. at 1074–75. But even that factor does not unambiguously cut in

4    favor of Richardson.

5    Again, consider *Barone*, where a police officer showed up in uniform at an official

6    community outreach event. 902 F.3d at 1097. The Ninth Circuit explained that "even if answering

7    [a particular] question [from the audience] had fallen hypothetically outside of [the employee]'s

8    job duties, she did not cease speaking as a public employee when the conversation moved briefly

9    beyond the narrow range of topics included within her job duties when she attended an event in

10   her official capacity." *Id*. at 1101; *see also Johnson*, 658 F.3d at 967–68 (9th Cir. 2011) (holding

11   a teacher does not cease acting as a teacher when "the conversation moves beyond the narrow

12   topic of curricular instruction").

13   Likewise, Richardson's "discussions with interested people . . . largely involve[d] the

14   Civil War[,]" the topic that he teaches at the MCC. (Doc. 21 at ¶ 72). The fact that "the

15   conversation moved briefly beyond" the Civil War to a few "obscured" "He/Him Nuts" and

16   "She/Her Nutless" chocolate bars does not substantially change this Court's analysis under

17   *Dahlia* and progeny. *See Barone*, 902 F.3d at 1101. The thrust of the inquiry is whether,

18   holistically speaking, Richardson "attended [the] event in [his] official capacity." *Id*. The Court

19   believes the answer is yes.

20       4.   Qualified Immunity

21   Moreover, even viewing all the facts in the SAC in light most favorable to Richardson, the

22   Court finds sufficient legal ambiguities as to whether Richardson spoke in his official capacity at

23   the open house—and the existence of legal ambiguities precludes a finding that the law was

24   "clearly established," which means that Defendants are entitled to qualified immunity.

25   Notably, instead of showing that "clearly established" law has "placed the constitutional

26   question *beyond debate . . . in the particular context at issue*," *Sampson v. Cnty. of Los Angeles

27   by & through Los Angeles Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1024 n.10 (9th

28   Cir. 2020) (emphases added), Richardson proffered nothing except a single, conclusory paragraph

1    stating in general terms that "retaliation for speech or filing lawsuits" is clearly prohibited by the

2    First Amendment, (Doc. 29 at 30). That, however, is inadequate considering the Supreme Court's

3    repeated admonition "that courts must not define clearly established law at a high level of

4    generality[.]" *Wesby*, 583 U.S. at 63 (citation and quotation marks omitted). Rather, to satisfy the

5    "clearly established" standard, an official must be warned about "the *particular circumstances*

6    before him" with "a *high degree of specificity.*" *Id.* (citation and quotation marks omitted)

7    (emphasis added); *see also Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 891 (9th Cir.

8    2022) (noting that "the Supreme Court has chided lower courts for 'fail[ing] to identify a case

9    where an officer acting under similar circumstances . . . was held to have violated' the relevant

10   constitutional provision" (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). For example,

11   Richardson has not shown—through a binding legal precedent or "a robust 'consensus of cases of

12   persuasive authority,'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (quoting *Wilson v. Layne*,

13   526 U.S. 603, 617 (1999))—that a college professor speaks as a private citizen rather than as a

14   public employee when he was purportedly "volunteering" at an event that was hosted on his

15   employer's property for the benefit of his employer, (*see* Doc. 21 at ¶ 72).

16       **D.  Academic Freedom Alternative Theory**

17           The Court finds it necessary to address one additional matter. Richardson seems to argue

18   that the messages on the chocolate bars—"He/Him Nuts," "She/Her Nutless," and "Building a

19   Woke Free Economy"—are part of his teachings; therefore, they are protected speech under the

20   principle of academic freedom. (*See* Doc. 21 at ¶¶ 72 ("In other words, [he] was engaging in

21   instruction[]" at the open house.), 170 (alleging that "the discipline imposed on [him] violated the

22   First and Fourteenth Amendments . . . in that they . . . unconstitutionally burdened [his] academic

23   freedom and right to free speech")

24           Under Ninth Circuit case law, the principle of academic freedom applies to "teaching and

25   academic writing that are performed 'pursuant to the *official duties*' of teachers and professors."

26   *Demers*, 746 F.3d at 412 (emphasis added).[24] If handing out the chocolate bars indeed falls under

27

28   ───────────────────
     [24] As a side note, counsels for Richardson seem to ignore the governing law as well as common sense. In a letter to
     the opposing counsels, for instance, Mr. Bradley argues, "As a teacher, [Richardson] cannot be required to conform
     . . . *to a subject.*" (Doc. 21 at 146 (emphasis added).) That is incorrect. The Court finds no case law authority for Mr.

1    Richardson's academic freedom, then the analysis proceeds to Step 3 of the *Eng* analysis. If not,

2    then Richardson's speech is not protected, and the Court would have to enter judgment in favor of

3    Defendants, but Richardson's academic freedom argument cannot withstand scrutiny.

4         First, Richardson expressly and consistently stated throughout the SAC that he spoke as a

5    private citizen at the open house and doubled down on that position in his brief. (*See, e.g.*, Doc.

6    21 at ¶ 182; Doc. 29 at 24–25.) In fact, even though he frequently invoked the term "academic

7    freedom" numerous times throughout the SAC, he never claims to have attended the open house

8    in an official capacity.

9         Second, and most importantly, even if this Court were to consider Richardson's academic

10    freedom argument, Richardson has not plausibly alleged that he was, in fact, "teaching" at the

11    open house. For one, the subject matters of his "speech"—the "He/Him Nuts," "She/Her

12    Nutless," and "Building a Woke-Free Economy" chocolate bars—bore no connection to the

13    courses that he teaches regarding the Civil War. (*See* Doc. 21 at ¶¶ 72, 94; *see also id*. at 112.)

14    For another, Richardson has not plausibly alleged that he intended to use—and actually used—

15    those chocolate bars as a part of his "teaching" during the open house event. Rather, Richardson

16    expressly states in the SAC (a) that he just "wanted to get rid of th[em] . . . before [they]

17    spoiled[;]" (b) that those bars represented only "a small portion of the total snacks he brought[;]"

18    (c) that he "did not 'display' the[m] . . . so they would get attention[;]" and (d) that those bars

19    "were mixed in with, and often obscured by, other candies." (*Id*. at ¶ 74.) Those facts show that

20    there is no credible allegation or argument that the chocolate bars had somehow "complemented

21    [Richardson's] *classroom curriculum* [regarding the Civil War] or had any other *legitimate*

22    *pedagogical purpose* that might merit the kind of First Amendment protection that has long been

23    recognized in the academic arena." *See Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (2d

24    Cir. 2003) (citations omitted) (emphases added).

25

26    Bradley's position that a public school cannot limit a teacher's instructions to a general subject matter—certainly, a public college or university may hire an individual to teach history but not gender studies, and vice versa. *See*

27    *Mahoney v. Hankin*, 593 F. Supp. 1171, 1174 (S.D.N.Y. 1984) ("Courts agree, however, that the school's administration may at least establish the parameters of focus and general subject matter of curriculum. (citing *Clark v. Holmes*, 474 F.2d 928 (7th Cir.1972))). So too, a public college may ask a specific instructor to "volunteer" at the

28    history table, but not the human biology table. (Of course, a university professor may have much greater latitude to go "off topic" for research purposes.).

1      Moreover, it is not "clearly established" within the Ninth Circuit that a professor's

2   academic freedom extends to his "speech" and messages to people who are neither students nor

3   academics, such as prospective students and their parents, especially when the subject matter of

4   the speech is unrelated to his field of study and research. This Court could not locate any Ninth

5   Circuit precedent that comes close to the facts of this case, nor did Richardson offer any. As such,

6   Defendants are entitled to qualified immunity. Accordingly, this Court **GRANTS** Defendants'

7   motion and **DISMISSES** the third cause of action **WITHOUT LEAVE TO AMEND**.

8         **V.    MOTION TO DISMISS: FIFTH TO TWELFTH CAUSES OF ACTION**

9      This Court "may decline to exercise supplemental jurisdiction over a claim" if, among

10   other things, this Court "has dismissed all claims over which it has original jurisdiction[.]" 28

11   U.S.C. § 1367(c)(3); *Johnson v. Barr*, 79 F.4th 996 (9th Cir. 2023) ("[T]he district court may

12   determine, using its sound discretion, whether to retain supplemental jurisdiction over the

13   remaining state law claims or to remand this case to state court.") (citations omitted). This Court,

14   however, need not spend much time on the question of supplemental jurisdiction, because

15   Richardson's state law claims under the fifth to twelfth causes of action, (Doc. 21 at ¶¶ 194–254),

16   can be easily addressed.

17      First, Richardson's fifth and twelfth causes of action are related to California Labor

18   § 1102.5, which provides that an employer shall not, among other things, (a) "prevent[] an

19   employee from disclosing information" that "discloses a violation" of the law, (b) "retaliate

20   against an employee for disclosing [such] information," or (c) "retaliate against an employee for

21   refusing to participate in an activity that would result in a violation" of the law. (*Id*. at ¶ 195.)

22   Richardson alleges under the fifth cause of action that SCCCD "retaliated" against him "for

23   refusing to participate in the abridgment or denial of his constitutional rights," "for refusing to

24   participate in a violation of [a] federal statute," and for "report[ing]" SCCCD's violations. (*Id*. at

25   ¶ 198.) He further alleges under the twelfth cause of action that Defendants retaliated against him

26   for "informing SCCCD of the violation of Government Code § 12940 and 34 C.F.R.

27   § 106.45(b)(2)(i)(B)." (Doc. 21 at ¶ 253 (citations reformatted).)

28         Richardson, however, did not respond to Defendants' arguments regarding the potential

1    inapplicability of § 1102.5, (*see* Doc. 25-1 at 29); in fact, Richardson's brief in opposition is

2    entirely devoid of any mention of the fifth or the twelfth cause of action, (*see* Doc. 29). The Court

3    therefore **DISMISSES** the fifth and twelfth causes of action as waived, with **PREJUDICE**. *See,*

4    *e.g.*, *Shull v. Ocwen Loan Servicing, LLC*, No. 13-CV-2999-BEN WVG, 2014 WL 1404877, at

5    *2 (S.D. Cal. Apr. 10, 2014) ("By failing to respond to the arguments raised by Defendant on

6    these claims, Plaintiff failed to oppose the motion to dismiss these claims. Where a party fails to

7    address arguments against a claim raised in a motion to dismiss, the claims are abandoned and

8    dismissal is appropriate." (citations omitted)); *Maldonado*, 2021 WL 2682163, at *8 ("Plaintiff

9    does not address Defendants' arguments regarding punitive damages in his opposition to the

10   motion to dismiss . . . Accordingly, Plaintiff's claim . . . is [dismissed] without leave to amend."

11   (internal citation omitted)).

12       Second, Richardson alleges that SCCCD discriminated against him because he "is over

13   fifty years of age, white, and 'cis-gender.'" (Doc. 21 at ¶ 217; *see also id*. at ¶¶ 227 (similar), 231

14   (similar), 239–42 (alleging that he was punished because he "was opposing the racial, gender, and

15   sexual identity he was subjected to").) Defendants, in response, argue that Richardson's

16   "allegations about the disparate treatment of 'older white' people are highly speculative and

17   unfounded in the current context." (Doc. 25-1 at 30 (citing Doc. 21 at ¶ 217).) Once again,

18   Richardson did not respond to Defendants' arguments and, therefore, the Court **DISMISSES** with

19   **PREJUDICE** the eighth, ninth, tenth, and eleventh causes of action as waived. *See Maldonado*,

20   2021 WL 2682163, at *8.

21       Third, Defendants contend that the Unruh Act "solely applies to private business

22   establishments rather than public entities[;]" therefore, it does not apply in the instant case

23   because the SCCCD is not a private business. (Doc. 25-1 at 29.) In response, Richardson argues

24   that, unlike tuition-free, taxpayer-subsidized public high schools, "[c]ommunity colleges" "have

25   'businesslike' attributes in that they charge tuition, compete for students, and don't have a captive

26   customer base that is required to attend." (Doc. 29 at 29.) As such, they are more akin to "private

27   colleges with whom they compete." (*Id*.)

28       The Court finds Richardson's contentions to be without merit. For one, a California state

court expressly held in 2022 that the Unruh Act does not apply to the California State University, Northridge. *Brinkley v. California State Univ., Northridge*, No. B296983, 2022 WL 16627781, at *9 (Cal. Ct. App. Nov. 2, 2022); *see also Brennon B. v. Superior Ct.*, 13 Cal. 5th 662, 682 (Cal. 2022) (suggesting, in dictum, that the California State University system falls under the definition of "public entity"). Nor is there any basis to distinguish between California State Universities and community colleges under the Unruh Act. For another, even accepting Richardson's argument that a community college is akin to a non-profit private college, it would still be exempt from the Unruh Act. *See Doe v. California Lutheran High Sch. Assn.*, 170 Cal. App. 4th 828, 838–41 (Cal. Ct. App. 2009) (holding that a nonprofit private religious high school is not a "business establishment" within the meaning of the Unruh Act). Accordingly, the Court **DISMISSES** the sixth and seventh causes of action with **PREJUDICE**.

## VI.   CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

    (1) Defendants' Motion to Dismiss (Doc. 25) is **GRANTED IN PART**.

        a. Plaintiffs' first and second causes of action are **DISMISSED with 21 days leave to amend** with respect to Plaintiff Stannard.

        b. Plaintiff Richardson's as-applied challenges to AR 3430, AR 3433, and AR 3435 under the first and second causes of action are **DISMISSED with PREJUDICE**.

        c. Plaintiff Richardson's facial challenges to AR 3430 and AR 3433 under the first and second causes of action are **DISMISSED with PREJUDICE**.

        d. Plaintiff Richardson's selective enforcement claim under the first cause of action is **DISMISSED with 21 days leave to amend**.

        e. Plaintiff Richardson's third cause of action is **DISMISSED with PREJUDICE.**

        f. Plaintiff Richardson's fourth cause of action is **DISMISSED with 21 days leave to amend.**

        g. Plaintiff Richardson' fifth to twelfth causes of action are **DISMISSED with**

1      **PREJUDICE**.

2          (2) Defendants' Motion to Dismiss (Doc. 25) is **DENIED IN PART** with respect to

3      Plaintiff Richardson's facial challenges to AR 3435 under the first and second causes

4      of action.

5          (3) Defendants' Motion to Strike (Doc. 26) paragraphs 186 and 193 from the Second

6      Amended Complaint is **DENIED as MOOT**.

7

8      IT IS SO ORDERED.

9          Dated:   **October 2, 2025**

                                                    _____
10                                                  UNITED STATES DISTRICT JUDGE