**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL STANNARD, et al., | Case No. 1:22-cv-01250 JLT EPG |
| Plaintiffs,<br>v. | ORDER GRANTING DEFENDANTS' MOTION AND DENYING DEFENDANTS' MOTION TO STRIKE |
| STATE CENTER COMMUNITY COLLEGE DISTRICT, et al., | (Docs. 36, 37) |
| Defendants. | |

Michael Stannard and David Richardson are two professors associated with the State Center Community College District ("SCCCD"). They bring this free speech action against SCCCD, SCCCD's Chancellor, Carole Goldsmith, SCCCD' Vice Chancellor Juliana D. Mosier, and Angel Reyna, the President of Madera Community College ("MCC"), challenging the constitutionality of SCCCD's anti-discrimination and anti-harassment policies and advancing related claims. Pending before the Court are Defendants' Motion to Dismiss and Motion to Strike. (Docs. 36, 37.) For the reasons set forth below, the Court **GRANTS IN PART** Defendants' motion to dismiss and **DENIES** Defendants' motion to strike in full.

## I.   BACKGROUND

### A.  Dr. Michael Stannard

Dr. Michael Stannard holds a doctorate in philosophy, and he had been an instructor at the SCCCD for approximately thirty years. (Doc. 33 at ¶ 10.) This litigation arises, in part, from two incidents involving him and some of his colleagues.

///

1

1. First Incident

The first investigation arose out of two comments Stannard made while working at Clovis Community College. The first statement occurred during a race-sensitivity training session that took place the day following the January 6, 2021 riots at the United States Capitol Building. (Doc. 33 at ¶ 13.) In that meeting, Stannard commented "that the riot at the Capitol was 'bad' and that the burning of minority-owned businesses during last summer's riots was [also] 'bad.'" (*Id.*) Then, in a "Justice and Healing Circle," Stannard reportedly commented that "children do better if they are raised with both biological parents," as opposed to single-parent households. (*Id.*) Stannard denies making this comment and states that "what he [actually] said was that children have a right to be raised by their biological parents, and that there was a philosophical argument for the biological two-parent family based on the 'problem of origins,' i.e., children who do not know their parents question their own origins." (*Id*.). Stannard states that, after making his "brief comment about the 'problem of origins,' he was told by the organizer that his remarks were 'offensive.' Another participant threatened to leave the group if the group did not move on from the topic." (*Id.* at ¶ 16.)

On March 9, 2021, SCCCD Human Resources Department Investigator, Erica Reyes, met with Stannard as part of an investigation into those two comments. (Doc. 33 at ¶¶ 11–12.) "Stannard affirmed that his intent was to speak the truth in a public environment where these issues were raised," and that the feelings of others "did not justify his censoring himself." (*Id.* at ¶ 15.) Stannard states that he "was kept in suspense, [and] did not know whether he would keep his job." (*Id.* at ¶ 22.) He further alleges that he was "force[d] to censor and suppress his speech in order to avoid . . . another 'investigation.'" (*Id.*)

On May 10, 2021, President of Clovis Community College, Lori Bennett, concluded that his comments "did not rise to the level of discrimination in violation of District policy," yet his comments offended some employees. (Doc. 33 at ¶ 23.) Bennett "'encourage[d Stannard], and all employees, to demonstrate empathy toward others and to reflect on how statements we make may impact others to ensure that we are creating an inclusive working and learning environment for all employees and students.'" (*Id.*)

Stannard believes that the "warnings, admonitions and instructions were nebulous and threatening" to him, and that the "matter should never have gotten this far. The complainants should have been told about the Constitutional right of free speech and how they cannot subvert the investigative procedures to harass and intimidate those who they perceived as their ideological/career/political adversaries." (Doc. 33 at ¶¶ 24–25.)

### 2. Second Investigation

The second incident arose out of two faculty Union meetings in December of 2023. During that meeting, "the issue of a male SCCCD instructor who had gone through a Title IX investigation came up before the general membership. This person was described as a 'rapist' by several female instructors and his presence on campus was referred to as a threat to other instructors by members of the union attending the meeting[s]." (Doc. 33 at ¶ 27.)

On January 23, 2024, Stannard received a letter from Christine Phillips, Director of EEO/Diversity & Professional Development for SCCCD, informing him that someone had made certain Title IX allegations at him because of what he said during those two meetings, which, if true, also "violated Board Policies 3430 and 3433, and Administrative Regulation 3434." (Doc. 33 at ¶ 30.)  The next day, Stannard received a "REVISED Notice of Allegations. Allegations subject to Title IX," which stated:

> The Complainant alleges that Respondent engaged in the following conduct:
>
> Michael STANNARD made unwelcome and offensive statements about victims of sexual assault and women in general which were misogynistic, abusive, intimidating, and denigrating, and created a hostile work environment, and he threatened to sue any employee who filed a complaint or grievance against him.

(*Id.* at ¶ 31.)

On February 5, 2024, Stannard received another letter from Christine Phillips informing him that she has "dismissed a formal Title IX complaint of sexual harassment," but nonetheless informed him "that the dismissal of a formal complaint under Title IX does not preclude the District from continuing an investigation or taking action under other District policies, code of conduct or administrative rules/regulations." (Doc. 33 at ¶¶ 33–34.)  In particular, the letter stated

3

that Stannard remains subject to an investigation "under Administrative Regulation 3435 – Responding to Discrimination, Harassment, and Retaliation Complaints and Investigation." (*Id.* at ¶ 34.) SCCCD "retained an independent investigator, Alison Winter of Levenfeld Winter LLP, to conduct an impartial investigation into the allegations." (*Id.* at 170.) Then, on August 28, 2024, SCCCD sent Stannard a letter of reprimand ("Letter") discussing its findings, which detailed three specific incidents involving Stannard.[1]

First, in an email chain among the Executive Council of the Union, (Doc. 33 at 170), Stannard wrote about allegations of sexual assault against a faculty member at Fresno City College, Tom Boroujeni.[2] Stannard wrote that "'the whole business is a personal problem between [Boroujeni] and a woman which . . . some other people are misrepresenting to get [Boroujeni] terminated,'" that he "did 'not understand why the woman [Boroujeni] is accused of raping continued to see him privately after the alleged rape' and 'why . . . others do not see this as one more unwise entanglement between two people which was a completely personal problem.'" (*Id.* at 171 (alterations in original).)

Second, during a Union meeting that occurred over Zoom on December 1, 2023, "[v]ideo evidence confirms that" Stannard stated, "'A sensible person would not think that [Boroujeni] did a sexual assault on her' because 'she continued to give him private time.'" (Doc. 33 at 172 (second alteration in original).) Stannard's "remarks during the meeting did not conform to the discussion occurring immediately prior to when [he] began speaking. The meeting at issue was a business meeting of the Union. No attendee commented on the victim's underlying claims or the reported facts before [Stannard] spoke." (*Id.* at 172–73.) While Stannard was "speaking, members of the Union interrupted [him] on four occasions specifically asking [him] to stop, but [he] continued speaking. [Stannard] described to the investigator that [he was] 'shouted … down[.]'"

---

[1] The Court incorporates by reference several exhibits appended to the Third Amended Complaint that are central to Plaintiffs' causes of action. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Under *Khoja v. Orexigen Therapeutics, Inc.*, the Court "may assume [an incorporated document's] contents are true." 899 F.3d 988, 1003 (9th Cir. 2018) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)) (alteration in original).

[2] The Letter notes that the incident occurred years ago while Boroujeni and his accuser both worked at California State University, Fresno. (Doc. 33 at 171 n.2) "A Title IX investigation occurred sustaining the allegations against Boroujeni." (*Id.*)

(*Id*. at 173.) A fellow faculty member, Ledgerwood, reportedly wrote in the group chat that Stannard is "pontificating . . . from a place of great ignorance and great privilege." (*Id*.) In response, Stannard sent a message "directly and privately" to Ledgerwood, stating that he "'hoped' she would explain how [his] public comments were incorrect the time [their] 'paths crossed.'" (*Id*. at 173–74.)

Third, Stannard "acknowledged" that he "made further comments about Boroujeni's Title IX investigation findings" during an in-person meeting of the Union Executive Council on December 4, 2023, which "were similar those [he] made in the past." (Doc. 33 at 174.) Stannard further claimed "that Boroujeni's Title IX findings were 'probably unjustified' and that he did not receive 'due process.'" (*Id*.) Overall, the Letter stated that "[Stannard]'s conduct was inappropriate and unprofessional" and had "caused disruption[s], including a common concern that [Stannard was] behaving in a way to intentionally upset his colleagues." (Doc. 33 at 175.)

**B. David Richardson**

Richardson is a self-identified "gay and conservative" history instructor at Madera Community College. (Doc. 33 at ¶ 45.) The present dispute stems from an autumn 2021 "College Hour" online meeting at Madera, which is a faculty-wide, "hour-long forum for SCCCD to instruct faculty on policies or other subjects determined by SCCCD." (*Id.* at ¶ 46.)

1. First Investigation

   i. *College Hour Incident*

On October 15, 2021, SCCCD required its instructors to attend a "College Hour" meeting about personal gender pronoun etiquette. (Doc. 33 at ¶ 47.) Jamie MacArthur, Ph.D., conducted the presentation and announced a preference for the "they/them" gender nonbinary pronoun. (*Id.*) During this online videoconference meeting, the speaker "could be seen in a large window on the computer screen while the other attendees were in small thumbnails with either the live feed of them watching," or some other image, if preferred. (*Id.* at ¶ 49.) Each thumbnail presented the attendee's name and a line for the attendee to insert their preferred gender pronoun. (*Id.*)

During the meeting, Richardson "reasoned that it was not intellectually equitable to allow only certain people to pick certain 'Preferred Gender Pronouns,'" and, therefore, "filled out his

'Preferred Gender Pronouns' as 'Do, Re, Mi.'" (Doc. 33 at ¶ 53.) Richardson states that he "was not joking, and he was not mocking anyone." (*Id*.) He states he "was making the serious point that . . . 'Preferred Gender Pronouns' . . . should not be mandatory because they were based on an irrational perception of reality and that if they were to be mandated, displayed, or required, then they would frustrate communication for ideological reasons." (*Id.*)

   *ii. Email Exchanges*

  No one commented on Richardson's pronouns during the meeting, and in his opinion, "no one noticed." (Doc. 33 at ¶ 55.)  A few days after the meeting, on October 18, 2021, MacArthur sent an email to Richardson, stating, in relevant part:

> The reason that I am contacting you is because I noticed in the College Hour on Friday that you had what appeared to be a joke shared where someone might normally share their pronouns on zoom (do-re-mi).  I wanted to let you know that doing this is considered to be extremely offensive by people in the trans community.   It's possible that you didn't know this, so I wanted to take a moment to share some resources related to this with you so that you have a better understanding of how people in the trans community would like to be treated[.]
>
> . . .
>
> I didn't mention anything about this at the time of the meeting, as I wanted to stay focused on the dialogue at hand.  Although it was painful for me to not say anything in that moment, I chose to put the good of the community ahead of my own well being.  I am choosing to share this information with you directly now instead of with someone else out of respect for the ideals embodied by our union of solidarity within our community of scholars.  I hope this message is received with the spirit of good will that I intend and that you would choose not to use the zoom platform as a way of making a joke that is harmful to trans people.

(*Id.* at ¶ 56.)

  Richardson felt this "communication was threatening to [him]," and he feared he would be "cancelled" as a dissenting voice. (Doc. 33 at ¶ 58.) Richardson responded to MacArthur's email:

> To be blunt, what makes they think it was a joke? Am Do not allowed to identify mi own pronouns as an LGBTQIA2+ individual? Have Do done or said anything to anyone to make they think it was a 'joke'? Do think they are making assumptions about mi own thought processes and rationale that is offensive in and of itself. Do don't find anything about the entire debate 'funny'. If they are uncomfortable with mi choice of pronouns, Do might suggest that the issues is not re although Do would never presume to know what is going on in their mind. Do also find it interesting that they would presume Do is

> any less educated on the subject of the transgender community than they is. Do don't question their choice of personal pronouns. Personal pronouns are personal.

(*Id.* at ¶ 59.)

On November 1, 2021, SCCCD's Employee Relations Coordinator, James Young, contacted Richardson regarding "concerns" over his use of pronouns during the College Hour meeting. (Doc. 33 at ¶ 60.) Young requested a time to speak with Richardson regarding this matter, to which Richardson replied:

> If Dr. MacArthur and yourself would like to make an issue of my personal pronouns which as I have told Dr. MacArthur are personal, then we are going to be opening a can of worms that I don't believe the District would want to get involved in. Picking and choosing which personal pronouns people can and cannot use would amount to harassment in the workplace and the creation of a toxic work environment. This week is not possible as I have three faculty evaluations that need to be completed. That being said, I would be happy to meet with you in the future as long as any meeting includes a union representative and everyone understands that any attempt to coerce or in any other way change my personal pronouns will be seen on my part as hostility towards an open and proud LGBTQIA2S+ individual. Thank you.

(*Id.* at ¶ 61.)

Richardson "copied his supervisors and some faculty members" to this email response "because he understood [MacArthur] was moving in the direction of 'canceling' him." (Doc. 33 at ¶ 62.) On November 1, 2021, MacArthur responded to this email, admitting that he had involved Human Resources and their union, and expressed that he wanted "to discuss the harm that has been caused and how to mediate a solution to that harm" through a "facilitated discussion" to create a safe workplace setting for everyone. (*Id.* at ¶ 63.) Richardson alleges this meant that MacArthur "invoked the power of SCCCD to compel Richardson to [MacArthur's] speech standards." (*Id.*) Richardson states that he had requested Human Resources ("HR") to investigate MacArthur's harassment of him, which did not take place. (*Id.* at ¶¶ 64–65.)

### iii. Investigation and Reprimand

SCCCD initiated an investigation into Richardson, which "lasted for approximately six months." (Doc. 33 at ¶ 65.) It concluded that Richardson (1) "intentionally misused pronouns in a mocking manner for Jamie MacArthur 8 times in an email exchange on October 18, 2021"; (2)

intentionally used second- and third-person pronouns "in a mocking manner" in that email; (3) retaliated against MacArthur "for bringing up concerns related to [his] use of pronouns in a Zoom meeting, and for attempting to seek an informal resolution through [HR]"; and (4) sent emails to Madera Community College staff and faculty "as retaliation for Dr. MacArthur attempting to seek an informal resolution through [HR], as a way to intimidate Dr. MacArthur into dropping their complaint." (*Id.*) Richardson contests these findings for many reasons. (*See generally id.* at ¶¶ 66–68.)

On May 17, 2022, Vice President of Learning and Student Services, Dr. Marie Harris, called Richardson to a meeting and presented him a "Letter of Reprimand." (Doc. 33 at ¶ 69.) The Letter instructed Richardson "to immediately stop using pronouns in a mocking manner in the workplace," to "exhibit basic standards of conduct and act professionally when [he] interact[s] with employees and students of this District, including in written exchanges via email," and warned that further "failure of this type or similar unprofessional behavior may result in disciplinary action, and . . . may lead to termination." (*Id.* at ¶ 72.) Richardson "was also informed at the meeting with Harris that SCCCD had an unwritten [preferred gender pronoun ("PGP")] policy and that he could use his own PGP so long as they were not deemed 'mocking.'" (*Id.* at ¶ 75.)

2. Second Investigation

On April 29, 2023, the Madera Community College campus ("MCC") of SCCCD organized and held an on-campus "open house," where "potential students, their parents, and community members could walk among the tables, look at the exhibits, and speak to the instructors." (Doc. 33 at ¶ 81.) Instructors were expected to put on the table "things associated with the discipline they taught" and discussions prospective students and community members "would presumably be on the subject that the instructor taught and involve a discussion of the substance of the course or various issues about the course." (*Id.*) For example, Richardson "would place items pertaining to the Civil War on the history department table. His discussions with interested people would largely involve the Civil War." (*Id.*) Richardson "also made it his practice to bring candies, chips, cookies, and other snack items for visitors to take." (*Id.* at ¶ 82.)

8

The snacks were supplied and paid for by Richardson; SCCCD was "aware of his practice and never issued any restrictions or guidelines concerning his participation at open houses." (*Id*.)

Among the things that Richardson brought were two kinds of chocolate bars from Jeremy's Chocolates: the ones "without nuts were labeled 'She/her' and the ones with nuts were labeled 'He/him.'" (Doc. 33 at ¶ 83.) Richardson claims to have brought those bars to the open house "because he had a remaining box and wanted to get rid of this candy before it spoiled." (*Id*.) Richardson further states that they were "a small portion of the total snacks he brought" and that "[h]e did not 'display' the[m] . . . so that they would get attention. Rather, the Jeremy's Chocolates were mixed in with, and often obscured by, other candies." (*Id*.) According to Richardson, no one objected or "expressed any misgivings or concerns" except another employee, Denna Calvin, who confronted Richardson about the messages on the bar. (*Id*. at ¶ 85.)

There were varying accounts of what happened during this confrontation. According to Richardson, Calvin was "interrogating him about his agenda[;] Calvin was loud and aggressive and attracted the attention of instructors and administrators who were standing near the history table." (Doc. 33 at ¶ 86.) When Calvin pressed him about the meaning of the messages on the bar, Richardson told "Calvin [to] contact the company with her inquiries." (*Id*. at ¶ 87.)

Calvin subsequently filed a Title IX complaint against Richardson for, among other things, the allegedly "mocking" pronouns and the reference to "building a woke-free economy." (Doc. 33 at ¶¶ 89–90.) Richardson was placed on administrative leave pending the outcome of the complaint; this decision was communicated to him through a letter signed by Julianna Mosier (Vice Chancellor – Human Resources) and approved by Carole Goldsmith (Chancellor). (*Id*. at ¶¶ 91–93.) Richardson insisted that "[t]here was no reasonable basis for a competent college administrator" to believe that there was a colorable Title IX violation. (*Id*. at ¶ 96.)

On May 10, 2023, SCCCD retained an outside investigator to investigate the incident, with a final report issued on July 3, 2023. (Doc. 33 at 98.) The report found, among other things, that Richardson did not "bring the chocolate bars . . . to intentionally offend the trans and non-binary community[.]" (*Id*. at ¶ 98 (quoting *id*. at 154).) SCCCD "continued to pursue the Title IX process[]" notwithstanding Richardson's request to have it dismissed. (*Id*. at ¶¶ 99–100.)

After Calvin and Richardson submitted written responses, (Doc. 33 at 98), SCCCD conducted a recorded hearing over Zoom on December 1, 2023, with a final determination issued on January 3, 2025, which explained that even though Richardson was investigated for possible violations of Administrative Regulations ("AR") 3430, 3433, and 3435,[3] "[t]he preponderance of the evidence does not support a finding" that Richardson had, in fact, violated those provisions, (*id*. at 97).

Richardson claims that, because he was "suspended for nine months" pending the outcome of the investigation, he "lost out on professional opportunities" and "suffered shame, mortification, embarrassment, and anxiety." (Doc. 33 at ¶ 106.) He further alleges that, because he lost access to his email, he "was prevented or substantially hindered from engaging in professional development and obtaining information about SCCCD." (*Id*.)

Approximately two months after the Title IX determination, Richardson was served a "Ninety Day Notice to Correct Deficiencies (Education Code sections 87732 and 87734.)" (Doc. 33 at ¶ 107.) The Ninety Day Notice expressly referenced the Title IX's finding that while Richardson's conduct did not arise to the level of harassment (under any of the challenged regulations), it was nonetheless "unprofessional" under Education Code § 87734.[4] (*Id*. at 114.)

---

[3] Notwithstanding typographical errors scattered throughout the record, the challenged SCCCD policies appear to be AR 3430, 3433, 3434, and 3435. (*See, e.g.*, Doc. 33 at ¶ 168.)

AR 3433 supplies the definition of sexual harassment under Title IX, which includes actions "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the District's education program or activity[.]" (Doc. 33 at 117.) AR 3434 is a purely procedural provision that "only applies to conduct defined as sexual harassment under Title IX and federal regulations and [] meet Title IX jurisdictional requirements." (*Id*. at 120.) AR 3434 outlines the procedural aspects of a Title IX investigation, addressing topics such as the hearing format, cross examination, and what must be included in the final written determination. (*Id*. at 129–33.)

Even if an action does not rise to the level of sexual harassment under Title IX, it may be prohibited under AR 3430, which defines "General Harassment" as incidents that "are sufficiently pervasive, persistent, or severe that a reasonable person" belonging to one of the enumerated protected classes "would be adversely affected to a degree that interfere with their ability to participate in or to realize the intended benefits or an institutional activity, employment or resource." (Doc. 33 at 84.) AR 3435 expressly states that "[f]or sexual harassment, sexual misconduct, or sexual assault under Title IX, Complainants must proceed under" AR 3433; and "[f]or other forms of . . . harassment and discrimination," that is, those that may violate AR 3430, "Complaints should use [AR 3435's] procedure." (*Id*. at 88.)

[4] California Education Code § 87734 states that a community college "shall not act upon any charges of unprofessional conduct or unsatisfactory performance" pursuant to § 87732 "unless during the preceding term or half college year prior to the date of the filing of the charge, and at least 90 days prior to the date of the filing," it "has given the employee . . . written notice of the unprofessional conduct or unsatisfactory performance, specifying the nature thereof with specific instances of behavior and with particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge." Cal. Educ. Code §§ 87732, 87734.

The Notice directed Richardson to, among other things: "provide every student and District staff member with respect[;]" "not denigrate or belittle students or employees or make inappropriate comments regarding his, her, or their gender, gender identity, gender expression, pronouns, or any other protected characteristic[;]" "adhere to all provisions of the collective bargaining agreement, . . . which incorporates the ethical standards of the American Association of University Professors[;]" "comply with . . . the District's Board Policies and Administrative Regulations[]" and Procedures; "communicate with all individuals respectfully and professionally[;]" and complete "ten hours of additional professional development in the areas of diversity, equity, inclusion, access, and effective communication." (*Id.*)

## C. Procedural History

Plaintiffs filed this instant action in Fresno Superior Court, which Defendants removed to federal court on September 28, 2022. (Doc. 1.) On May 13, 2024, the Court granted Defendants' first motion to dismiss with leave to amend. (Doc. 20.) Plaintiffs then filed their Second Amended Complaint ("SAC") on June 3, 2024. (Doc. 21.) On October 2, 2025, the Court granted Defendants' first motion to dismiss with leave to amend. (Doc. 32.) Plaintiffs filed the Third Amended Complaint ("TAC") on October 23, 2025. (Doc. 33.)

Defendants moved to dismiss the TAC for failure to state a claim and for failure to establish standing. (Doc. 37). The matter is fully briefed and ripe for review. (Pls.' Opp'n, Doc. 39; Defs.' Reply, Doc. 40.) Defendants further moved to strike portions of the TAC seeking declaratory relief, injunctive relief, and punitive damages. (Doc. 36.) The matter is fully briefed and ripe for review. (Pls.' Opp'n, Doc. 38; Defs.' Reply, Doc. 41.)

## II.   FOURTH CAUSE OF ACTION

Stannard alleges that Defendants Mosier and Goldsmith "retaliated against him for engaging in speech that was protected by the First Amendment by, inter alia, issuing written reprimands and placing those reprimands in his personnel file[,]" for which Stannard seeks damages, (Doc. 33 at ¶¶ 219, 228.)

///

///

## A.    Legal Frameworks

### 1.    The *Eng*/*Pickering* Inquiry

In the context where a government entity attempts to restrict the speech of one of its employees, the Ninth Circuit has instructed district courts to apply a "*Pickering*-based analysis that 'reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (quoting *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004)). The relevant standard is set forth in *Garcetti v. Ceballos*:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

547 U.S. 410, 418–19 (2006) (citations omitted).

"In analyzing First Amendment retaliation claims brought by government employees, [the Ninth Circuit] employ[s] the familiar test established in *Pickering*." *Adams v. Cnty. of Sacramento*, 143 F.4th 1027, 1033 (9th Cir. 2025). Specifically:

> Under the *Pickering* framework, it is the plaintiff's burden to establish that "(1) she spoke on a matter of public concern; (2) she spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." "If [a plaintiff] establishes such a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating [the employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech."

*Id*. at 1033–34 (quoting *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018)) (alterations in original). This is also known as the *Eng v. Cooley* analysis within the Ninth Circuit. 552 F.3d 1062, 1064 (9th Cir. 2009).

12

### 2. Qualified Immunity

Even if Stannard makes out a plausible claim for relief, Defendants are "entitled to qualified immunity, even if they violated [Stannard]'s First Amendment rights, [so long as] they reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information [that they] possessed.'" *See Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (third alteration in original) (quoting *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 973 (9th Cir. 1996)). Stated differently, if the caselaw is sufficiently ambiguous as to whether Stannard's speech was protected, or whether Defendants' actions are lawful, Defendants are entitled to qualified immunity, and this cause of action must be dismissed.

As the Supreme Court explained in detail in *D.C. v. Wesby*:

> [O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."
>
> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that the rule was firmly established." . . .

583 U.S. 48, 62–64 (2018) (citations omitted) (cleaned up).

///

13

**B.  Step 1: Matter of Public Concern**

"In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern." *Roe v. City and County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997) (citing *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir. 1987)). "Whether an employee's speech addresses a matter of public concern" must be determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). All these considerations must be evaluated in concert. For instance, even though content is "the greatest single factor to be considered," *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009), but "[i]n a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995).

1.  Content

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citation and quotation marks omitted). On the other hand, "speech addressing a personal employment dispute or complaints over internal office affairs," *Adams*, 143 F.4th at 1035 (citation and quotation marks omitted), or private communications concerning a workplace misconduct investigation, *Roberts v. Springfield Util. Bd.*, 68 F.4th 470, 475 (9th Cir. 2023), may not implicate a matter of public concern. That is because "[s]peech that deals with 'individual personnel disputes and grievances' . . . [is generally] of 'no relevance to the public's evaluation of the performance of governmental agencies.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

Here, after the release of two articles from EdSource about the sexual assault allegations

against Boroujeni, (Doc. 33 at 171 n.2), the Union President, Keith Ford, "requested feedback about whether to send a letter to EdSource on behalf of the Union, himself, or at all." (Doc. 33 at 171.) Instead, Stannard "took the opportunity to write about the underlying details of the assault and provide [his] opinion about the victim's actions." (Doc. 33 at 171–72.) Stannard also "acknowledged saying that the outcome of the Boroujeni investigation was 'questionable' because respondents do not receive 'due process' and that the Title IX coordinators had an 'ideological comment' to Title IX regulations." (Doc. 33 at 171.)

Based on these facts, the Court finds that Stannard has plausibly alleged that the subject matter of his comments is related to a matter of public concern. Stannard made his comments in reference to several news articles from EdSource about allegations of sexual assault against a colleague, Boroujeni. (Doc. 33 at 171.) And commenting about the allegations contained in two news articles almost certainly implicated "a subject of legitimate news interest." *Roe*, 543 U.S. at 83–84.

### 2. Context

The context of speech may tilt in favor of a finding of public concern if Stannard was motivated by a desire to "'bring to light actual or potential wrongdoing or breach of public trust.'" *Desrochers*, 572 F.3d at 715 (quoting *Connick*, 418 U.S. at 148). The context of speech militates against a finding of public concern "[w]hen a public employee's contested speech occurs in the context of an internal power struggle or personal employment grievance[.]" *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1104 (9th Cir. 2011) (citing *Desrochers*, 572 F.3d at 715).

On the one hand, the Court notes that Stannard was advocating for another employee rather than himself. (Doc. 33 at 171.) Nothing in the TAC suggests that Stannard was defending himself from allegations of sexual misconduct, lashing out in response to his dissatisfaction with his job, or otherwise motivated by his own personal gains. *See Lisner v. City of Huntington Park*, No. EDCV 19-02009-VAP (SPx), 2020 WL 12893774, at *9–10 (C.D. Cal. Oct. 22, 2020).

On the other hand, the independent investigator purportedly found that Stannard "intended to 'mock' or 'bait'" a fellow co-worker, (*see* Doc. 33 at 173-74), which may suggest that Stannard was motived by "internal power struggle or personal employment grievance,"

15

*Clairmont*, 632 F.3d at 1104 (citing *Desrochers*, 572 F.3d at 715). Indeed, a statement may tilt against a finding of public concern if "it was made because of a grudge or other private interest or to co-workers rather than to the press." *Multnomah*, 48 F.3d at 425. That said, this Court may not simply take SCCCD's characterization of the investigation report as true, especially when the underlying report has not been made available to the Court. In any event, the Court is required to pass its own judgment on Stannard's intent.[5]

In light of these considerations, the Court declines to draw a definitive conclusion as to Stannard's intent or motivation at this time. The Court notes that at least a part of Stannard's motivation was to speak out and defend another co-worker. As such, Stannard has plausibly alleged that he was not solely expressing his "personal adverse reaction" to the subject matter but was also "advancing societal political debate." *Adams*, 143 F.4th at 1038.

3.   Form

The form of a statement reflects a matter of public concern when the speech is made in a public forum as opposed to a private conversation. *Desrochers*, 572 F.3d at 714. "[A] speaker's "narrow . . . focus and limited audience weigh against [a] claim of protected speech." *Adams*, 143 F.4th 1037 (quoting *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)).

Here, the form of speech weighs against a finding of public concern. First, that Stannard sent an email "directly and privately" to a fellow co-worker, (Doc. 33 at 173), tilts against a finding of public concern, *Adams*, 143 F.4th at 1037–38 ("[T]he fact that private communications are directed to co-workers—rather than the public or press—may cut against a conclusion that the matter is of public concern." (citations omitted)); *see also Taitai v. City of Port Hueneme*, No. 2:15-cv-04106 ODW (AJWx), 2015 WL 8334771, at *4 (C.D. Cal. Dec. 7, 2015) (explaining that a limited audience, especially "a one-on-one conversation," tends to weigh against a finding of protected speech). Second, though Stannard's comments in Union meetings were received by more people, they were nonetheless uttered within the confines of Union meetings and were not disseminated to the general public. (Doc. 33 at 170). This factor therefore tilts against a finding of

---

[5] Under *Waters v. Churchill*, this Court may, if appropriate to do so, accept an independent investigator's finding of *raw* facts, but not her interpretations of the facts or her conclusions therefrom. *See Corlett v. Tong*, No. 24-CV-78 TWR (MPP), 2024 WL 4257645, at *26 (S.D. Cal. Sept. 20, 2024).

public concern.

### 4. Overall Considerations

In sum, Stannard has plausibly alleged that the content (i.e., subject matter) of his comments touched on a matter of public concern. The context of his comments gave rise to a plausible argument he was motivated, at least in part, by a desire to defend a colleague rather than purely motivated by personal reasons. The "form" weighs against a finding of public concern because his comments were all directed to a limited audience. Considering that the content of the speech is "the greatest single factor to be considered," *Desrochers*, 572 F.3d at 710, and that Stannard was motivated, at least in part, by a desire to defend a colleague, the Court finds that Stannard has plausibly established that he spoke on a matter of public concern.

### C. Step 2: Private or Official Capacity

Next, the Court turns to the question of whether Richardson spoke as a private citizen or as a public employee. "Two inquiries are necessary to resolve this mixed question of law and fact. First, a factual determination must be made as to the 'scope and content of a plaintiff's job responsibilities.'" *Johnson*, 658 F.3d at 966 (quoting *Eng*, 552 F.3d at 1071). "Second, the 'ultimate constitutional significance' of those facts must be determined as a matter of law." *Id*. "If [the plaintiff] spoke as any ordinary citizen might, then [the] inquiry continues. But if [the plaintiff]'s speech 'owes its existence' to his position as a teacher, then [he] spoke as a public employee, not as a citizen, and [the] inquiry is at an end." *Id*. (citations omitted); *see also Eng*, 552 F.3d at 1071 ("In evaluating whether a plaintiff spoke as a private citizen, we must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities. If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected, and qualified immunity should be granted.").

While "no single formulation of factors can encompass the full set of inquiries relevant to determining the scope of a plaintiff's job duties," *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) (en banc), several factors may be considered. The Ninth Circuit, for instance, instructs courts to consider a few "guiding principles," namely, "whether or not the employee confined his communications to his chain of command," "the subject matter of the communication," and

17

whether "a public employee speaks in direct contravention to his supervisor's orders." *Id*. at 1074–75 (citation omitted)). Other considerations may include "the impetus for [the] speech, the setting of [the] speech, the speech's audience," *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540–41 (6th Cir. 2012) (internal citation and quotation marks omitted)), as well as "whether the employee was commissioned or paid to make the speech in question[,] . . . whether the employee spoke at her place of employment[,] whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance')[,] whether the employee's speech derived from special knowledge obtained during the course of her employment[,] and whether there is a so-called citizen analogue to the speech[,]" *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011) (internal citations omitted).

Defendants raise several points in support of their position that Plaintiff Stannard spoke as an employee when he made the alleged comments. First, Defendants seem to argue that Stannard spoke as an employee rather than a private citizen because the Union meetings did not take place at a public forum. (*See* Doc. 40 at 9.) Regardless of whether the Union meetings were open to the public or were open only to Union members, the meetings were not controlled by the SCCCD. Similarly, the TAC states that the email from Stannard to his colleagues was sent using the Union's email system, (Doc. 33 at ¶ 37), not Stannard's work email. The setting (Union meetings) and intended audience of the speech (Union members participating in their capacity as Union members) also weigh in favor of a finding that Stannard did not speak as an employee of SCCCD. *See Handy-Clay*, 695 F.3d at 540–41.

Second, Defendants contend that Stannard was not perceived as a private citizen at the Union meetings. (Doc. 40 at 9.) This contention, however, misunderstand the "perception" inquiry, which asks whether Stannard's "speech gave objective observers the impression that the employee represented the ***employer*** when []he spoke (lending it 'official significance')[.]" *Decotiis*, 635 F.3d at 32 (citation omitted) (emphasis added). Even assuming, arguendo, that Stannard "was not perceived as a 'private citizen' at the official Union meeting," (Doc. 40 at 9), it does not necessarily follow that Stannard was perceived as representing SCCCD, his employer. In any event, "perception" is only one of the many factors that may be considered when assessing

whether Stannard spoke as an employee. Also, the subject matter of the speech strongly cuts against a finding that Stannard spoke as an employee, for there is no evidence or allegation that Stannard's job duties involved investigating or responding to allegations of sexual assault. *See Dahlia*, 735 F.3d at 1074 (9th Cir. 2013).

Finally, the fact that SCCCD employees complained about Stannard's speech, (*see* Doc. 40 at 9), does not retroactively and substantially alter the Court's analysis here. For one, it cannot overcome an overwhelming showing that Stannard spoke in his capacity as a private citizen. For another, and intuitively, whether Stannard spoke as an employee is measured by what happened during and leading up to his speech; what happened after his speech was already delivered cannot retroactively change the Court's analysis as to, for example, the subject matter and setting of the speech. *See Adams*, 143 F.4th at 1034 ("We assess whether an employee's speech involves a matter of public concern 'at the time of publication.'" (quoting *Roe*, 543 U.S. at 84)). For these reasons, the Court finds that Stannard has plausibly alleged that he did not speak as an employee of SCCCD when made the alleged comments during the two Union meetings.

### D. Step 3: Causation

The third step of the *Eng* analysis requires the plaintiff to bear "the burden of showing the state took adverse employment action . . . [and that the] speech was a substantial or motivating factor in the adverse action. This third step is purely a question of fact." *Eng*, 552 F.3d at 1071 (internal citations and quotation marks omitted) (alterations in original). The Court finds that there is no dispute that Stannard was disciplined because of his comments. Thus, the *Eng* analysis resolves in favor of Stannard as to causation.

### E. Step 4: *Pickering* Balancing Test

Because Plaintiff "has passed the first three steps, the burden shifts to the government to show that 'under the balancing test established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the employee's First Amendment rights.' This inquiry, known as the *Pickering* balancing test, asks 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.' Its qualified restriction of ordinarily protected speech recognizes that '[a] government entity has

19

broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.'" *Eng*, 552 F.3d at 1071 (citations omitted) (alterations in original). The *Pickering* "balancing test entails a factual inquiry into [] matters [such] as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office. The 'manner, time, and place' in which the speech occurred also constitute relevant considerations." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992) (internal citations omitted). Moreover, this is "'a context-intensive, case-by-case balancing analysis,' the outcome of which is rarely clear; thus 'the law regarding [First Amendment retaliation] claims will rarely, if ever, be sufficiently "clearly established" to preclude qualified immunity.'" *Eng*, 552 F.3d at 1076 n.6 (quoting *Dible v. City of Chandler*, 515 F.3d 918, 930 (9th Cir. 2008)) (alteration in original).

Though Defendants—as high-level officials at SCCCD—bear the burden of showing that SCCCD's interests outweigh Stannard's First Amendment rights, the Court struggles to find, in Plaintiffs' briefs, any explicit discussion of step 4 of the *Eng* analysis. (*See generally* Doc. 37 at 25–28; Doc. 40 at 7–10.) Defendants have not explained what SCCCD's interests are or how they outweigh Stannard's speech-related interests.[6] Without further facts and arguments from Defendants, the Court cannot determine the scope and strength of SCCCD's interests.

For all the foregoing reasons, the Court finds that Plaintiff Stannard has plausibly alleged a prima facie case of First Amendment retaliation, and that Defendants have failed to meet their burden of showing that SCCCD's interests outweigh Stannard's interests under the *Pickering* balancing test.

### F. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a

---

[6] To be sure, Stannard may have caused disruptions to Union activities, (*see, e.g.*, Doc. 172–73 (suggesting that Stannard may have spoken on a matter beyond the context/purpose of the meeting and refused to stop talking)), but Plaintiffs argue that there was no substantial of disruption to SCCCD activities, (*see* Doc. 39 at 26–27; *see also id.* at 24 ("But the second investigation leading to the reprimand was not 'in the workplace'; it was at a union meeting using union resources off campus and outside of work hours." (citing Doc. 33 at ¶¶ 27, 37–43))).

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation and quotation marks omitted). "[C]learly established law must be 'particularized' to the facts of the case[]" and "should not be defined 'at a high level of generality.'" *Id.* at 79 (first quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); and then quoting *al–Kidd*, 563 U.S. at 742). This requires Plaintiff to "identify a case where an [official] acting under similar circumstances as [Defendants] was held to have violated" that right. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (quoting *White*, 580 U.S. at 79) (footnote omitted). A Rule 12(b)(6) "dismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies." *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001) (footnote citation omitted).

Here, however, the facts alleged in the TAC do not demonstrate that Defendants are entitled to qualified immunity.[7] Defendants seem to argue that they are entitled to qualified immunity merely because California Education Code § 59336 "makes it mandatory for the District to complete [an] investigation within 90 days of receiving a complaint[] and forward a copy or summary of the report and written notice to the *complainant*." (Doc. 37 at 32 (citation omitted) (emphasis added); *see also* Doc. 40 at 10 ("Therefore, Defendants were required by law to investigate their employees' official complaints, and, as such, are entitled to qualified

---

[7]Previously, this Court undertook extensive analysis and found—based on the SAC and documents attached to it—that Richardson spoke as a public employee at the open house event. (*See* Doc. 32 at 39–46, 47–49.) As such, Defendants' decision to place Richardson on leave and issue the Ninety Day Notice did not violate Richardson's First Amendment rights under step 1. Consequently, Richardson's failure to identify a factually similar Ninth Circuit precedent under step 2 further confirmed that Defendants are entitled to qualified immunity. (*See* Doc. 32 at 46–47, 49.) Indeed, the Court has examined every case that cited *Demers v. Austin*: Apart from the Ninth Circuit's recent opinion in *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025), the Court failed to locate another binding precedent that factually resembles Richardson's claim of academic freedom. But *Reges v. Cauce* does not inform the qualified immunity analysis in this action because it was decided nearly two years after Defendants' purported retaliatory actions—the Ninety Day Notice, for instance, was issued on February 29, 2024. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600–02 (9th Cir. 2019) (explaining that whether an official acted reasonably in light of "clearly established" law should be evaluated in accordance with the relevant case law that existed at the time of the purported constitutional violation).

21

immunity.").) Defendants are certainly correct as to what the statute says, but it does not follow that they are entitled to qualified immunity.[8]

The two issues presented by the qualified immunity analysis are whether the Defendants violated the plaintiff's First Amendment Rights and whether they did so because the law was <u>not</u> clearly established.  The defendants argue that the law *was* clearly established and that they complied with it. (Doc. 37 at 32 "[E]ven, if arguably, Stannard makes any plausible claim for relief, Defendants, here acted under the clearly established law since the letter was issued pursuant to Cal. Code Regs. Tit. 5, §59336, which makes it mandatory for the District to complete investigation within 90 days of receiving a complaint, and forward a copy or summary of the report and written notice to the complainant. (Cal. Code Regs. Tit. 5, § 59336 (a))."] In essence, they conflate the question of whether the law interpreting the First Amendment allowed them to reasonably believe that the conduct they engaged in was allowed by the United States Constitution with what the state regulation required. Even were this the correct standard for the qualified immunity analysis—and it isn't—their argument fails.

For one, a statutory duty to send a copy of the report to the *complainants* does not require SCCCD to send a copy of it to *respondent* Stannard. For another, the statute requires SCCCD to complete an investigation, but it does not dictate a particular outcome; indeed, nothing in the statute compels SCCCD to issue a warning letter. Second, without further facts and arguments from Defendants, the Court cannot speculate as to the scope and strength of SCCCD's interests—and whether they outweigh Stannard's speech-related interests. A Rule 12(b)(6) "dismissal is not appropriate" here because the Court cannot "determine, based on the complaint itself, that qualified immunity applies." *See Groten*, 251 F.3d at 851 (footnote citation omitted).

Accordingly, the Court **DENIES** Defendants' motion to dismiss with respect to the fourth

---

[8] Defendants contend that Plaintiffs have failed to oppose their argument regarding qualified immunity. (Doc. 40 at 10.) This is incorrect because Plaintiffs have clearly argued that Defendants proffered no legal citation for their argument that they are entitled to qualified immunity merely because they have a statutorily mandated duty to complete an investigation. (*See* Doc. 39 at 27.) Indeed, case law suggests the opposite: Defendants are *not* entitled to qualified immunity if it is truly the case that they merely performed an entirely non-discretionary—or ministerial—act, for "[q]ualified immunity shields only actions taken pursuant to discretionary functions." *See F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir. 1989) (citing *Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984)); *Mishler v. Nevada State Bd. of Med. Examiners*, 990 F.2d 1259 (9th Cir. 1993) (Mem.).

cause of action, but with leave to reassert the qualified immunity argument at summary judgment.

### III.    FIRST CAUSE OF ACTION

Stannard alleges under the first cause of action that SCCCD "Administrative Regulations 3430, 3433, 3434, and 3435 (collectively 'SCCCD's Harassment Policy') are unconstitutional on their face and as applied to him in that they can be – and have been – applied to constitutionally protected speech." (Doc. 33 at ¶ 168.) He "requests (a) a declaration that these Administrative Regulations have been unconstitutionally applied to him and are unconstitutional on their face and (b) an expungement of all documents pertaining to the unconstitutional application of these regulations to him, including but not limited to the August 28, 2024 Determination" Letter. (*Id.*) The Court begins by considering Stannard's as-applied challenges to those administrative regulations and then his facial challenges.

#### A.  As-Applied Challenges

##### 1.  Standing for Expungement

It is well-established that Article III "[s]tanding is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo v. Robins*, 578 U.S. 330, 339 (2016)). This requirement is further comprised of "three elements that a plaintiff must plead and—ultimately—prove." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (internal quotation marks and citation omitted). "First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted). "Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of." *Id.* (internal quotation marks and citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted). "'The part[ies] invoking federal jurisdiction bear[] the burden of establishing' the [three] elements of standing," *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), "for *each claim* that they press and for *each form of relief* that they seek (for example,

injunctive relief and damages)[,]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citations omitted) (emphases added).

As this Court previously explained, (Doc. 32 at 18), a warning letter placed in an employee's personnel file is a cognizable form of injury, *see Boswell v. Potter*, 51 F. App'x 661, 663 (9th Cir. 2002) ("Letters of warning placed in the employee's personnel file are likely to deter employees from engaging in protected activity."); *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) ("A warning letter or negative review also can be considered an adverse employment action.").

Defendants first argue that nothing in the warning letter suggests that it was placed in Stannard's personnel file. (Doc. 37 at 20.) However, at the motion-to-dismiss stage, the Court must accept as true Stannard's allegation that the reprimand was "placed in his personnel file as a matter of custom and practice." (*See* Doc. 39 at 26.) Nor have Defendants expressly disavowed any intent to use the Letter against Stannard, prospectively.

Defendants then argue that Stannard did not "clearly plead a request for expungement of the letter." (Doc. 40 at 8.) The Court struggles to understand this argument, because the TAC expressly asks for expungement. (*See, e.g.*, Doc. 33 at ¶ 186 ("This action is brought pursuant to 42 U.S.C. § 1983 for prospective relief, including expungement, injunctive relief and declaratory relief.").)

Defendants further contend that Stannard has failed to establish standing because "Stannard's claims are fundamentally retrospective in nature." (Doc. 40 at 7.) The ultimate question on standing is not about the "nature" of the claims, as Defendants seem to argue, (Doc. 40 at 7), but whether Plaintiffs have established standing "for each *form of relief*" that they seek. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citations omitted) (emphasis added). Even though Stannard is airing his grievances over events that have already occurred (e.g., his discipline), he is alleging "continuing, present adverse effects," *see O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)—that is, the existence of a disciplinary record—for which he is seeking prospective relief, (*see* Doc. 39 at 13).

///

24

## 2. AR 3433

With respect to first investigation, the TAC states that President of the Clovis Community College determined that the allegation against Stannard "was 'not sustained.'" (Doc. 33 at ¶ 23.) There is little dispute about this.

The parties disagree about whether the challenged regulations were, in fact, applied to Stannard during the second investigation and the letter of reprimand therefrom. Defendants argue that the Letter "contain[ed] no references to the[ challenged] policies, let alone any references that they were allegedly 'applied' to Plaintiff Stannard." (Doc. 37 at 27.) In response, Plaintiffs point to paragraphs 30 to 34 of the TAC and argues that the "context of the allegations[] . . . establishes that . . . the SCCCD's Harassment Policy" were applied against Stannard. (Doc. 39 at 23.)

The Court notes that, on the one hand, the TAC quotes a letter from Christine Phillips, "Director of EEO/Diversity & Professional Development," stating that the formal Title IX complaint against Stannard (pursuant to AR 3433) was dismissed. (Doc. 33 at ¶¶ 30, 33.) Yet, other parts of the TAC state, in a conclusory manner, that SCCCD had determined that Stannard "violated Administrative Regulations 3430, 3433, and 34334 by making offensive or unwelcome statements." (*See, e.g.*, Doc. 33 at ¶ 36.) Even though the Court struggles to determine whether Defendants had indeed applied AR 3433 against Stannard, this question can be answered during discovery. Consequently, the Court finds it premature to dismiss Stannard's as-applied challenge to AR 3433.[9]

For these reasons, the Court **DENIES** Defendants' motion to dismiss Stannard's as-applied challenge to AR 3433 under the first cause of action.

## 3. AR 3434

The Court further notes that Stannard received a letter on January 23, 2024, informing him

---

[9] Defendants argue that they are entitled to qualified immunity for the first cause of action. (Doc. 37 at 28 ("Defendants were required by law to investigate official complaints in the workplace, and, as such, are entitled to [] qualified immunity.").) This argument is without merit, because it is well established that "[q]ualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief" under the first cause of action. *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)); *see also Pearson v. Callahan*, 555 U.S. 223, 242 (2009) ("[Qualified immunity] is not available" in "criminal cases and § 1983 cases against a municipality, as well as § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages." (citation omitted)).

that a Title IX complaint was filed against him, (Doc. 33 at ¶ 30), which was dismissed on February 5, 2024, (Doc. 33 at ¶ 33). Stannard has not explained what happened or detailed the resulting burdens placed on him during those nine business days. Based on the TAC and exhibits attached to it, the Court struggles to see how those nine business days could give rise to a plausible argument that AR 3434 was unconstitutionally applied to him. Nor has Stannard articulated a legal theory as to why SCCCD may not complete a brief Title IX investigation when three faculty members had lodged a complaint against him. (*See* Doc. 37 at 26; *see also* Doc. 33 at 170 (stating that Ledgerwood, Romero, and Taylor had filed complaints of hostile work environment against Stannard).)[10] As the Supreme Court explained in *Waters v. Churchill*:

> [T]here will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.

511 U.S. 661, 678 (1994) (plurality).

Stannard further alleges that he was unfairly targeted for investigation while others like Ledgerwood were not investigated. (Doc. 33 at ¶ 183; *see also id.* at 173.) However, Stannard has not alleged that someone had filed a Title IX complaint against Ledgerwood. For these reasons, the Court **DISMISSES** Plaintiff Stannard' as-applied challenge to AR 3434 under the first cause of action.

### 4. AR 3435

Defendants contend that the Letter "contains no reference" to SCCCD regulations such as AR 3435. (*See* Doc. 37 at 27.) Plaintiffs, on the other hand, point to paragraphs 30 to 34 of the TAC and argues that the "context of the allegations[] . . . establishes that the relevant regulations were the SCCCD's Harassment Policy." (Doc. 39 at 23.)

---

[10] SCCCD has two procedural provisions for conducting such investigations: AR 3434 is used to conduct Title IX (AR 3433) investigations; and AR 3435 is used to conduct non-Title IX investigations. To the extent SCCCD continued to investigate Stannard "for nearly a year," (Doc. 33 at ¶ 181), after the dismissal of the Title IX complaint, Stannard may be able to argue that the *procedures* outlined in AR 3435 was unconstitutionally applied to him, (*see id.* at 88–94). The Court expresses no opinion on the constitutionality of the procedural provisions in AR 3435, facially or as applied to Stannard.

The Court notes that Stannard received a letter from Christine Phillips on February 5, 2024, which expressly states that while the formal Title IX complaint was dismissed, SCCCD nonetheless has "an obligation to continue an investigation under a different policy or mandated process, specifically under Administrative Regulation 3435 – Responding to Discrimination, Harassment, and Retaliation Complaints and Investigation Not Under Title IX." (Doc. 33 at ¶ 34.) Then the formal Letter sent to Stannard on August 28, 2024 expressly states: "A preponderance of evidence established a violation of Board Policy and Administration Regulations about discrimination and harassment." (Doc. 33 at 175.) Drawing all reasonable inferences in favor of Plaintiff Stannard, the Court finds that Stannard has plausibly alleged that the second investigation was carried out under AR 3435.

Moreover, the Court has found in Part II above that Stannard has established a prima case of First Amendment violation and that Defendants' have failed to carry their burden under step 4 of the *Eng* analysis; for substantially similar reasons, the same conclusion is warranted here. As such, the Court **DENIES** Defendants' motion to dismiss Stannard's as-applied challenge to AR 3435 under the first cause of action.

5. AR 3430

Finally, the Court notes that nothing in the TAC or the attached exhibits, including the Letter issued on August 28, 2024, clearly shows that SCCCD had applied AR 3430 against Stannard. This question can be answered during discovery. Consequently, the Court finds it premature to dismiss Stannard's as-applied challenge to AR 3430. Accordingly, the Court **DENIES** Defendants' motion to dismiss Stannard's as-applied challenge to AR 3430 under the first cause of action.

**B. Facial Challenges**

The Court begins by noting that it has previously considered and dismissed with prejudice Plaintiffs' facial challenges to AR 3430 and AR 3433. (Doc. 32 at 24–27.) The Court finds no reason to revisit those determinations. Accordingly, the Court **DISMISSES** Plaintiffs' facial challenges to AR 3430 and AR 3433 under the first cause of action with **PREJUDICE**.

In addition, this Court has already declined to dismiss Plaintiffs' facial challenge to AR

27

3435, (Doc. 32 at 27–28); and Defendants make no effort to defend AR 3435 on First Amendment grounds, (*see generally* Docs. 37, 40). As such, the Court **DENIES** Defendants' motion to dismiss to Plaintiffs' facial challenge to AR 3435 under the first cause of action.

Further, the Court has previously noted in a footnote that the SAC did not properly raise a facial challenge to AR 3434, as procedural due process is not one of the enumerated claims. (*See* Doc. 32 at 12 n.9.) Nothing in the TAC or Plaintiffs' brief in opposition to Defendants' motion to dismiss, (Docs. 33, 39), explains how the plain text of AR 3434, on its face, falls outside the bounds of reasonable investigatory discretion that is given to public employers, *see Waters*, 511 U.S. at 678. As such, the Court **DISMISSES** Plaintiffs' facial challenge to AR 3434 under the first cause of action.

**C.  Leave to Amend**

Finally, the "[C]ourt considers five factors in assessing the propriety of leave to amend—bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)). The instant action was removed to this Court on September 28, 2022, (Doc. 1), and that Plaintiffs have had more than three years and multiple opportunities to amend the complaint. (*See generally* Docs. 21 (second amended complaint), 33 (third amended complaint).) The Court has given Plaintiffs ample opportunities to amend the complaint; and all parties, including Defendants, have a right to proceed further along the litigation and have this case decided on the merits. The Court therefore declines to grant further leave to amend. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("As here, where the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." (citation and quotation marks omitted) (alteration adopted)). Accordingly, the Court **DISMISSES** Stannard's facial challenges to AR 3430, AR 3433, and AR 3434 with **PREJUDICE**. The Court further **DISMISSES** Stannard's as-applied challenge to AR 3434 with **PREJUDICE**.

///

28

## IV.   SECOND AND THIRD CAUSES OF ACTION

### A.   Second Cause of Action

Richardson alleges under the second cause of action that SCCCD regulation AR 3435 is unconstitutional, facially and as-applied to him. (*See* Doc. 33 at ¶ 188.) The Court has, in its prior order, dismissed without leave to amend Richardson's as-applied First Amendment challenges to AR 3435 but declined to dismiss Richardson's facial challenge to AR 3435. (Doc. 32 at 51–52; *see also id*. at 19 ("[Richardson] simply cannot bring an *as-applied* challenge against AR 3430, AR 3433, and AR 3435, when they *were never applied to him*." (emphases in original).) Defendants have made little effort to defend AR 3435 on First Amendment grounds. (*See generally* Docs. 37, 40.)[11]

Accordingly, the Court **GRANTS** Defendants' motion to dismiss to the extent that Richardson seeks an as-applied challenge to AR 3435 under the second cause of action but **DENIES** the motion to the extent that Richardson seeks a facial challenge to AR 3435.

### B.   Third Cause of Action

Richardson alleges under the third cause of action that Defendants "retaliated against him filing a lawsuit against SCCCD." (Doc. 33 at ¶ 207.) The parties' dispute centers around the third step of the *Eng* analysis: Richardson bears "the burden of showing the state took adverse employment action . . . [and that the] speech was a substantial or motivating factor in the adverse action." *Eng*, 552 F.3d at 1071 (citations and quotation marks omitted) (alterations in original). Specifically, Richardson must plausibly allege that Defendants' "retaliatory conduct was a but-for cause" of his injuries, *Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019) (citing *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018), "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive[,]" *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)).

---

[11] The Court has already found that Richardson has established Article III standing to pursue a facial challenge to AR 3435. Defendants, however, continue to insist that Richardson has failed to establish Article III standing, (*see* Doc. 37 at 24 (insisting that Richardson has failed to establish prospective standing because Richardson has no planned speech)), even though they recognize that Richardson has "pleaded [] identical factual background," (Doc. 40 at 10).

29

In addition to direct evidence, Richardson may prove retaliatory motive through circumstantial evidence, which often includes "(1) proximity in time between the protected [activity] and the alleged retaliation; (2) the employer's expressed opposition to the [protected activity]; and (3) other evidence that the reasons proffered by the employer for the adverse employment action were false and pretextual." *See Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (citing *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001)). Circumstantial evidence of retaliatory animus based on temporal connection must be considered in conjunction with the surrounding circumstances. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (explaining that temporal connection should be evaluated in light of the surrounding circumstance); *see also Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2004) (a thirteen-month lapse is too long to support an inference of causality when the surrounding circumstance does not show a retaliatory motive).

Richardson contends that SCCCD's second investigation into him should have been dismissed "for lack of merit" as soon as the independent external investigator found that Richardson did not bring the "chocolate bars to intentionally offend the trans and non-binary community"—and that Defendants' refusal to do so was due to their personal animus towards Richardson's lawsuit. (Doc. 33 at ¶ 210 (citation to the record and quotation marks omitted).) Considering the possible tension between the external investigator's report, (*see id*. at 150–67), and SCCCD's heavy-handed response, (*see id*. at ¶¶ 106, 214), in the light most favorable to Richardson, it is plausible that SCCCD's refusal to dismiss the Title IX portion of the investigation (under AR 3433) may be attributable to something beyond Defendants' mere disdain towards Richardson's chocolate bars, but also animosity towards Richardson's lawsuit. The Court therefore **DENIES** Defendants' motion to dismiss the third cause of action.

## V.   FIFTH CAUSE OF ACTION

"At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Ariz. Students' Ass'n*, 824 F.3d at 870. Stannard alleges under the fifth cause of action that Defendants retaliated against him for filing a lawsuit against SCCCD. (Doc.

33 at ¶¶ 229–38.) Defendants contend that Stannard has failed to "provide even a single fact in his TAC[] that Defendants retaliated against him for filing the present lawsuit." (Doc. 37 at 32.) The Court agrees for the following reasons.

First, and most importantly, Stannard alleges in the TAC that Defendants retaliated against him for his speech and for filing a lawsuit, which are two distinct claims under two distinct legal theories. While Stannard could readily establish that SCCCD's decision to issue a warning letter to him was but-for caused by Defendants' animosity towards his **speech**, he has not plausibly established that Defendants' decision to issue said letter "would not have been taken absent the retaliatory [animus]" towards his **lawsuit**. *See Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019). Notably, Stannard alleges in paragraphs 233 and 234 of the TAC that he was rejected from part-time teaching positions because Defendant selectively investigated instructors "based on the content of the[ir] speech[.]" (Doc. 33 at ¶¶ 233–34.) Then, in paragraph 235 of the TAC, Stannard states that he "is informed and believes" that Defendants retaliated against him "because of his exercise of First Amendment rights to petition for redress . . ." (*Id*. at ¶ 235.) What is missing from the TAC, however, is any "specific facts to back up" his claim that Defendants retaliated against him because of his *lawsuit*. *See K.C. v. Town of Atherton*, No. 24-CV-00507-RFL, 2024 WL 4489444, at *2 (N.D. Cal. Oct. 15, 2024).[12]

Second, the Court notes that "in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (citation and quotation marks omitted); *see also Vasquez*, 349 F.3d at 646 (holding that a thirteen-month lapse, without

---

[12] Stannard does not allege that Defendants were aware of his *lawsuit*, only that "Defendants were aware of [Stannard]'s *speech*." (Doc. 33 at ¶ 235 (emphasis added).) Even if the "[T]AC alleges that [Defendants were] aware of [Stannard's lawsuit], it lacks facts plausibly suggesting that [Defendants] 'took the alleged actions because [they] . . . had an animus against [his lawsuit].' Instead, [Stannard] alleges in a conclusory fashion that he 'is informed and believes'" that Defendants retaliated against him because of his lawsuit. *See K.C. v. Town of Atherton*, No. 24-cv-00507-RFL, 2024 WL 4489444, at *2 (N.D. Cal. Oct. 15, 2024). But "[a] conclusory allegation based on information and belief remains insufficient under *Iqbal/Twombly*[,]" *Menzel v. Scholastic, Inc.*, No. 17-cv-05499-EMC, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018), unless "the belief is based on factual information that makes the inference of culpability plausible[,]" *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 927 (9th Cir. 2013) ("A complaint will not survive a motion to dismiss if it 'tenders naked assertions devoid of further factual enhancement.'" (quoting *Iqbal*, 556 U.S. at 678)).

31

more, is too long to support an inference of causality). Here, however, the purported "retaliatory act"—i.e., the Letter—was issued nearly 24 months after Stannard filed his lawsuit in state court.

Third, unlike Richardson, Stannard has not alleged any conceivable tension between an external investigator's findings and SCCCD's conclusions, the existence of which may contribute to an inference of retaliatory animus.

For these reasons, the Court finds that Stannard has not plausibly alleged that his alleged injuries are but-for caused by Defendants' retaliatory animus towards his lawsuit. Moreover, the Court notes that it has given Plaintiffs ample opportunities to amend the complaint; and all parties, including Defendants, have a right to proceed further along the litigation and have this case decided on the merits. The Court therefore declines to grant further leave to amend. Accordingly, the Court **DISMISSES** the fifth cause of action with **PREJUDICE**.

## VI.   MOTION TO STRIKE

The Court summarily denies Defendants' motion to strike Plaintiffs' request for injunctive and declaratory reliefs, and for punitive damages, (Doc. 36), because it is well established under *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970 (9th Cir. 2010) that parties may not use Rule 12(f) to "strike any portion of plaintiff's prayer for relief." *See McGuire v. Recontrust Co.*, No. 2:11-cv-2787-KJM-CKD, 2013 WL 5883782, at *3–4 (E.D. Cal. Oct. 30, 2013).[13]

According to Rule 12(f) of the Federal Rules of Civil Procedure, a party can move to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A punitive damages claim is plainly not an insufficient "defense," nor is it "redundant" or repetitive. A request for punitive damages is not immaterial or impertinent "because whether these damages are recoverable relates directly to the plaintiff's underlying claim for relief." *Whittlestone*, 618 F.3d at 974. Further, Defendants have not asserted

---

[13] Defendants rely on *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1244–45 (C.D. Cal. 2011) for the proposition that "a motion to strike may be properly granted where a plaintiff seeks a form of relief that is not available as a matter of law." (Doc. 36 at 15.) Respectfully, *Cholakyan* is incorrect because it contradicts the Ninth Circuit's decision in *Whittlestone*. Compare *Cholakyan*, 796 F. Supp. 2d at 1244–45 ("A motion to strike is properly granted where plaintiff seeks a form of relief that is not available as a matter of law."), *with Whittlestone*, 618 F.3d at 971 ("In this case of first impression, we hold that Rule 12(f) of the Federal Rules of Civil Procedure does not authorize a district court to strike a claim for damages on the ground that such damages are precluded as a matter of law.").

that Plaintiffs' request for punitive damages is somehow "scandalous." To the extent Defendants argue that Plaintiffs have failed to properly plead their punitive damages claims, such arguments should be brought under a Rule 12(b)(6) motion.

Moreover, Defendants dedicated an inordinate amount of space in their briefs arguing that Plaintiffs have failed to establish standing for prospective relief. (*See generally* Doc. 36 at 15–21; Doc. 41 at 3–8.) Failure to establish Article III standing to pursue prospective relief has long been pursued under Rule 12(b)(1), and Defendants have cited no recent case in which a federal court within the Ninth Circuit has permitted parties to debate over Article III standing on motion to strike.  For these reasons, the Court **DENIES** Defendants' motion to strike in full.

## VII.    CONCLUSION

Based upon the foregoing, the Court **ORDERS**:

(1) Defendants' Motion to Dismiss (Doc. 37) is **GRANTED IN PART**.

    a. Plaintiff Stannard's as-applied challenge to AR 3434 under the first cause of action is **DISMISSED with PREJUDICE**.

    b. Plaintiff Stannard' facial challenges to AR 3430, AR 3433, and AR 3434 under the first cause of action are **DISMISSED with PREJUDICE**.

    c. Plaintiff Richardson' as-applied challenge to AR 3435 under the second cause of action is **DISMISSED with PREJUDICE**.

    d. Plaintiffs' fifth cause of action is **DISMISSED with PREJUDICE.**

(2) Defendants' Motion to Dismiss (Doc. 37) is **DENIED IN PART** with respect to Plaintiff Stannard's as-applied challenges to AR 3430, AR 3433, and AR 3435 under the first cause of action, and with respect to his facial challenges to AR 3435 under the first cause of action.

(3) Defendants' Motion to Dismiss (Doc. 37) is **DENIED IN PART** with respect to Plaintiff Richardson's facial challenge to AR 3435 under the second cause of action.

(4) Defendants' Motion to Dismiss (Doc. 37) is **DENIED** with respect to the third cause of action.

(5) Defendants' Motion to Dismiss (Doc. 37) is **DENIED** with respect to the fourth cause

of action, but with leave to reassert the qualified immunity argument at summary judgment.

(6) Defendants' Motion to Strike (Doc. 36) is **DENIED** in full.

IT IS SO ORDERED.

Dated:   **February 25, 2026**

UNITED STATES DISTRICT JUDGE